**JOHN BEAUDETTE, INC., John Beaudette, John Beaudette, Inc. and John Beaudette as Assignees of Suburban Construction Company, Inc., Plaintiffs,**

v.

**SENTRY INSURANCE A MUTUAL COMPANY, Defendant.**

**No. CIV.A. 96–10963–MBB.**

United States District Court, D. Massachusetts.

Nov. 2, 1999.

TIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 140); CROSS–MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFFS HAVE STANDING TO PURSUE THESE CLAIMS (DOCKET ENTRY # 110); DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION TO STRIKE PLAINTIFFS' SUMMARY JUDGMENT AFFIDAVITS (DOCKET ENTRY # 161); DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION TO STRIKE AFFIDAVIT OF DENNIS PHILLIPS (DOCKET ENTRY # 193); CROSS–MOTION FOR SUMMARY JUDGMENT ON ASSIGNED CLAIMS OF SUBURBAN CONSTRUCTION COMPANY, INC. (DOCKET ENTRY # 109)

Mark W. Roberts MC Roberts & Roberts, LLP, Boston, MA, Leonard H. Kesten, Boston, MA, for Plaintiffs.

John T. Harding, Morrison, Mahoney & Miller, Boston, MA, for Defendant.

MEMORANDUM AND ORDER RE: DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CHAPTER 93A, TORT AND OTHER CLAIMS (DOCKET ENTRY # 90); DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE 1986, 1989 AND 1990 POLICIES (DOCKET ENTRY # 88); DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON ASSIGNED CLAIMS OF SUBURBAN CONSTRUCTION COMPANY, INC. (DOCKET ENTRY # 92); PLAIN-

BOWLER, United States Magistrate Judge.

Pending before this court are the above styled motions. After conducting a hearing, this court took the motions (Docket Entry 88, 90, 92, 109, 110, 140, 161 & 193) under advisement.

*PROCEDURAL BACKGROUND*

Plaintiffs John Beaudette, Inc. ("JBI") and John Beaudette ("Beaudette") initially filed this environmental insurance coverage action in Massachusetts Superior Court on March 11, 1996. Defendant Sentry Insurance A Mutual Company ("Sentry") removed the action to the United States District Court for the District of Massachusetts. Thereafter, this court allowed plaintiffs leave to amend the complaint to allege various causes of action by them in their capacity as assignees of Suburban Construction Company, Inc. ("Suburban").[1]

---

1. Where appropriate, this court refers to Beaudette and JBI in their capacity as assignees as "the Suburban Assignees" and to Beaudette, JBI and the Suburban Assignees collectively as "plaintiffs."

The amended complaint sets forth counts: (1) for declaratory judgment by Beaudette, JBI and the Suburban Assignees (Count I); (2) to reach and apply by Beaudette and JBI (Count II); (3) for violation of section 112 of Massachusetts General Laws chapter 175 ("section 112") by Beaudette and JBI (Count III); (4) for violation of section 113 of Massachusetts General Laws chapter 175 ("section 113") by Beaudette and JBI (Count IV); (5) for estoppel by Beaudette and JBI (Count V); (6) for breach of contract by the Suburban Assignees (Count VI); (7) for negligence and misrepresentation by Beaudette, JBI and the Suburban Assignees (Count VII); (8) for violation of Massachusetts General Laws chapters 93A ("chapter 93A") and 176D ("chapter 176D") by Beaudette and JBI (Count VIII); and (9) for violation of chapters 93A and 176D by the Suburban Assignees (Count IX). (Docket Entry # 51).

Sentry moves for summary judgment on the claims raised by the Suburban Assignees due to the expiration of the relevant statute of limitations. (Docket Entry # 92). Sentry additionally moves for summary judgment on plaintiffs' claims for coverage under the insurance policies issued by Sentry during the years 1986, 1989 and 1990, thereby leaving at issue the policies for the years 1987 and 1988. (Docket Entry # 88). Sentry asserts that the 1986 insurance policy predates the date of the loss and that the loss was known at the time of the issuance of the 1989 and 1990 insurance policies. (Docket Entry 89 & 165). Finally, Sentry moves for summary judgment on counts I through V, VII and VIII (Docket Entry # 90) insofar as these claims are brought by Beaudette and JBI because: (1) Beaudette is not a "judgment debtor" within the meaning of section 3(9) of Massachusetts General laws chapter 214 ("chapter 214"); (2) Beaudette and JBI lack a private right of action under sections 112 and 113; (3) Beaudette and JBI cannot assert a chapter 93A claim due to the absence of a business or contractual relationship; (4) Beaudette and Sentry cannot assert a chapter 93A claim based on a violation of section 176D because their chapter 93A claim arises under section 11; (5) the chapter 93A, negligence, misrepresentation and estoppel claims are time barred; (6) Beaudette's and JBI's misrepresentation claim is deficient due to the absence of any commercial, transactional or fiduciary relationship which might give rise to a duty on the part of Sentry, the absence of any reasonable reliance and the absence of any evidence that Sentry intended to induce JBI to act on the alleged misrepresentation concerning coverage; (7) Beaudette's and JBI's estoppel claim fails due to the lack of reasonable reliance and the lack of a legal or transactional relationship with Sentry; and (8) Beaudette's and JBI's negligence claim fails because of the absence of any duty of care between Sentry vis-a-vis Beaudette and JBI. (Docket Entry 91 & 164).

Plaintiffs also move for summary judgment. (Docket Entry # 140). Without referring to any particular count, plaintiffs seek to establish that Suburban was entitled to defense and indemnity coverage under the insurance policies issued in the years 1987, 1988, 1989 and/or 1990 and that the environmental damage to the gasoline station owned by JBI was caused by an "occurrence" which is covered by the policies and not subject to an absolute pollution exclusion which was not contained in the original policies for the years 1987 and 1988.[2] Plaintiffs seek a declaration that the 1987 policy contained a "sudden and accidental" pollution exclusion as opposed to the absolute pollution exclusion and that the 1988 policy contained a "completed operations" pollution exclusion as opposed to the absolute pollution exclusion. They additionally seek a declaration that Sentry is obligated to pay JBI the amount of a default judgment entered against Sub-

**2.** Plaintiffs additionally argue that the absolute pollution exclusion is contrary to the mandate set forth in section 112.

urban as well as consequential damages and that Sentry wrongfully denied coverage in violation of chapter 93A. Plaintiffs also move for summary judgment on the negligence and misrepresentation count. (Docket Entry 140 & 180).

## FACTUAL BACKGROUND [3]

JBI owns a gasoline station ("the station") in Rockport, Massachusetts. Beaudette is the sole shareholder, officer and director of JBI. In 1987 Suburban was hired to install a new gasoline dispensing system at the station. (Docket Entry 140 & 168, ¶¶ 18 & 19). Suburban began installing the new system at the station on November 18, 1987. It completed all of the work no later than December 10, 1987. (Docket Entry # 146).

The work consisted of installing three new gasoline pumps and suction lines between the pumps and the underground

storage tanks. Suburban tested the system for tightness after completing the work. Initially the pumps dispensed an incorrect grade of gasoline thereby necessitating disconnecting and reconnecting the piping between the pumps and the storage tanks. Suburban performed this work but did not conduct a test for tightness after finishing these repairs. (Docket Entry # 146).

On January 26, 1988, gasoline vapors were detected in the Rockport sewer system. In March 1988 the gasoline was traced back to the station. (Docket Entry 142 & 146).

On March 16 and 17, 1988, Down to Earth Drilling tested the four underground storage tanks. The testing determined that two of the tanks showed evidence of a leak. On March 21, 1988, Down to Earth Drilling excavated the surface of the two tanks and detected a leak in the unions connecting certain pipes. (Docket Entry # 147, Ex. 8 & 9).[4] Suburban was

**3.** Additional facts are set forth when discussing the particular motion *infra*. Disputes, where material, are noted. In the context of resolving each summary judgment motion *infra* in the discussion sections or elsewhere, this court views the facts in favor of the nonmoving party and resolves factual disputes in favor of the nonmoving party.

**4.** Sentry moves to strike the affidavit of Mark W. Roberts, Esq. ("Attorney Roberts"). (Docket Entry # 161). With the exception of a portion of paragraph one of the affidavit, this court did not rely on the paragraphs set forth in the affidavit. In addition, any consideration of the remaining paragraphs would not resolve plaintiffs' summary judgment motion in plaintiffs' favor. This court did, however, consider the attached deposition excerpts and documents. Sentry does not object to such consideration. (Docket Entry # 161, n. 4).

Paragraph one concerns the authentication of the so-called original 1987 through 1990 insurance policies. The parties vehemently contest this issue as well as which policies govern this dispute. Attorney Roberts avers that he received the original policies on September 26, 1997, from Kevin Sullivan, Esq. Attorney Roberts further attests that he reviewed the policies at that time with Kevin Sullivan, Esq. and confirmed that the policies did not include an absolute pollution exclusion.

In its motion to strike (Docket Entry # 161) as well as its opposition to plaintiffs' summary judgment motion (Docket Entry # 172), Sentry objects to consideration of the documents attached as exhibit one to Attorney Roberts' affidavit, i.e, the so-called original policies, due to the lack of authentication. Sentry submits that Attorney Roberts lacks personal knowledge of the terms of the policies and has no factual basis to aver that the documents are true and accurate copies of the original policies.

Rule 56(e)("Rule 56(e)"), Fed.R.Civ.P., mandates that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). A party cannot expect this court to give weight to averments made without personal knowledge "or those which are in a form patently inadmissible at trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990); *see also Murphy v. Ford Motor Company*, 170 F.R.D. 82, 84 (D.Mass.1997) ("affidavits based on 'information and belief' do not satisfy" Rule 56(e)). Conclusory statements also fall short of satisfying the requirements of Rule 56(e). *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir.1991); *see generally Apex Construction Company, Inc. v. United States*, 719 F.Supp. 1144, 1151 (D.Mass.1989) (affidavits fail to satisfy Rule 56(e) "when they are not made on personal knowledge, contain impermissible speculation or conclusory lan-

guage [and] do not show affirmatively that the witness is competent to testify to the matters stated").

To the extent Attorney Roberts characterizes deposition testimony of witnesses or the contents of attached documents in certain paragraphs, such averments are improper and stricken. Paragraph eight is also stricken. The documents or lack thereof speak for themselves.

Rule 901(a) ("Rule 901"), Fed.R.Evid., sets forth the requirement of authenticating a document prior to its admission into evidence. The test of authentication, as set forth in the rule, "is straightforward" and " 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *United States v. Holmquist*, 36 F.3d 154, 166 (1st Cir.1994) (quoting Rule 901), *cert. denied*, 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 724 (1995). Under this standard, "the proponent need not rule out all possibilities inconsistent with authenticity." *United States v. Alicea–Cardoza*, 132 F.3d 1, 4 (1st Cir.1997).

The trial judge makes a preliminary determination of authenticity. *See* Fed.R.Evid. 901, Advisory Notes ("requirement of showing authenticity . . . is governed by the procedure set forth in Rule 104(b)"); Fed.R.Evid. 104; *United States v. Sliker*, 751 F.2d 477, 499 (2d Cir.1984) ("trial judge may make a preliminary determination as to the prior fact and admit the evidence to the jury's final determination that the prior fact exists"), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). The standard for a preliminary showing of authenticity under Rule 901 is the presence of sufficient evidence for a reasonable person to determine "that the evidence is what it purports to be." *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994); *accord United States v. Alicea–Cardoza*, 132 F.3d at 5 (standard "is one of reasonable likelihood"); *see* 5 Jack B. Weinstein *Weinstein's Federal Evidence* § 901.02[2] (1999) (Rule 901 satisfied if proponent makes sufficient showing to allow "reasonable person to believe the evidence is what it purports to be"). Once the trial judge determines there is sufficient evidence "to allow a reasonable person to believe the evidence is what it purports to be," he may admit the evidence subject to the factfinder assessing "what weight it will give the evidence." *United States v. Alicea–Cardoza*, 132 F.3d at 4; *see* Rule 104(e), F.R.E.; *see generally* Joseph W. Cotchett *Federal Courtroom Evidence* § 901.1 (1998). In other words, the trial judge "serves a gatekeeping function" with respect to matters of authentication. *United States v. Paulino*, 13 F.3d at 23. As described by one commentator, although the court's preliminary finding "permits admission of the evidence, the jury is entitled to disregard the evidence if they are not satisfied that the evidence is genuine." 5 Jack B. Weinstein *Weinstein's Federal Evidence* § 901.02[4] (1999).

In determining whether there is sufficient threshold proof that the document is what the proponent claims it to be, the trial judge may base his findings on circumstantial evidence. *United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir.) ("finding may be based entirely on circumstantial evidence"), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *see United States v. Echeverri*, 982 F.2d 675, 679–680 (1st Cir.1993). It is appropriate to consider where the document is located. *See, e.g., United States v. Paulino*, 13 F.3d at 24 (characterizing document's "physical setting" as "telling"); *United States v. Echeverri*, 982 F.2d at 679–680. In addition, the contents of the document may provide sufficient indicia of authenticity. *United States v. Paulino*, 13 F.3d at 24; *see* Rule 901(b)(4), F.R.E.

In the case at bar, plaintiffs, as the proponents, claim that the so-called original policies are, in fact, the complete and actual policies or copies thereof. Attorney Roberts' averment that he received the policies from Kevin Sullivan, Esq. and reviewed them is based on personal knowledge and not stricken from the record.

The 1987 through 1989 policies attached as exhibit one to Attorney Roberts' affidavit are properly authenticated through the aforementioned testimony of Attorney Roberts as well as the deposition testimony of Attorney Robert P. Sullivan ("Attorney Sullivan"), Suburban's counsel in the state court declaratory judgment action against Beaudette and certain other defendants, the deposition and affidavit testimony of Dennis Phillips ("Phillips"), President of Suburban during the relevant time period, and the documents' location and their contents. By deposition, Phillips testified that he saw the policies first in the late 1980s when they were kept in notebooks in the office of Suburban's accountant, Roger Mann ("Mann"). Phillips also testified at his deposition that either he or Mann delivered the policies to Attorney Sullivan in 1988 or 1989. Although Phillips does not remember reading the policies, he has personal knowledge that he saw the policies and that they were given to Attorney Sullivan who kept them in his office. Attorney Sullivan testified that he had either the original or copies of the policies in his office and that he received the policies from Phillips. (Docket Entry # 170, Ex. L & O). When presented with the policies attached as exhibit one to Attorney Roberts' affidavit, however, Attorney Sullivan did not know whether they were the same policies that he had kept in his office. Nevertheless, Attorney Roberts avers that he received the policies from Kevin Sullivan, Esq. in September 1987, although he fails to attest that Kevin Sullivan, Esq.'s office is the same as Attorney

Sullivan's office, reviewed them at that time and that the policies were in the same condition as now provided to this court in exhibit one. Phillips also testified at his deposition that he saw the policies at a meeting with Attorney Roberts as well as on the morning of his February 17, 1998 deposition. In light of the foregoing and the documents' location, reasonably inferred as located in the office of Suburban's former attorney, and their contents, circumstantial evidence supports a preliminary determination that the so-called original policies may constitute the complete and actual policies.

On the other hand, contrary evidence also demonstrates that the terms of the actual policies are disputed and that the so-called original policies may not be what the proponents claim, i.e., complete original policies or copies of the complete original policies. The policies were not uncovered until September 1997. Attorney Sullivan believed he would have reviewed the policies to determine if they contained a special pollution exclusion endorsement and he did not challenge Sentry's March 1989 position that the policies contained such an exclusion. He did not "really recognize" the so-called original policies at his deposition. Sentry produced copies of signed special pollution exclusion endorsements dated March 10, 1988, and Phillips acknowledges the signatures as his. (Docket Entry # 170, Ex. L & O). Documentary evidence and testimony from Sentry officials described *infra* with respect to the contents of the recreated policies more than sufficiently questions the completeness and accuracy of plaintiffs' representation that the so-called original policies are what they purport to be, i.e., complete and accurate original policies or copies of the original policies. Sentry submits credible evidence that Sentry's secondary evidence, i.e., the recreated policies, which contain special pollution exclusion endorsements as well as other pollution provisions, more accurately and correctly reflect the terms of the complete, actual policies.

For purposes of plaintiffs' summary judgment motion, therefore, such evidence sufficiently creates a genuine issue of material fact as to whether the so-called original or the recreated policies reflect the complete and accurate contents of the actual policies. Because plaintiffs need not eliminate "all possibilities inconsistent with authenticity," *United States v. Holmquist,* 36 F.3d at 168, and possible defects in the chain of custody concern the weight of the disputed documents as opposed to their admissibility, *United States v. Scharon,* 187 F.3d 17, 22 (1st Cir.1999), however, the aforementioned evidence offered by plaintiffs is sufficient for a reasonable factfinder to "'find in favor of authentication.'" *United States v. Holmquist,* 36 F.3d at 168

(quoting 5 J. Weinstein & M. Berger *Weinstein's Evidence* ¶ 901(a)[01] (1994)). As additionally explained in part V *infra,* it is therefore for the factfinder to assess the weight of the evidence that the so-called original policies are, in fact, the complete, actual policies in light of the aforementioned evidence submitted by Sentry.

As a collateral matter, this court's reliance on Attorney Robert's averment presents a potential issue of disqualification of counsel, as noted by Sentry. Sentry did not adequately brief the issue and, contrary to its assertion, Attorney Roberts' averment does not "obviously" mandate his disqualification. In the event Sentry wishes to press this matter, it should file a motion with a supporting memorandum. Moreover, in the event plaintiffs wish to present Attorney Roberts' testimony at trial to support their position that the so-called original policies are the actual policies, they should be prepared to address the issue of disqualification.

Finally, even considering the affidavits of William E. Bailey, Esq. and Arthur P. Doyle in support of plaintiffs' summary judgment motion, such consideration would not change this court's opinion as to the merits of the motion. Accordingly, the motion to strike with respect to these affidavits (Docket Entry # 161) is moot.

Sentry's motion to strike (Docket Entry # 193) Phillips' affidavit as contrary to his deposition testimony is without merit. It is only "[w]hen an interested witness has given clear answers to unambiguous questions" that "he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory," absent "a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994). Numerous courts of appeal which consider "the situation in which a party contradicts, without satisfactory explanation, his or her prior testimony" conclude that the court is "free to disregard the conflicting affidavit." *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3rd Cir.1988) (collecting circuit court decisions).

Phillips' affidavit testimony, however, is not inconsistent or contradictory to his earlier deposition testimony. Contrary to Sentry's position, Phillips did not testify at his deposition that he had no memory of ever seeing the policies. Although he testified that he did not read the policies, he also testified that he saw the policies on three occasions. By affidavit, Phillips states that the policies were maintained in the ordinary course of Suburban's business and were transferred to Attorney Sullivan in the same condition. He additionally avers that the policies are the same as those labeled exhibits six through nine at At-

notified of the release of gasoline stemming from its work at the station. (Docket Entry # 146). On or about April 5, 1988, Suburban notified Sentry of the problem. (Docket Entry # 95).

Sentry issued two types of insurance policies to Suburban, a comprehensive liability policy, designated by the number 88–87723–02, and an umbrella liability policy, designated by the number 88–76723–03. Sentry initially issued the comprehensive liability policy in January 1986 ("the 1986 CLP policy"), with annual renewals thereafter in January 1987 ("the 1987 CLP policy"), January 1988 ("the 1988 CLP policy"), January 1989 ("the 1989 CLP policy"), January 1990 ("the 1990 CLP policy") and January 1991. Likewise, Suburban first issued the umbrella liability policy in January 1986 ("the 1986 umbrella policy"), with annual renewals thereafter in January 1987 ("the 1987 umbrella policy"), January 1988 ("the 1988 umbrella policy"), January 1989 ("the 1989 umbrella policy"), January 1990 ("the 1990 umbrella policy") and January 1991. (Docket Entry 51 & 54, ¶¶ 11).

In or around March 1989 Sentry reconstructed the 1987 and 1988 CLP and umbrella policies. (Docket Entry # 147, Ex. 2). Sentry undertook prior efforts to locate true and correct copies of these policies due to its involvement in another insurance coverage dispute with Suburban resulting from contaminated property in New Hampshire. That dispute gave rise to litigation in the United States District Court for the District of New Hampshire, *Suburban Construction Company, Inc. v. Hartford Fire Insurance Company and Sentry Insurance A Mutual Company,*

No. 90–379–D ("the New Hampshire action"). (Docket Entry # 95, Ex. I). Based upon a search Sentry conducted in connection with the present dispute, Sentry determined that it did not have a complete paper copy of each of the insurance policies issued to Suburban.[5] Lacking a complete photocopy of the original of the policies and/or the subsequent renewals, Sentry reconstructed the policies and certified that the reconstructed policies were true and exact reproductions of the original policies.[6] (Docket Entry # 147, Ex. 2; Docket Entry # 95, Ex. I).

Prior to 1989 Sentry's underwriting department kept paper copies in its office files for each insurance policy. These files consisted of a declarations page, which includes a list of endorsements, and an internal ratings worksheet for the particular policy. (Docket Entry # 95, Ex. I).

In reconstructing the 1987 and 1988 CLP and umbrella policies, Sentry's underwriting personnel used the declarations page and the internal ratings worksheet as well as other documents. Based on the underwriting documents, Edward L. Severson ("Severson"), Corporate Underwriting Superintendent at Sentry since 1979, and Curtis Wachsmuth ("Wachsmuth"), Underwriting Supervisor at Sentry from 1987 to 1997, uniformly aver that the special pollution exclusion endorsement, which excludes coverage for property damage arising out of the discharge or release of pollutants and oftentimes has a place for the signature of the insured, was part of the recreated 1987 and 1988 CLP and the 1987 and 1988 umbrella policies from the date of their inception. (Docket Entry 173 & 174). These averments are consistent

---

torney Sullivan's deposition. Accordingly, these portions of Phillips' affidavit are not stricken. Nor is the affidavit contrary to Rule 56(e). Together with the aforementioned testimony, there is sufficient evidence in the record to authenticate the policies attached as exhibit one to Attorney Roberts' affidavit as one of the versions of the disputed policies.

5. Sentry's internal diary for Suburban's claim indicates that Harvard L. Gross ("Gross"), a senior claims adjuster at Sentry, telephoned

JBI's attorney on February 15, 1989, and advised him that Sentry would not cover the claim. JBI's attorney then requested a copy of the policy. Shortly thereafter, Gross requested a certified copy of the CLP and umbrella policies due to the absence of a hard copy on the shelf. (Docket Entry # 147, Ex. 22).

6. These policies are referred to as the "recreated" CLP or umbrella policies with reference to the particular year of the recreated policy.

with Sentry's policy at the time to completely exclude coverage for pollution in accounts involving businesses with underground storage tanks such as Suburban. (Docket Entry # 173).

In addition, Wachsmuth confirmed at his deposition that the special pollution exclusion endorsement, without a place for the insured's signature and produced on December 4, 1986, was part of the 1987 CLP renewal of Suburban's policy. (Docket Entry # 171, Ex. G; Docket Entry # 174, Ex. A). He also testified that the special pollution exclusion endorsement was part of the 1988 CLP policy from the date of its inception. (Docket Entry # 171, Ex. G).

One form of the special pollution exclusion endorsement contains a place for the policyholder's acknowledgment with a line for the signature of the company official, a line for the name of the company and another line for the date. Sentry's records contain Phillips' signature on the exclusion for the recreated 1988 CLP and the recreated 1988 umbrella policies dated March 10, 1988.[7] (Docket Entry # 173, Ex. C & D). The signed exclusion for the recreated 1988 umbrella policy also contains a date stamp as received by Sentry on April 8, 1988. (Docket Entry # 173, Ex. D). The handwriting for the name of the company and the March 10, 1988 date, however, differs from the handwriting of Phillips' signature. At his deposition, Phillips rec-

ognized his signature but did not recognize the handwriting on the lines naming the company, "Suburban Consrt Co Inc.," and the date, "3–10–88." (Docket Entry # 170, Ex. L).

Phillips avers that he initially refused to accept the pollution exclusions urged by Sentry. He attests that he did not sign absolute pollution exclusions until after receiving a letter from Sentry dated March 8, 1990. (Docket Entry # 145). Moreover, neither Mann nor Phillips remember signing such an exclusion in 1988. Furthermore, it was Mann's policy to always type the name of the company whenever Phillips signed a legal document on behalf of Suburban.[8] (Docket Entry 144 & 145).

In 1987 and 1988 Sentry also employed another pollution exclusion which was less draconian than the special pollution exclusion endorsement signed by Phillips. Designated IL 09 28 for CLP policies and corresponding to exclusion UB–106 for umbrella policies, these completed operations exclusions bar coverage for property damage arising from the discharge of pollutants except for damages arising from completed operations, according to a procedure bulletin.[9] Use of these exclusions was optional at the time. The inclusion of IL 09 28 or UB–106, however, did not merit a reduction in premium, according to the bulletin. Another procedure bulletin clarifies that the completed operations pol-

---

7. There is no indication of a signed acknowledgment for the recreated 1987 CLP and umbrella policies.

8. Accordingly, it is a genuine issue of material fact as to when Phillips' signed the special pollution exclusion endorsements in the recreated 1988 CLP and umbrella policies.

9. As set forth in the recreated 1988 umbrella policy, the completed operations pollution exclusion (UB–106), replaces exclusion k, i.e., the sudden and accidental pollution exclusion, with the language that this insurance shall not apply:

(1) to personal injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants: ... (b) at or from any site or location used by or for the named insured

or others for the handling, storage, disposal, processing or treatment of waste; (c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured may be legally responsible; or (d) at or from any site or location on which the named insured or any contractor or subcontractors working for the named insured are performing operations: (i) if the pollutants are brought on or to the site or location in connection with such operations; or (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(Docket Entry # 147, Ex. 2). The completed operations pollution exclusion (IL 09 28) in the recreated 1988 CLP policy contains similar language. (Docket Entry # 147, Ex. 2).

lution exclusion was not acceptable for businesses with underground tank and piping service, i.e., Suburban. (Docket Entry # 173, Ex. E & F).

All of the recreated CLP policies as well as the so-called original CLP policies provide indemnity coverage for sums which the insured becomes "legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence." The CLP policies additionally include a duty to defend obligation which reads as follows: "We shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage." (Docket Entry # 95, Ex. I; Docket Entry # 147, Ex. 1 & 2). The CLP policies also contain a no action clause which provides that, "[N]o legal action may be brought against us until we agree in writing that the insured has an obligation to pay or until the amount of that obligation has been finally determined by judgment after trial." (Docket Entry # 95, Ex. I; Docket Entry # 147, Ex. 1 & 2). The so-called original 1987 through 1989 CLP policies also included an integration clause.[10]

Sentry's practice was to list all of the forms and endorsements applicable to the policy on the declarations page. (Docket Entry # 147, Ex. 4). The so-called original 1987 CLP policy contains a sudden and accidental pollution exclusion for "property damage arising out of the . . . release . . . of . . . pollutants into or upon land." The exclusion expressly "does not apply if such discharge, dispersal, release or escape is sudden and accidental." The declarations page of the so-called original 1987 CLP policy does not reference the special pollution exclusion endorsement. (Docket Entry # 147, Ex. 1). The declarations page for the recreated 1987 CLP policy does not list either the special pollution exclusion endorsement or the completed operations pollution exclusion. (Docket Entry # 147, Ex. 2; Docket Entry # 171, Ex. G; Dock-

et Entry # 174, Ex. A; Docket Entry # 169, Ex. Q). The body of the recreated 1987 CLP policy, however, contains the sudden and accidental pollution exclusion and an unsigned special pollution exclusion endorsement processed on February 26, 1987, and effective on January 1, 1987, replacing the former exclusion. (Docket Entry # 147, Ex. 2; Docket Entry # 174, Ex. A). Initially, the recreated 1987 CLP policy contained a special pollution exclusion endorsement without a signature line. (Docket Entry # 169, Ex. Q; Docket Entry # 174, Ex. A; Docket Entry # 171, Ex. G). The ratings worksheet for the recreated 1987 CLP policy includes the special pollution exclusion endorsement under the list of forms and endorsements applicable to the policy. (Docket Entry # 95, Ex. I(3)). Likewise, the on-line declarations page print-out from Sentry's computer dated February 15, 1989, references the special pollution exclusion endorsement. (Docket Entry # 147, Ex. 21).

The body of the so-called original 1988 CLP policy includes the completed operations pollution exclusion (IL 09 28) modifying the sudden and accidental pollution exclusion. The declarations page for the so-called original 1988 CLP policies also lists the completed operations pollution exclusion (IL 09 28). (Docket Entry # 147, Ex. 1). The body of the recreated 1988 CLP policy contains an unsigned special pollution exclusion endorsement with a place for the insured's signature. It also contains the completed operations pollution exclusion (IL 09 28). The declarations page for the recreated 1988 CLP policy, however, references the completed operations pollution exclusion (IL 09 28) and fails to include the special pollution exclusion endorsement. (Docket Entry # 147, Ex. 2). On the other hand, internal Sentry worksheets for the 1988 CLP policy list both the special pollution exclusion endorsement and the completed operations pollution exclusion (IL 09 28) under the list

---

10. This clause provides that, "This policy contains all the agreements between you and us." (Docket Entry # 147, Ex. 1). The so-called original 1987 and 1988 umbrella policies only contain the following language prohibiting changes to the policies "except by endorsement issued to form part of this policy." (Docket Entry # 147, Ex. 1).

of forms and endorsements for the policy. (Docket Entry # 174, Ex. C; Docket Entry # 147, Ex. 15). Another internal Sentry worksheet for the 1988 CLP policy lists only the special pollution exclusion endorsement under the list of forms and endorsements for the policy. (Docket Entry # 147, Ex. 6). To the extent that policy documents indicate the inclusion of IL 09 28 in "the 1988 policies," Wachsmuth attests that the documents were issued by mistake. (Docket Entry # 174). Similarly, various Sentry officials testified that the failure to list the special pollution exclusion endorsement on the declarations pages for the 1987 and 1988 CLP policies was a mistake or clerical error. (Docket Entry # 147, Ex. 4).

Under the recreated as well as the so-called original umbrella policies Sentry agreed "[t]o indemnify the insured for . . . all sums which the insured shall be obligated to pay by reason of legal liability for damages imposed upon the insured by law . . . if the legal liability for damages results from . . . property damage . . . to which this insurance applies, caused by an occurrence." (Docket Entry # 147, Ex. 1 & 2). The umbrella policies also contain a no action clause which reads that: "No action shall lie against us . . . until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured, or by written agreement of the insured, claimant and us." (Docket Entry # 147, Ex. 1 & 2).

The so-called original 1987 umbrella policy lists the special pollution exclusion endorsement on the declarations page and also contains the exclusion in the body of the policy. The special pollution exclusion endorsement in the so-called original 1987

CLP policy did not contain a signature line for the insured's name. (Docket Entry # 147, Ex. 1). The recreated 1987 umbrella policy lists the special pollution exclusion endorsement on the declarations page and contains an unsigned copy of the exclusion in the body of the policy. (Docket Entry # 147, Ex. 2; Docket Entry # 95, Ex. I(2); Docket Entry # 174, Ex. B). Other evidence in the record shows that the body of the recreated 1987 umbrella policy contains a special pollution exclusion endorsement without a signature line as well as the aforementioned one with a signature line. (Docket Entry # 174, Ex. B).

The so-called original 1988 umbrella policy lists the special pollution exclusion endorsement and the completed operations pollution exclusion (UB–106) on the declarations page but contains only the special pollution exclusion endorsement in the body of the policy, unsigned with a place for the insured's signature. (Docket Entry # 147, Ex. 1). As previously noted, Wachsmuth attests that the reflection of a pollution exclusion other than the special pollution exclusion endorsement in "the 1988 policies" was a mistake. (Docket Entry # 174). The recreated 1988 umbrella policy lists the special pollution exclusion endorsement and the completed operations pollution exclusion (UB–106) on the declarations page and contains both exclusions in the body of the policy. (Docket Entry # 147, Ex. 2; Docket Entry # 174, Ex. D). The record contains copies of a special pollution exclusion endorsement signed by Phillips on March 10, 1988, as well as copies of an unsigned special pollution exclusion endorsement in the recreated 1988 umbrella policy.[11] (Docket Entry # 147,

---

**11.** One copy of the signed special pollution exclusion endorsement in the recreated 1988 umbrella policy contains the handwritten notation that the exclusion was similar to "one used in '87" which lacked a signature. (Docket Entry # 147, Ex. 27). In addition, an internal Sentry memorandum notes that the pollution exclusion for the January 1988 to January 1989 term was signed after the date of the loss. (Docket Entry # 147, Ex. 29).

Similarly, an April 6, 1989 internal Sentry office memo refers to a copy of the signed special pollution exclusion endorsement for the January 1, 1988 to 1989 policy term without identifying the type of policy. The Sentry official notes that the endorsement was not signed until after the date of the loss but that Phillips acknowledges that it applies to the aforementioned policy term. (Docket Entry # 147, Ex. 25). Plaintiffs contend that Sentry was therefore aware that the exclusion upon

Ex. 2 & 27; Docket Entry # 174, Ex. D; Docket Entry # 173, Ex. D). An internal Sentry worksheet likewise lists the special pollution exclusion endorsement and the completed operations pollution exclusion (UB–106) as included in the 1988 umbrella policy. (Docket Entry # 147, Ex. 6).

On April 22, 1988, Gulf of Maine Research Center, Inc., an environmental consulting services firm, sent Beaudette a copy of its report ("the GMRC report") detailing the findings concerning the leaks at the station. Referring to the March 1988 testing by Down to Earth Drilling, the GMRC report noted a leak in the vent line of one of the tanks and a release of gasoline when transferring gasoline into this tank. (Docket Entry # 147, Ex. 9).

Sentry initially assigned Gross to analyze Suburban's claim. On April 11, 1988, he issued the first liability report determining that coverage existed for the accident.[12] (Docket Entry # 147, Ex. 18; Docket Entry # 171, Ex. D). An April 12, 1988 management review evaluation conducted by Gross' immediate supervisor agreed with Gross' initial determination. (Docket Entry # 147, Ex. 18; Docket Entry # 171, Ex. D). By letter dated May 10, 1988, Gross received a copy of the GMRC report. (Docket Entry # 147, Ex. 9).[13]

Gross reiterated his belief that coverage existed at least with respect to the 1988 CLP policy in a second report issued on June 3, 1988. Therein, he notes that Suburban did 100% of the work replacing the piping at the station and that the gasoline leaked out of the piping and into the ground resulting in pollution of the soil and adjacent groundwater. (Docket Entry # 147, Ex. 8; Docket Entry # 171, Ex. D).

On June 3, 1988, Gross wrote a letter to JBI's attorney referencing the claim number. Unequivocally, Gross states that it is Sentry's "position that there would be coverage for both on-site and off-site damage and cleanup costs" for the accident. (Docket Entry # 147, Ex. 20).

In early 1989 Gross reviewed a letter "from Beaudette's attorney" advising Sentry that the claim was of greater magnitude than originally anticipated. (Docket Entry # 171, Ex. D). Gross therefore decided to reexamine the CLP policy by requesting a computer generated printout of the declarations for the 1987 and 1988 policies. (Docket Entry # 171, Ex. D). Concluding that there was no coverage for the accident, he wrote a letter to Phillips denying coverage. (Docket Entry # 171, Ex. D).

As set forth in the March 17, 1989 letter, Gross advised Phillips that Sentry declines "any coverage" for the claim filed by Beaudette concerning the gasoline contamination at the station. (Docket Entry # 95, Ex. B; Docket Entry # 147, Ex. 24). The letter quotes, at length, the special pollution exclusion endorsement of "your policy"[14] and denies coverage on the basis of the exclusion. (Docket Entry # 95, Ex. B; Docket Entry # 147, Ex. 24). As indicated *supra*, this exclusion bars coverage for property damage arising out of the actual or threatened release of pollutants. (Docket Entry # 95, Ex. B; Docket Entry # 173, Ex. A–D).

Gross also wrote a similar letter to JBI's attorney on March 17, 1989. Therein, Gross stated that Sentry declines "any coverage" on behalf of Suburban for the accident based on the quoted language of the special pollution exclusion endorse-

---

which it based its coverage denial was executed after the date of the loss.

**12.** Gross testified that the assigned accident date of February 2, 1988, therein was "[t]otally arbitrary." (Docket Entry # 171, Ex. D).

**13.** A number of the references to exhibits in Attorney Roberts' affidavit differ from the ac-

tual exhibits contained in the attachments. This court located and considered the referenced exhibits notwithstanding the incorrect references.

**14.** The letter fails to identify the year and type of policy.

ment. (Docket Entry # 95, Ex. D; Docket Entry # 147, Ex. 24).

On or about March 31, 1989, after the Massachusetts Department of Environmental Quality Engineering ("DEQE") issued a notice of responsibility letter to Beaudette dated February 8, 1989, JBI filed an action against Suburban and certain other defendants in Massachusetts state court ("the state court action"). (Docket Entry # 95, Ex. A; Docket Entry # 147, Ex. 11). The complaint seeks to recover the costs and damages associated with the release of gasoline at the station due to Suburban's failure to properly connect the components of the gasoline dispensing system. (Docket Entry # 95, Ex. A). According to Sentry's internal diary, it received a copy of the summons and complaint on April 4, 1989. Gross then discussed the option of filing a declaratory judgment action or agreeing to the lack of coverage with Phillips and Mann. (Docket Entry # 147, Ex. 22).

By letter dated April 7, 1989, JBI's attorney requested that Sentry produce a signed acknowledgment of the pollution exclusion quoted in the March 17, 1989 letter. In an April 14, 1989 reply letter, however, Gross refused to provide the information because Sentry was not a party to the state court action. Gross also unequivocally informed JBI's attorney that Sentry would "not provide coverage for [the state court action]." (Docket Entry # 147, Ex. 25; Docket Entry # 95, Ex. D).

Meanwhile, in another April 7, 1989 letter from Sentry to the Commissioner of the Division of Insurance for the Commonwealth of Massachusetts, Sentry notified the agency of its use of the more restrictive special pollution exclusion endorsements, enclosed copies of the forms for various types of policies and stated that Sentry would "require the insured's written authorization" prior to using the exclusions.[15] (Docket Entry # 147, Ex. 26). The enclosed pollution exclusion forms are synonymous to those used in the recreated 1987 and 1988 CLP and umbrella policies. (Docket Entry # 173, Ex. A–D). The April 7, 1989 letter also requested approval to use the endorsements on policies written after May 15, 1989. (Docket Entry # 147, Ex. 26).

At or around this time, Suburban tendered the defense of the state court action to Sentry. (Docket Entry # 95). An internal Sentry memorandum dated April 5, 1989, notes differing opinions among Sentry personnel as to Sentry's duty to defend the state court action and that another Sentry official was reviewing the policy. (Docket Entry # 147, Ex. 30). Thereafter, in an April 14, 1989 letter to Phillips, Gross acknowledged receipt of the "lawsuit" in the state court action but again denied coverage for the claim. Referring to the March 17, 1989 letter, Gross stated that Sentry had "no duty to defend or indemnify Suburban" and therefore returned the summons and complaint to Phillips. (Docket Entry # 95, Ex. C). In a separate April 14, 1989 letter, Suburban's counsel acknowledged that Sentry declined to defend the state court action on behalf of Suburban and notified Gross that Suburban would hold Sentry responsible for all fees and expenses incurred in the defense. (Docket Entry # 95, Ex. G).

As of April 1989 both Beaudette and Suburban therefore knew that Sentry had stated a firm position declining any coverage and, accordingly, would not defend or indemnify Suburban for any defense costs or judgment in the state court action. (Docket Entry # 93, Ex. 1; Docket Entry

---

**15.** In a May 18, 1989 bulletin issued by the Division of Insurance for the Commonwealth of Massachusetts ("DICM"), the agency began to require that restrictions of coverage without rate adjustments be signed by the insured on a particular form issued by the agency. The bulletin, however, only applied to insurance products dated on or after July 1, 1989.

(Docket Entry # 147, Ex. 28). The bulletin is therefore irrelevant as to whether pollution exclusions in earlier policies required Suburban's signature to take effect. The alleged March 10, 1988 endorsement of the recreated 1988 CLP policy pre-dates the July 1, 1989 effective date of the DICM policy.

# 95, Ex. D; Docket Entry # 147, Ex. 24 & 25; Docket Entry # 170, Ex. L).

By letter dated June 8, 1989, JBI's attorney contended to Gross that the language of the pollution exclusion quoted in the March 17, 1989 letter did not exclude coverage for the accident.[16] (Docket Entry # 147, Ex. 25). At this time, Beaudette understood that JBI's attorney was contesting Sentry's denial of coverage. (Docket Entry # 170, Ex. I). In reply to the June 8, 1989 letter, Gross repeated Sentry's position of denying coverage to Suburban in a letter dated June 19, 1989. (Docket Entry # 147, Ex. 25). In a July 11, 1989 letter to Gross, JBI's attorney continued to dispute Sentry's construction of the language of the pollution exclusion. By letter dated July 20, 1989, Gross again repeated Sentry's position of denying coverage. (Docket Entry # 147, Ex. 25).

There is little indication of any further correspondence between JBI's and Suburban's attorneys and Sentry until JBI's new attorney sent Sentry a chapter 93A letter dated October 19, 1995. (Docket Entry # 95, Ex. H). JBI's attorney as of February 1990 or 1991[17] does not remember pursuing Sentry for coverage under the policy. (Docket Entry # 170, Ex. K). In addition, Phillips did not personally speak to anyone at Sentry about Suburban's request for coverage under the policies. (Docket Entry # 170, Ex. L). Beaudette likewise testified that he did not have any direct communications personally with Sentry concerning the state court action. (Docket Entry # 170, Ex. H).

By the end of 1989, due to the financial constraints of several lawsuits, Suburban could no longer maintain its business. (Docket Entry 144 & 145). Suburban ceased its business operations in or around December 1989. (Docket Entry # 170, Ex. L). At the time, Suburban forwarded its records to its attorneys, Kahn & McKenzie. (Docket Entry # 170, Ex. L).

Attorney Sullivan withdrew as Suburban's counsel in the state court action in or around November 1991 due to nonpayment of legal fees. (Docket Entry # 170, Ex. L & O). On March 4, 1992, JBI filed a motion for a default judgment without opposition on the issue of liability against Suburban in the state court action. (Docket Entry # 170, Ex. K). According to JBI's attorney at the time, the court allowed the motion for default judgment in the spring of 1992. (Docket Entry # 170, Ex. K). A notice of docket entry confirms that Suburban was defaulted on March 30, 1992. (Docket Entry # 147, Ex. 13). In addition, on or about March 30, 1992, Phillips remembers seeing a form notice from the court concerning Suburban's default and forwarding the document to Kahn & McKenzie. (Docket Entry # 170, Ex. L).

JBI's attorney did not immediately request an assessment of damages against Suburban after entry of the default judgment as to liability. Rather, he wished to wait until the trial concluded against the remaining defendants and then obtain a final judgment against all parties. Trial of the state court action took place in December 1992. Thereafter, JBI's attorney requested an assessment of damages against Suburban based upon affidavits by counsel and Beaudette. (Docket Entry # 170, Ex. K). As set forth in the April 14, 1993 notice of docket entry, the court entered a final judgment against Suburban in the amount of $684,560 with prejudgment interest in the amount of $329,732.01 and attorneys' fees in the amount of $274,181.69.[18] (Docket Entry # 147, Ex. 13).

According to JBI's attorney, after entry of the final judgment in the state court action, his law firm agreed with Beaudette

---

16. JBI's attorney also sent a copy of the letter to Attorney Sullivan.

17. In early 1990 or 1991, a different JBI attorney at the same law firm began working on the case.

18. As reflected in the docket entry, the court also entered the final judgment in favor of the remaining defendant, J.P. Noonan Trucking Company ("Noonan"), based on the jury's verdict in favor of Noonan. *See Beaudette v. Noonan,* 419 Mass. 311, 644 N.E.2d 218 (1995); (Docket Entry # 147, Ex. 13).

to pursue an appeal against Noonan but not to pursue a claim against Sentry.[19] He also remembers advising Beaudette that he would be well served to find a lawyer willing to pursue a claim against Sentry. (Docket Entry # 170, Ex. K).

At his deposition, Beaudette could not recall whether he instructed JBI's attorney to sue Sentry. He also did not have an explanation for why he waited so long after entry of the final judgment on liability and damages to pursue Sentry. (Docket Entry # 170, Ex. H).

Beaudette additionally testified that he did not know whether Sentry was notified of the April 1993 final judgment prior to the October 1995 demand letter. (Docket Entry # 170, Ex. H). JBI's attorney attempted to serve the February 1992 motion for a default judgment as to liability on Suburban and Phillips. He characterizes the attempt to serve Phillips as unavailing. JBI's attorney had no idea as to whether Sentry received notice of the April 1993 final judgment and he does not recall forwarding a copy of the judgment to Sentry. (Docket Entry # 170, Ex. K). Although Phillips remembers seeing a notice of default as to Suburban and forwarding it to Kahn & McKenzie, he does not remember seeing the April 1993 entry of final judgment as to Suburban. Rather, he first learned of the judgment in a telephone conversation with JBI's and Beaudette's attorney at an undetermined time. (Docket Entry # 170, Ex. L).

Bruce Adamski ("Adamski"), an Environmental Claims Specialist at Sentry, avers that Suburban never demanded that Sentry indemnify it for the April 1993 final judgment. He also attests that Suburban never submitted a claim for any defense costs incurred in the state court action to Sentry for reimbursement. He avers that Suburban never informed Sentry of the entry of the March 1992 default judgment

as to liability or the entry of the April 1993 final judgment. According to Adamski, Suburban never forwarded any of these documents to Sentry. In addition, Adamski attests that neither JBI nor Beaudette informed Sentry of the March 1992 default judgment as to liability or the April 1993 final judgment. Until the October 1995 demand letter, JBI never made any demand upon Sentry to satisfy the April 1993 final judgment. In fact, the letter was the first notice Sentry received of the existence of the judgment, according to Adamski. (Docket Entry # 95).

## STANDARD OF REVIEW

Pending before this court are various motions for partial summary judgment. "Summary judgment is appropriate where there are no genuine disputes as to material facts and the moving party is entitled to judgment as a matter of law." *Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates*, 119 F.3d 55, 57 (1st Cir.1997). In this respect, a "genuine" issue exists where "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). " '[M]aterial' means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. Morse & Company, Inc.*, 76 F.3d 413, 428 (1st Cir.1996).

The moving party bears the initial burden of informing the "court of the basis for the motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material

---

**19.** JBI's attorney also remembers discussing the issue of attempting to collect the judgment from Suburban. In light of a substantial judgment entered against Suburban in New Hampshire and Suburban selling its assets, JBI's law firm did not wish to undertake the difficult task of collecting on the judgment. (Docket Entry # 170, Ex. K). At the time of his February 1998 deposition, Beaudette acknowledged that he still owed the law firm in excess of $200,000 in legal fees.

fact." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). "As to issues on which the summary judgment target bears the ultimate burden of proof, she [or he] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995); *accord DeNovellis v. Shalala*, 124 F.3d at 306. Thus, once the moving party makes a proper showing as to the " 'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant," *Dow v. United Brotherhood of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993), who may not rest on allegations in his briefs. *Borschow Hospital & Medical Supplies, Inc. v. Cesar Castillo*, 96 F.3d 10, 14 (1st Cir.1996).

Each summary judgment motion is reviewed separately and factual disputes are resolved in favor of the nonmoving party. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates*, 119 F.3d at 56. In general, the role of summary judgment is " 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *DeNovellis v. Shalala*, 124 F.3d at 305–306. "The test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *DeNovellis v. Shalala*, 124 F.3d at 306.

I. *DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON ASSIGNED CLAIMS OF SUBURBAN CONSTRUCTION COMPANY, INC. (DOCKET ENTRY # 92); CROSS–MOTION FOR SUMMARY JUDGMENT ON ASSIGNED CLAIMS OF SUBURBAN CONSTRUCTION COMPANY, INC. (DOCKET ENTRY # 109)*

As previously noted, Sentry moves for summary judgment on the claims raised by the Suburban Assignees due to the expiration of the relevant statute of limitations. (Docket Entry # 92). Plaintiffs op-

pose the motion and filed a cross motion for summary judgment on the assigned claims contending that they are not barred by the relevant statute of limitations. (Docket Entry # 109).

The assigned claims are for declaratory judgment (Count I), breach of contract (Count VI), negligence and misrepresentation (Count VII) and violation of chapter 93A (Count IX). The relevant limitations periods under state law are: (1) six years for breach of contract, Massachusetts General Laws chapter 260, section 2; (2) four years for violations of chapters 93A and 176D, Massachusetts General Laws chapter 260, section 5A; and (3) three years for negligence and misrepresentation, Massachusetts General Laws chapter 260, section 2A. *See McEneaney v. Chestnut Hill Realty Corporation*, 38 Mass.App.Ct. 573, 650 N.E.2d 93, 96 (1995) (statute of limitations for misrepresentation claim is three years), *review denied*, 420 Mass. 1107, 652 N.E.2d 146 (1995).

▮ As assignee of Suburban's claims against Sentry, the Suburban Assignees have no greater rights against Sentry than Suburban had against Sentry. *See Graves Equipment, Inc. v. M. DeMatteo Construction Company*, 397 Mass. 110, 489 N.E.2d 1010, 1012 (1986); *see also Unisys Finance Corporation v. Hackel Organization, Inc.*, 42 Mass.App.Ct. 275, 676 N.E.2d 486, 490 (1997), *review denied*, 424 Mass. 1109, 679 N.E.2d 558 (1997). Thus, if Suburban's claims are barred by the statute of limitations then the Suburban Assignees' claims are also barred. *See, e.g., Seney v. Prudential Property & Casualty Insurance Company*, 1997 WL 835052 at * 4 (Mass.Super. Dec.23, 1997) (driver with insurance policy assigned rights against insurance company to injured passenger who was subject to limitations defense raised by insurer with breach of contract claim accruing on the date insurer denied coverage to insured driver). The relevant framework is therefore whether, at the time plaintiffs filed suit on March 11, 1996,[20] Suburban's declaratory judg-

20. Because the assignment of the claims took place after this action commenced, Rule 15(d)

ment, chapter 93A, negligence and misrepresentation or breach of contract claims had expired under the applicable statute of limitations. *See, e.g., Seney v. Prudential Property & Casualty Insurance Company,* 1997 WL 835052 at * 4 (Mass.Super. Dec.23, 1997) (in determining viability of injured passenger/assignee's claims, "question is whether [the insured] would have a Chapter 176D and Chapter 93A claim against [insurance company]").

## A. Declaratory Judgment Claim

■ "In determining which if any statute of limitations applies to a claim, the court must look to the essential nature of that claim." *Department of Revenue of the Commonwealth of Massachusetts v. The Mailhouse, Inc.,* 1997 WL 573212 at * 3 (Mass.Super. Aug.5, 1997); *accord Gilbert v. City of Cambridge,* 932 F.2d 51, 57 (1st Cir.) (court must focus on substance of claim as opposed to its form as one for declaratory relief or damages), *cert. denied,* 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991). An action for declaratory relief "is a procedural device" and

therefore time barred to the extent the direct or underlying substantive claim is also time barred. *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993); *see also Stefanick v. Planning Board of Uxbridge,* 39 Mass.App.Ct. 418, 657 N.E.2d 475, 478 (1995) ("permissible expedient of a complaint for declaratory relief ... does not suspend" application of statute of limitations), *review denied,* 422 Mass. 1104, 661 N.E.2d 935 (1996). The Suburban Assignees' request for declaratory relief in Count I is therefore "barred to the same extent that the claim for substantive relief on which it is based would be barred." *International Association of Machinists and Aerospace Workers v. Tennessee Valley Authority,* 108 F.3d 658, 668 (6th Cir.1997); *see, e.g., Page v. LeRoux,* 43 Mass.App.Ct. 708, 685 N.E.2d 1205, 1207 n. 2 (1997) (complaint seeking declaratory relief as to ownership of property interest under partnership agreement subject to six year limitations period applicable to breach of contract claims). Stated otherwise, where, as here, the legal and

---

("Rule 15(d)"), Fed.R.Civ.P., governing supplemental pleadings, applies. *United States v. CMA, Inc.,* 890 F.2d 1070, 1073 (9th Cir. 1989) (assignment of claim, which took place after filing of original action, governed by Rule 15(d)); *see also Klos v. Haskell,* 835 F.Supp. 710, 715 (W.D.N.Y.) (" 'supplemental pleading is designed to cover matters that occur subsequent to the filing of the complaint, but pertain to the original pleadings' "), *aff'd,* 48 F.3d 81 (2d Cir.1995). Whether analyzed under Rule 15(c), *see FDIC v. Knostman,* 966 F.2d 1133, 1138–1139 (7th Cir.1992); *Davis v. Piper Aircraft Corporation,* 615 F.2d 606, 609 n. 3 (4th Cir.), *cert. dismissed,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); *Bromley v. Michigan Education Association,* 178 F.R.D. 148, 155–156 (E.D.Mich.1998), or directly under Rule 15(d), *see William Inglis & Sons Baking Company v. ITT Continental Baking Company, Inc.,* 668 F.2d 1014, 1057 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Jones v. Jones,* 400 S.E.2d 305, 309 (W.Va.1990) (discussing federal cases construing relation back under Rule 15(d) in light of identical state rule); *see also United States v. CMA, Inc.,* 890 F.2d at 1073 (discussing *Security Insurance Company v. United*

*States ex rel. Haydis,* 338 F.2d 444 (9th Cir. 1964)), the result is the same. The claim relates back to the original filing of the complaint. The assigned claims generally rely on the same facts and concern the same insurance policies such that Sentry had sufficient notice of the claims at the outset of the action. *See William Inglis & Sons Baking Company v. ITT Continental Baking Company, Inc.,* 668 F.2d at 1057; *see generally* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1508 (1990). In addition, the claims arose out of the same conduct, transactions and occurrences set forth in the original complaint. *See FDIC v. Knostman,* 966 F.2d at 1138 (analyzing relation back of Rule 15(d) pleading under Rule 15(c)). The allegations in the assigned claims bear a direct relation to the claims asserted in the original complaint. *See, e.g., Rowe v. United States Fidelity & Guaranty Company,* 421 F.2d 937, 944 (4th Cir.1970) (district court should have allowed supplemental pleading inasmuch as claims by assignees against insurer involving failure to settle bore direct relation to claims in original complaint). Thus, as previously determined (Docket Entry # 50, n. 2), the determinative date is March 11, 1996.

equitable claims coexist, the equitable relief of a declaratory judgment "will be withheld if an applicable statute of limitations bars the concurrent legal remedy." *Gilbert v. City of Cambridge*, 932 F.2d at 57.

■ The substance of the claim for declaratory relief under the subject insurance policies,[21] is contractual in nature. *See Berkshire Mutual Insurance Company v. Burbank*, 422 Mass. 659, 664 N.E.2d 1188, 1189 (1996) (applying six year contractual period to declaratory judgment action based on uninsured motorist policy). The Suburban Assignees, as well as Beaudette and JBI, seek a declaration that "[t]he judgment was covered" under the 1987 and/or 1988 CLP and umbrella policies, the absolute pollution exclusions were not part of the policies and/or did not become effective until received by Sentry on April 8, 1988, and that Sentry had a duty to defend and to indemnify Suburban in the state court action for its negligent acts. (Docket Entry #51). The substance of these allegations appears contractual in nature. As such, the declaratory judgment claim is subject to the six year limitations period applicable to contract actions.

The basis of the declaratory relief that Sentry had a duty to defend and to indemnify Suburban is the contractual promise to pay defense costs and to indemnify Suburban against any judgment, settlement or final resolution of the state court action. For reasons stated in the next section, the Suburban Assignees' declaratory judgment claim is barred to the extent it seeks a declaration of Sentry's duty to defend (Docket Entry #51, ¶48(g)) and not barred to the extent it seeks a declaration

of Sentry's duty to indemnify or a declaration that the judgment in the state court action was a covered loss under the 1987 and/or 1988 CLP and umbrella policies.[22]

The basis of the declaratory relief that the special pollution exclusion endorsements were not part of the policies or did not become effective until April 8, 1988 (Docket Entry #51, ¶¶48(d) & (e)), is the contractual terms of the policies and therefore subject to the six year limitations period. Sentry's breach occurred, if at all, by 1989 inasmuch as the Suburban Assignees fail in their burden of presenting facts of Sentry's involvement after 1989. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.*, 119 F.3d at 65. These declaratory judgment claims, to the extent independent of Sentry's duty to indemnify Suburban for the final judgment in the state court action, are therefore untimely.[23]

### B. *Breach of Contract Claim*

■ The parties do not dispute that under Massachusetts law a cause of action for breach of contract begins to accrue at the time of the breach. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.*, 119 F.3d at 64. Rather, they dispute the determinative date of the breach. Sentry contends that the breach occurred when Sentry refused to defend and indemnify Suburban in March and April 1989 as set forth in the aforementioned letters. Gross then reiterated the denial of coverage in the subsequent letters in June and July 1989.

The Suburban Assignees contend that the pertinent date is the April 1993 final judgment in the state court action. Ac-

---

21. The amended complaint fails to cite a relevant statutory provision for the cause of action.

22. The declaratory judgment claims based on the "judgment" (Docket Entry #51, ¶¶48(a)-(c)) involve Sentry's duty to indemnify and are therefore timely.

23. To the extent the declaratory judgment claim seeks a declaration of Sentry's obli-

gations under the 1989 and 1990 policies (Docket Entry #51, ¶48(f)), the underlying breach of contract claim is barred under the known loss rule as to the 1990 policies and not as to the 1989 policies for reasons explained *infra*. Hence, the declaratory judgment claim seeking a declaration that the judgment is covered under the 1989 policies (Docket Entry #51, ¶48(f)), is timely.

cording to the Suburban Assignees, an insurer's breach of both the duty to defend and the duty to indemnify occurs upon entry of a final judgment.

■ Neither party sufficiently distinguishes between the duty to defend and the duty to indemnify under the policies for purposes of the breach of contract claim. *See generally Travelers Insurance Company v. Waltham Industrial Laboratories Corporation,* 883 F.2d 1092, 1100 (1st Cir.1989) (criticizing litigant's argument as overlooking distinction between duty to defend and duty to indemnify). These dual obligations undertaken by Sentry, however, are distinct. *See Sterilite Corporation v. Continental Casualty Company,* 17 Mass.App.Ct. 316, 458 N.E.2d 338, 341 n. 4 (1983), *review denied,* 391 Mass. 1102, 459 N.E.2d 826 (1984).[24] The contractual duty to defend is dependent upon commencement of a lawsuit, *see Hall v. Allstate Insurance Company,* 880 F.2d 394, 399 (11th Cir.1989) ("duty to defend was conditioned upon commencement of a suit against [the insured]"), and "is measured by the allegations of the underlying complaint." *Travelers Insurance Company v. Waltham Industrial Laboratories Corporation,* 883 F.2d at 1099. In contrast, the duty to indemnify is dependent upon the entry of a final judgment, settlement or final resolution by other means. *See Bankwest v. Fidelity & Deposit Company of Maryland,* 63 F.3d 974, 978 (10th Cir.1995 ) (citing *Travelers Insurance Company v. Waltham Industrial Laboratories Corporation,* 883 F.2d at 1099). In short, whereas the duty to defend is measured by the allegations of the underlying complaint, the duty to indemnify is measured by the facts as they unfold at trial or are inherent in the settlement agreement. *See Travelers Insurance Company v. Waltham Industrial Laboratories Corporation,* 883 F.2d at 1099–1100.

Under Massachusetts law, which governs this dispute, a cause of action accrues at the time of the breach for statute of limitations purposes "even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time." *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.,* 29 Mass.App.Ct. 215, 560 N.E.2d 122, 126 (1990). As reasoned by the Massachusetts Supreme Judicial Court ("the SJC"), "Prior to the time when the contract is violated, there is no justiciable controversy, and it would be illogical to let the statute of limitations for bringing an action begin to run before the action can be brought." *Berkshire Mutual Insurance Company v. Burbank,* 422 Mass. 659, 664 N.E.2d 1188, 1189 (1996); *accord Cardin v. Pacific Employers Insurance Company,* 745 F.Supp. 330, 334 (D.Md.1990) (" 'accrual of a cause of action means a right to institute and maintain suit; i.e., whenever one person may sue another a cause of action has accrued and the statute [of limitations] begins to run' ").

Although Massachusetts law applies to this dispute, unfortunately, the parties fail to cite to a Massachusetts case where the court determined, as a necessary basis for its decision, the accrual date of a breach of contract claim alleging a breach of the duty to defend or to indemnify between an insured and his insurer under a comprehensive general liability or umbrella policy. In *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.,* 29 Mass.App.Ct. 215, 560 N.E.2d 122 (1990), relied upon by Sentry, the insured filed breach of contract and negligence claims against an insurance agent who failed to procure adequate coverage. Accordingly, the court in *International Mobiles* identified the breach as the date the agent failed to obtain adequate insurance coverage. In contrast, the Suburban Assignees filed an action against Sentry for

---

**24.** On appeal, after remand, *Sterilite Corporation v. Continental Casualty Company,* 20 Mass.App.Ct. 215, 479 N.E.2d 205 (1985), the SJC reversed the judgment on other grounds,

*Sterilite Corporation v. Continental Casualty Company,* 397 Mass. 837, 494 N.E.2d 1008 (1986).

breach of the duty to defend and the duty to indemnify. Thus, in contrast to the breach of the insurance agent's contract with the insured by the insurance agent's failure to obtain coverage in *International Mobiles*, the breach at issue in the case at bar involves either Sentry's failure to defend Suburban in the state court action or its failure to pay the sums which Suburban became legally obligated to pay as damages.

Likewise, in another case relied upon by Sentry, *Berkshire Mutual Insurance Company v. Burbank*, 422 Mass. 659, 664 N.E.2d 1188 (1996), the SJC construed underinsured motorist benefits under a policy which stated that, "[T]he determination as to whether an injured person is legally entitled to recover damages from the owner or operator of a responsible auto will be" by arbitration if the parties cannot agree. *Berkshire Mutual Insurance Company v. Burbank*, 664 N.E.2d at 1189.[25] Hence, the SJC decided that the breach occurred and the limitations period began to run when the insurer violated the contract by refusing to submit to arbitration. *Berkshire Mutual Insurance Company v. Burbank*, 664 N.E.2d at 1188–1190. In so doing, the SJC cited to a number of analogous decisions in the area of underinsured motorist benefits. As paraphrased by the SJC in *Berkshire Mutual*, those courts concluded that the limitations period began to run on various dates, including the date when the insurer refused to pay and when the insurer first denied coverage. *Berkshire Mutual Insurance Company v. Burbank*, 664 N.E.2d at 1190 n. 5.

▆ The Suburban Assignees cite to a number of cases, *Ghaly v. First American Title Insurance Company of New York*, 228 A.D.2d 551, 644 N.Y.S.2d 770 (1996) (cause of action for breach of duty to de-fend accrues upon termination of underlying litigation); *Kielb v. Couch*, 149 N.J.Super. 522, 374 A.2d 79 (1977) (cause of action for reimbursement of defense costs did not accrue until termination of underlying litigation in light of no action clause and inability to determine all of defense costs), which rely or cite to *Ginn v. State Farm Mutual Automobile Insurance Company*, 417 F.2d 119 (5th Cir.1969) (cause of action on liability insurance with "no action" clause cannot be maintained until issuance of final judgment against insured), which is no longer good law, *Hall v. Allstate Insurance Company*, 880 F.2d 394, 397–398 (11th Cir.1989). Although the policies at issue in this case contain no action clauses, the SJC's decision in *Ratner v. Canadian Universal Insurance Company*, 359 Mass. 375, 269 N.E.2d 227, 229 (1971), prevents an application of the clause as a means to bar an insured's cause of action against the insurer for breach of the duty to defend. *See Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Company*, 664 F.2d 252, 254 (10th Cir.1981) (citing *Ginn* and *Kielb* as the minority view holding that no action clauses cause limitations period to begin to run at conclusion of underlying litigation and *Ratner* as the majority view of "most courts" that such clauses do not apply to suits brought by insureds against insurers for breach of duty to defend). It is therefore unlikely that a Massachusetts court would follow decisions which rely, in whole or in part, on no action clauses as a means to forego triggering the limitations period until issuance of a final judgment in an action alleging breach of the duty to defend.

The remaining cases cited by the Suburban Assignees are either outdated and based on a no action clause, *Creem v. Fidelity & Casualty Company of New*

---

**25.** In *Berkshire Mutual Insurance Company v. Burbank*, 664 N.E.2d at 1189, the insurer did not repudiate the contract. *See generally Restatement (Second) of Contracts* § 250(a) (1981) (defining repudiation as statement "indicating that obligor will commit a breach"). Instead, Berkshire committed an actual breach of the contract by refusing to submit to arbitration. Similarly, the insurance agent sued in *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 126, did not repudiate the contract but, instead, committed a breach by not procuring adequate coverage.

*York,* 206 N.Y. 733, 100 N.E. 454 (1912), or do not apply Massachusetts law, *Tibbs v. Great American Insurance Company,* 755 F.2d 1370, 1375 (9th Cir.1985) (applying California law); *Employers' Fire Insurance Company v. Continental Insurance Company,* 326 So.2d 177 (Fla.1976) (limitations period begins to run on duty to indemnify on date judgment was entered under Florida law).

■■■ Mindful that Massachusetts and First Circuit cases distinguish between the duty to defend and the duty to indemnify, *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282, 285 n. 7 & 290; *Travelers Insurance Company v. Waltham Industrial Laboratories Corporation,* 883 F.2d at 1099; *Shapiro v. Public Service Mutual Insurance Company,* 19 Mass.App.Ct. 648, 477 N.E.2d 146, 151 (1985), *review denied,* 395 Mass. 1102, 480 N.E.2d 24 (1985); *Sterilite Corporation v. Continental Casualty Company,* 458 N.E.2d at 341 n. 4, this court examines these duties separately to determine the date of the breach. Turning to the contractual obligation to defend, this duty, as previously explained, depends upon the allegations in the underlying lawsuit. Assuming that the allegations in the state court action were "reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms," *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282 (internal quotation marks omitted); *Sterilite Corporation v. Continental Casualty Company,* 458 N.E.2d at 340 ("initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions"), Sentry had a duty to defend Suburban when the state court action was filed in March 1989. It also unequivocally denied coverage and its responsibility to defend Suburban in the state court action

in the March 17, 1989 letters and reaffirmed the denial in subsequent letters up to and including the July 20, 1989 letter from Gross to JBI's attorney. By April 1989 Suburban had retained counsel and, accordingly, began incurring defense costs. (Docket Entry # 147, Ex. 25; Docket Entry # 170, Ex. O). The fact that the exact amount of such defense costs remained unknown does not prevent the accrual of the breach of contract claim. *See International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.,* 560 N.E.2d at 126. Having carefully considered the issue, this court believes that the SJC would find that Sentry breached its duty to defend Suburban in 1989 when the state court action was filed and Sentry unequivocally refused to defend Suburban in the litigation. At that point in time, Suburban had the capability of filing a declaratory judgment against Sentry for breach of its duty to defend. Following the thorough reasoning of the courts in *Trustees of the International Brotherhood of Electrical Workers Local 98 Pension Plan v. Aetna Casualty & Surety Company,* 1999 WL 116285 at * 2–4 (E.D.Pa. March 5, 1999) (breach of contractual duty to defend accrued when insurer failed to appoint competent counsel to defend insured); *Cardin v. Pacific Employers Insurance Company,* 745 F.Supp. 330, 332–335 (D.Md.1990) (statute of limitations for breach of duty to defend began to accrue when insurer denied insured's request for payment of attorney's fees for defending insured), Suburban's claim against Sentry for breach of its duty to defend Suburban in the state court action accrued in March 1989 and certainly no later than August 1989. Inasmuch as Beaudette and JBI filed this suit on March 11, 1996, the contract claim raised by the Suburban Assignees that Sentry breached its duty to defend Suburban in the state court action is time barred.[26]

---

**26.** Although not cited by either party, the Massachusetts Appeals Court decided, without extensive analysis and without distinguishing between the duties to defend and indemnify, that an insurer breached its contractual obligation when it disclaimed any obligation to defend or indemnify the insured. *Lumbermens Mutual Casualty Company v. Y.C.N. Transportation Company, Inc.,* 46

Citing *Ratner v. Canadian Universal Insurance Company*, 359 Mass. 375, 269 N.E.2d 227 (1971), however, a case involving an insurer's breach of the duty to defend, the Suburban Assignees quote the SJC's statement that an insured, after a refusal to defend, "can declare upon the policy and can assign as breach either the refusal to defend or the later refusal to pay." *Ratner v. Canadian Universal Insurance Company*, 269 N.E.2d at 229. The SJC, however, was not addressing a statute of limitations issue but, rather, a claim by the insurer that the no action clause made the suit premature. *Ratner v. Canadian Universal Insurance Company*, 269 N.E.2d at 228–229. In addition, none of the cases cited by the SJC for this principle involve a statute of limitations issue. The principle in *Ratner*, therefore, does not detract from the fact that the alleged breach of the duty to defend in the case at bar occurred when JBI filed suit against Suburban, Suburban began to accrue defense costs and Sentry denied coverage for Suburban's defense costs.

With respect to the contractual duty to indemnify, the duty does not arise until issuance of a judgment, settlement or final resolution wherein the insured becomes legally obligated to pay damages. *See generally* 8 John Alan Appleman *Insurance Law and Practice* § 4851 (1981). Institution of a suit prior thereto is premature because the insurer's breach of the duty to indemnify may never occur if the insured is found not liable in the underlying action. Moreover, up until entry of a judgment, settlement or final resolution against the insured, the insurer may rescind an earlier denial of coverage and agree to pay the judgment. Thus, in recognizing that the duty to indemnify is

distinct from the duty to defend, the Massachusetts Appeals Court in *Sterilite Corporation v. Continental Casualty Company*, 458 N.E.2d at 341 n. 4, cited and relied upon *Spoor–Lasher Company, Inc. v. Aetna Casualty and Surety Company*, 39 N.Y.2d 875, 386 N.Y.S.2d 221, 352 N.E.2d 139 (1976), wherein the court concluded "that any determination as to the obligation of the insurer to indemnify its insured would now be premature and must await the resolution of the underlying claim." [27] *Spoor–Lasher Company, Inc. v. Aetna Casualty and Surety Company*, 386 N.Y.S.2d 221, 352 N.E.2d at 140.

■ The contractual language of the policies defining the parties' obligations confirms that Sentry had no duty to indemnify Suburban until Suburban became legally obligated to pay damages for property damage caused by an occurrence under the particular policy. Under the CLP policies, Sentry agreed to pay all sums which Suburban became "legally obligated to pay as damages" due to property damage caused by an occurrence. (Docket Entry # 147, Ex. 1 & 2). The umbrella policies contain the similar obligation to pay all sums for which Suburban "shall be obligated to pay by reason of legal liability for damages" provided that such legal liability for damages results from property damages "caused by an occurrence." (Docket Entry # 147, Ex. 1 & 2). Irrespective of the no action clauses, therefore, the language of the policies conditioned Sentry's duty to indemnify upon Suburban incurring a legal liability for damages. *See generally* 8 John Alan Appleman *Insurance Law and Practice* § 4851 (1981) (language in policy insuring against "liability imposed by law" requires final judg-

Mass.App.Ct. 209, 705 N.E.2d 297, 301 (1999), *review denied*, 429 Mass. 1104, 709 N.E.2d 1121 (1999). This finding in *Lumbermens*, however, was not necessary to its decision inasmuch as the court found that the statute of limitations was waived irrespective of when the cause of action accrued. *Lumbermens Mutual Casualty Company v. Y.C.N. Transportation Company, Inc.*, 705 N.E.2d at 301.

**27.** Similarly, as noted by the First Circuit, the difficulties concerning a determination of indemnity coverage involving latent perils such as the accumulation of hazardous waste "may become unmanageable in the abstract setting preceding a judicial determination as to the nature and extent of any damage, its causes and timing." *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company*, 91 F.3d at 290.

ment). Stated otherwise, the duty did not arise until Suburban became legally obligated to pay damages.

Nevertheless, Sentry unequivocally manifested an intention not to perform its obligation to indemnify Suburban in March and April 1989, prior to the time when its performance was due. Sentry argues that such conduct repudiated the agreement and constituted the requisite breach for purposes of the accrual of the statute of limitations.[28] It is true that Sentry's unequivocal manifestation of an intention not to indemnify Suburban repudiated the agreement to indemnify Suburban. *See generally Thermo Electron Corporation v. Schiavone Construction Company*, 958 F.2d 1158, 1164 (1st Cir.1992). Specifically, Sentry's March 17, 1989 denial of coverage letter to Phillips (Docket Entry # 95, Ex. B) and its follow up April 14, 1989 letter to Phillips denying its duty to defend and duty to indemnify (Docket Entry # 147, Ex. 25) constituted an anticipatory repudiation of Sentry's promise to indemnify Suburban for any legal liability for damages resulting from an occurrence within the meaning of the policies.[29]

A party's repudiation of a bilateral contract excuses the nonbreaching party from further performance. *See Thermo Electron Corporation v. Schiavone Construction Company*, 958 F.2d at 1164; *La Vallee v. Cataldo*, 343 Mass. 332, 178 N.E.2d 484, 485 (1961). The doctrine of anticipatory repudiation, however, only applies to bilateral contracts. *See Jackson v. American Can Company, Inc.*, 485 F.Supp. 370, 376–375 (W.D.Mich.1980). At the time

Sentry repudiated the agreement to indemnify Suburban in 1989, Suburban had, presumably, already fully paid its premiums for the 1987 and 1988 policies.

More significantly, in sharp contrast to other jurisdictions,[30] "Massachusetts has not generally recognized the doctrine of anticipatory repudiation, which permits a party to a contract to bring an action for damages prior to the time performance is due if the other party repudiates." *Cavanagh v. Cavanagh*, 33 Mass.App.Ct. 240, 598 N.E.2d 677, 679 (1992) (citing seminal decision of *Daniels v. Newton*, 114 Mass. 530 (1874)), *review denied*, 413 Mass. 1107, 602 N.E.2d 1094 (1992). Nor do the exceptions to this rule, such as for suits in equity for specific performance or for an anticipatory repudiation accompanied by an actual breach of the contract, apply to the case at bar.[31]

In any event, with respect to the date of accrual of a cause of action for anticipatory breach, the "general rule ... is that 'where an action is brought after the time fixed by an executory contract for the beginning of performance by a party who has committed an anticipatory breach, the period of limitations runs, not from the time of such breach, but from the time fixed by the contract for performance by the defaulting party.'" *Rupe v. Triton Oil & Gas Corporation*, 806 F.Supp. at 1499 (quoting 51 Am.Jur.2d *Limitations of Action* § 132 (1970)).

In sum, the duty to indemnify accrued at the time Sentry became legally obligated to pay damages which occurred upon entry

---

**28.** As previously noted, the Suburban Assignees' argument, based on *Ratner*, i.e., that they could assign as breach the failure to pay, is unavailing inasmuch as *Ratner* did not involve a statute of limitations issue but, rather, the enforcement of a no action clause. In addition, *Ratner* did not concern a repudiation of the failure to pay.

**29.** In contrast, the denial of coverage and disclaimer of any duty to defend amounted to a breach of the promise to defend Suburban at that time as opposed to an anticipatory breach of a performance not yet due.

**30.** *See, e.g., Sven Salen v. Jacq. Pierot, Jr. & Sons, Inc.*, 559 F.Supp. 503, 506 (S.D.N.Y. 1983), *aff'd*, 738 F.2d 419 (2d Cir.1984); *see also Hall v. Allstate Insurance Company*, 880 F.2d 394, 399 (11th Cir.1989); *Rupe v. Triton Oil & Gas Corporation*, 806 F.Supp. 1495, 1499 (D.Kan.1992).

**31.** Because neither party briefed the issue of the effect of anticipatory repudiation upon the running of the statute of limitations, the parties may revisit this issue, if necessary, in post trial motions.

of the default judgment as to liability in 1992 or the entry of the final judgment in 1993 thereby making the filing of a suit for breach of the duty to indemnify in 1996 timely. Although Sentry repudiated the agreement to indemnify Suburban prior to the date its performance was due, Massachusetts does not adhere to the doctrine of anticipatory repudiation which, in any event, applies to bilateral contracts.

## C. *Negligence and Misrepresentation Claims*

In Count VII, the Suburban Assignees bring a claim for negligence and misrepresentation against Sentry. As alleged therein with respect to the negligence claim, the Suburban Assignees contend that Sentry breached its duties to Suburban to defend, to indemnify and to enter into a good faith settlement of the state court action. Plaintiffs elsewhere submit that Sentry was negligent in its handling of Suburban's claim[s]. In addition to these purportedly negligent acts, the Suburban Assignees allege that Sentry engaged in misrepresentation by misrepresenting the terms of the insurance policies and failing to disclose the actual language in the policies.

Sentry asserts that the three year statute of limitations applicable to negligence and misrepresentation claims bars the Suburban Assignees' claims. It argues that the claims accrued when Suburban sustained harm by retaining Attorney Sullivan and incurring defense costs in April 1989.

Although the Suburban Assignees do not dispute the applicable three year limitations period, they disagree as to the relevant date of the accrual of the claims. The Suburban Assignees submit that the tort claims for negligence and misrepresentation began to accrue on April 14, 1993, the date of the docket entry for the final judgment assessing damages on behalf of JBI against Suburban in the amount of $684,560 together with interest and attorneys' fees. Prior to that time, the Suburban Assignees did not suffer any harm resulting from Sentry's misconduct,

according to the Suburban Assignees. They additionally argue that the continuing nature of the duty to defend tolled the accrual of the limitations period as to the duty to defend negligence claim until entry of the April 14, 1993 final judgment. They also maintain that the duty to indemnify negligence claim did not accrue until Suburban suffered damages with the entry of the April 14, 1993 final judgment. (Docket Entry # 109).

Negligence requires both the existence of negligence, i.e., duty and breach, and harm causally connected to the negligent conduct. *See Cannon v. Sears, Roebuck and Company*, 374 Mass. 739, 374 N.E.2d 582, 584 (1978) ("negligence action may not be maintained unless one has suffered injury or damage"). A cause of action for negligence, therefore, does not accrue simply upon the occurrence of a negligent act. *See, e.g., International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 124 (negligent failure of agent to obtain adequate insurance did not, standing alone, trigger limitations period). Rather, a negligence claim typically accrues at the time of injury or harm. *Cantu v. St. Paul Companies*, 401 Mass. 53, 514 N.E.2d 666, 668 (1987); *Cambridge Plating Company, Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993) ("the general rule for negligence claims is that the cause of action accrues at the time of injury").

A plaintiff, however, need not know the full extent of the harm in order for the limitations period to accrue. *See Massachusetts Electric Company v. Fletcher, Tilton & Whipple, P.C.*, 394 Mass. 265, 475 N.E.2d 390, 392 (1985) ("cause of action accrues when some harm has occurred even though the full extent and nature of that harm has not been and cannot be established immediately"). Consequently, it is sufficient if the plaintiff "knows or reasonably should know that it has sustained appreciable harm as a result of a defendant's negligence." *Massachusetts Electric Company v. Fletcher, Tilton & Whipple, P.C.*, 475 N.E.2d at 391; *accord*

*Cantu v. St. Paul Companies,* 514 N.E.2d at 668.

With these general principles in mind, this court turns to two cases, *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.,* 29 Mass.App. Ct. 215, 560 N.E.2d 122 (1990), and *Medical Professional Mutual Insurance Company v. Breon Laboratories, Inc.,* 966 F.Supp. 120 (D.Mass.1997), which are particularly instructive with respect to the accrual of the negligence claim alleging breach of the duty to defend and the negligence claim alleging breach of the duty to indemnify. The distinguishing circumstance between the two cases is that the plaintiff in *International Mobiles* did not incur appreciable harm until settlement of the underlying tort suit because its primary insurer assumed the defense for Mobiles. The failure of the agent to procure sufficient insurance coverage and the disclaimer of coverage by the excess carrier did not, by themselves, cause Mobiles appreciable harm. Accordingly, the court distinguished cases involving the occurrence of tangible harm through the payment of out of pocket legal expenses due to the assumption of defense costs by the primary carrier and considered the settlement as the triggering event for both the negligence and the chapter 93A claims. *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.,* 560 N.E.2d at 124–125.

In contrast, the court in *Medical Professional Mutual Insurance Company,* rejected the plaintiff's argument that the triggering event occurred when the underlying tort action settled. Instead, the plaintiff incurred an appreciable injury "when it first began to pay out of pocket legal fees." *Medical Professional Mutual Insurance Company v. Breon Laboratories, Inc.,* 966 F.Supp. at 124–125.

■ Similarly, in the case at bar, Suburban suffered appreciable harm when it hired an attorney to answer the complaint in the underlying state court action. *See, e.g., Cantu v. St. Paul Companies,* 514 N.E.2d at 668–669; *Salin v. Shalgian,* 18 Mass.App.Ct. 467, 467 N.E.2d 475, 477 n. 8 (1984), *review denied,* 393 Mass. 1102, 469 N.E.2d 830 (1984). By that time, Sentry's negligence in refusing its obligation or duty to defend Suburban was more than apparent. In June 1988 Sentry initially conceded there was coverage for the property damage and the clean up costs at the station. In a sharp reversal of position, in March 1989 Sentry denied coverage due to the special pollution exclusion endorsement. Suburban's counsel or Phillips apparently had a copy of the policies. Phillips attests that he switched insurance companies because the Sentry policies did not contain an absolute pollution exclusion and that he refused to sign an exclusion for several years. (Docket Entry # 145). Sentry's negligence in denying coverage, mishandling the claim and/or inadequately investigating whether coverage existed under one or more of the subject policies was therefore evident. Suburban then retained the services of Attorney Sullivan who, in April 1989, wrote to Sentry explicitly advising Sentry that Suburban intended to hold Sentry responsible for fees and expenses incurred to defend the state court action. *See, e.g., Paterson–Leitch Company, Inc. v. Massachusetts Municipal Wholesale Electric Company,* 840 F.2d 985, 985 & 994–995 (1st Cir.1988) (letter wherein the plaintiff stated it would document delays at work site "for settlement of damages incurred" demonstrated that the plaintiff knew of the injury).

■ "Under Massachusetts law, the plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations." *Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.,* 119 F.3d at 65. More specifically, "When a defendant files a motion [for summary judgment] contending that [the] plaintiff's claims are time-barred, the plaintiff bears the burden of pointing to facts of record that would justify a factfinder in concluding that the suit is timely." *Church v. General Electric Company,* 1997 WL 129381 at * 4 (D.Mass. March 20, 1997). The Suburban Assignees fail to identify any such facts.

To the extent the Suburban Assignees contend that Sentry negligently handled the defense or Suburban's claim, Sentry's involvement in the defense ended when it disclaimed coverage. Any negligent handling of the defense or Suburban's claim and resulting damage therefore occurred in 1989.

■ The Suburban Assignees' reliance on the continuing tort theory as a means to toll the negligent duty to defend and/or handle Suburban's claim is also unavailing. Massachusetts courts limit this theory to actions in nuisance and trespass. *White's Farm Dairy, Inc. v. De Laval Separator Company,* 433 F.2d 63, 67 (1st Cir.1970) (Massachusetts confines continuing tort theory "to instances of nuisance and trespass"); *Boothroyd Dewhurst, Inc. v. Poli,* 783 F.Supp. 670, 699–700 (D.Mass.1991); *Flotech, Inc. v. E.I. Du Pont de Nemours Company,* 627 F.Supp. 358, 363–364 (D.Mass.1985) (noting Massachusetts courts' reluctance to extend theory beyond nuisance and trespass actions), *aff'd,* 814 F.2d 775 (1st Cir.1987); *see also Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 53 (1990) ("plaintiff's claim of corporate 'freeze out' is a tort claim, but it is not a continuing tort" for statute of limitations purposes). The reluctance of Massachusetts courts to extend the theory beyond nuisance and trespass actions "is based upon a strong judicial preference to adhere to the purposes and policies of the statute of limitations." *Flotech, Inc. v. E.I. Du Pont de Nemours Company,* 627 F.Supp. at 363. Thus, for example, noting that the legislature did not recognize a continuing wrong theory with respect to the statute of limitations applicable to the Massachusetts Oil and Hazardous Material Release Prevention Act, Massachusetts General Laws chapter 21E, the SJC declined to extend the theory to such a cause of action as a means to toll the limitations period. *Carpenter v. Texaco, Inc.,* 419 Mass. 581, 646 N.E.2d 398, 400 n. 4 (1995). The Suburban Assignees' citation to a case applying the doctrine to a nuisance claim, *Ahern v. Warner,* 16 Mass.App.Ct. 223, 450 N.E.2d 662, 665 (1983); *Carpenter v. Texaco, Inc.,* 646 N.E.2d at 400 n. 4 (citing *Ahern* as a case involving a continuing nuisance), is therefore distinguishable from the case at bar which involves a duty to defend negligence claim. Consequently, "[b]ecause this court is in the business of applying not changing the laws of its forum state, it must decline [the] invitation to adopt the continuing tort doctrine in this context." *Boothroyd Dewhurst, Inc. v. Poli,* 783 F.Supp. at 699–700 (internal quotation marks omitted).

■ The negligence claim based on breach of the duty to defend, including any negligent handling of the defense or of Suburban's claim, is therefore time barred inasmuch as the claim began to accrue in 1989. The negligence claim based on the duty to indemnify, however, did not accrue until issuance of the final judgment on April 13, 1993. Up until that time, Suburban had not suffered any appreciable harm by incurring the legal liability to pay damages. The prior default judgment imposed legal liability on Suburban but the defaulting party could still contest any amount of damages. In fact, the default judgment did not set any amount of damages. Although the alleged negligence in Sentry's refusal to indemnify Suburban was apparent by 1989, negligence without appreciable harm will not trigger the limitations period. Before entry of the final judgment, Suburban had not incurred any damages vis-a-vis Sentry's breach of the duty to indemnify.

Contingent liability for damages, subject to JBI submitting adequate proof of its damages resulting from Suburban's negligent work, is generally insufficient without tangible harm such as out of pocket payments. As noted by the court in *International Mobiles,* "It might be supposed that Mobiles' consciousness or contingent liability was damage enough, but the authorities are chary of treating the threat of future harm without realization of some tangible harm, like out-of-pocket payments, as the basis for concluding that damage has occurred and the cause of action has ac-

crued." *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 125. Although Suburban may not have paid such damages due to its financial condition and the actual amount was subject to increase due to post judgment interest, it nevertheless incurred legal liability for an amount of damages on April 13, 1993. The March 11, 1996 filing of this action, occurring less than three years after the triggering event, is therefore timely as to the duty to indemnify negligence claim.

■■■■ The remaining negligence claim involves Sentry's alleged failure to enter into a good faith settlement of the state court action. An insured's claim against an insurer for failure to settle within the policy limits sounds in negligence. *Hartford Casualty Insurance Company v. New Hampshire Insurance Company*, 417 Mass. 115, 628 N.E.2d 14, 17 (1994). The insurer's duty concerning the negotiation of a settlement is "at all times to act reasonably and in good faith." *First State Insurance Company v. Utica Mutual Insurance Company*, 870 F.Supp. 1168, 1175 (D.Mass.1994), *aff'd*, 78 F.3d 577 (1st Cir.1996). In order to establish a claim, the insured must "prove that the plaintiff in the underlying action [JBI] would have settled the claim within the policy limits and that, assuming the insurer's unlimited exposure (that is, viewing the question from the point of view of the insured) no reasonable insurer would have refused the settlement offer or would have refused to respond to the offer." [32] *Hartford Casualty Insurance Company v. New Hampshire Insurance Company*, 628 N.E.2d at 18.

■■■ A negligent failure to settle within policy limits, however, does not trigger the three year statute of limitations unless

"the plaintiff knows or reasonably should have known that it sustained appreciable harm" causally connected to the negligent conduct. *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 124. Logically, an insured does not experience appreciable harm until there is a judgment in excess of the policy limits. *See Catholic Relief Insurance Company of America v. Liquor Liability Joint Underwriting Association of Massachusetts*, 1997 WL 781448 at * 23 (Mass.Super. Dec.22, 1997). Accordingly, the limitations period begins to run upon a jury's verdict or judgment in excess of the policy limits. *See Spilios v. Cohen*, 38 Mass.App.Ct. 338, 647 N.E.2d 1218, 1219–1220 (1995) (cause of action alleging legal malpractice because attorney rejected settlement did not accrue until judge's decision awarding the plaintiff less than the settlement amount), *review denied*, 420 Mass. 1104, 651 N.E.2d 410 (1995); *see also* John Alan Appleman *Insurance Law and Practice* § 4713 (1979) ("cause of action in favor of the insured does not arise against the insurer until a judgment in excess of policy limits is returned by a jury"). Thus, to the extent that the Suburban Assignees' claim concerns the negligent failure to settle the state court action within the policy limits, such a claim accrued on April 13, 1993, and, accordingly, is not barred by the three year statute of limitations applicable to negligence actions.

■■■ Turning to the misrepresentation claim, the Suburban Assignees fail to elucidate the nature of this claim in their brief. Nevertheless, the amended complaint clarifies that the claim concerns the alleged misrepresentation of the terms of the insurance policies.[33]

As previously discussed, tort causes of action ordinarily accrue "when the plaintiff

---

**32.** Because the sole issue is whether the claim of Sentry's alleged negligent failure to settle the underlying action is time barred, this court expresses no opinion as to whether the claim applies to a case where no offer was made. *See generally RLI Insurance Company v. General Star Indemnity Company*, 997 F.Supp. 140, 149–150 (D.Mass.1998) (dicta

noting that court would extend cause of action to circumstance wherein no settlement offer was made).

**33.** The amended complaint states that, "Sentry misrepresented the forms of the subject insurance policies to Suburban, John Beaudette, Inc. and John Beaudette by failing to

is injured as a result of the defendant's unlawful conduct or omission." *Pagliuca v. City of Boston*, 35 Mass.App.Ct. 820, 626 N.E.2d 625, 628 (1994); *see also Cambridge Plating Company, Inc. v. Napco, Inc.*, 85 F.3d 752, 763 (1st Cir.1996) ("cause of action for deceit accrues when the plaintiff knew or should have known of the misrepresentation"); *Kent v. Dupree*, 13 Mass.App.Ct. 44, 429 N.E.2d 1041, 1043 (1982) ("cause of action accrues at the time a plaintiff learns or reasonably should have learned of the misrepresentation"). This occurred in 1989 when Sentry denied coverage by allegedly misrepresenting the terms of the pollution exclusion and Suburban incurred legal fees as a result.

Application of the discovery rule does not change this result. The discovery rule provides that where the factual basis for the cause of action is inherently unknowable at the time of the injury, the cause of action accrues when the plaintiff "knew, or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action." *Geo. Knight & Company, Inc. v. Watson Wyatt & Company*, 170 F.3d 210, 213 (1st Cir.1999); *see also Bernier v. The Upjohn Company*, 144 F.3d 178, 180 (1st Cir.1998).

First, the misrepresentation at issue was not inherently unknowable. Suburban initially had a copy of the policy which it gave to Attorney Sullivan. As noted above, Philips avers that, at first, he refused to sign an absolute pollution exclusion. Accordingly, when Sentry reversed its earlier position and disclaimed coverage in the spring of 1989 based on the terms of an absolute pollution exclusion, Suburban learned or reasonably should have learned of the misrepresentation of the terms of the policies at that time. *See generally*

disclose the actual language of the Policies." (Docket Entry # 51). Such a claim therefore encompasses Sentry's alleged misrepresentation that the policies contained special pollution exclusion endorsements and/or its failure to disclose that the policies contained two conflicting exclusions creating an ambiguity in favor of the insured.

*McEneaney v. Chestnut Hill Realty Corporation*, 38 Mass.App.Ct. 573, 650 N.E.2d 93, 96–97 (1995), *review denied*, 420 Mass. 1107, 652 N.E.2d 146 (1995). In addition, the harm caused by Sentry's misrepresentation of the terms of the policies was apparent when Sentry denied coverage in 1989 inasmuch as Suburban retained Attorney Sullivan to answer the complaint and to defend the state court action. In other words, the cause of action for misrepresentation was not "'incapable of detection by [Suburban] through the exercise of reasonable diligence.'" *Geo. Knight & Company, Inc. v. Watson Wyatt & Company*, 170 F.3d at 213.

Even assuming for purposes of argument an inherently unknowable basis for the claim, Suburban was aware of the harm, i.e., the denial of coverage and the resulting legal costs of defending the state court action, by 1989. A reasonably prudent person reacting to Sentry's sharp reversal of its coverage decision would have researched the terms of the policies and determined that he or it was harmed. *See generally Malapanis v. Shirazi*, 21 Mass. App.Ct. 378, 487 N.E.2d 533, 537 (1986). Thus, by 1989 Suburban was on notice that Sentry misrepresented the terms of the policies resulting in the injury of unreimbursed defense costs.

The Suburban Assignees fail in their burden of presenting facts to take the misrepresentation claim outside the statute of limitations.[34] Inasmuch as the Suburban Assignees did not file their misrepresentation claim until more than three years after the 1989 accrual of the cause of action, the claim is time barred.

## D. *Chapter 93A Claim*

Turning to the chapter 93A claim, the "accrual date for a c. 93A cause

34. Likewise, viewing the facts in Sentry's favor and mindful of plaintiffs' burden as the moving parties, plaintiffs' cross motion for summary judgment is without merit as to this issue.

of action is determined by the same principles dispositive of the accrual date of general tort actions." *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 124; *accord Rousseau v. Diemer*, 24 F.Supp.2d 137, 142 (D.Mass.1998) (quoting *International Mobiles*); *see, e.g., Medical Professional Mutual Insurance Company v. Breon Laboratories, Inc.*, 966 F.Supp. at 125–126 (treating negligence and chapter 93A claims as subject to the same accrual rules). Thus, absent application of the discovery rule, the chapter 93A claim accrues "at the time injury results from the assertedly unfair or deceptive practice." [35] *Cambridge Plating Company, Inc. v. Napco, Inc.*, 991 F.2d at 25; *see, e.g., Industrial Technical Services v. Phoenix Home Life Mutual Insurance Company*, 866 F.Supp. 48, 51 (D.Mass.1994) (chapter 93A claim accrued at the time insurance agent

misrepresented terms of coverage under the policies). Where the factual basis for the chapter 93A claim is inherently unknowable, that is, " 'incapable of detection by the wronged party through exercise of reasonable diligence,' " *Geo. Knight & Company, Inc. v. Watson Wyatt & Company*, 170 F.3d at 213, the discovery rule tolls the limitations period "until the occurrence of 'an event or events that were reasonably likely to put the plaintiff on notice that someone may have caused her injury.' " *Cambridge Plating Company, Inc. v. Napco, Inc.*, 991 F.2d at 28–29 (emphasis omitted).

Count IX filed by the Suburban Assignees asserts a chapter 93A claim based on chapter 176D for unfair settlement practices.[36] Section 9 of chapter 176D lists 14 unfair settlement practices which section 9(1) of chapter 93A makes applicable to chapter 93A consumers seeking relief under section 9.[37] In Count IX,

---

35. The loss connected to the unfair and deceptive act which the chapter 93A plaintiff must establish "is analogous, if not identical, to the appreciable harm the plaintiff sustains in a negligence action." *International Mobiles Corporation v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d at 124.

36. JBI and Beaudette filed a separate count for Sentry's alleged violation of chapter 93A.

37. Chapter 93A claimants must "proceed under one of two sections of the chapter." *Shawmut Community Bank, N.A. v. Zagami*, 411 Mass. 807, 586 N.E.2d 962, 966 (1992). Section 11 applies to persons engaged "in the conduct of any trade or commerce" and refers "to individuals acting in a business context in their dealings with other business persons." *Shawmut Community Bank, N.A. v. Zagami*, 586 N.E.2d at 966.

A section 11 plaintiff engaged in trade or commerce is not entitled to recover for violation of chapter 93A simply based on the showing of a violation of section 9 of chapter 176D. *RLI Insurance Company v. General Star Indemnity Company*, 997 F.Supp. 140, 150–151 (D.Mass.1998). Section 9(1) of chapter 93A, however, expressly allows a section 9 chapter 93A plaintiff to bring an action against persons violating clause 9 of section 3 of chapter 176D as well as against persons violating section 2 of chapter 93A. Mass. Gen. L. ch. 93A, § 9(1). Because of this explicit

statement in section 9(1), a section 9 plaintiff "may recover for violations of G.L. c. 176D, § 3, cl. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2." *Polaroid Corporation v. Travelers Indemnity Company*, 414 Mass. 747, 610 N.E.2d 912, 917 (1993).

In contrast, section 11 of chapter 93A omits any reference to the ability of a section 11 plaintiff to recover for violations of section 9 of chapter 176D. Rather, section 11 simply allows recovery against persons violating section 2. Mass. Gen. L. ch. 93A, § 11. Accordingly, as unequivocally stated by the SJC, " § 11 does not grant an independent right to recover for violations of G.L. c. 176D, § 3, cl. 9." *Polaroid Corporation v. Travelers Indemnity Company*, 610 N.E.2d at 917. Instead, section 11 plaintiffs "must satisfy the elements of a claim based on an alleged unfair and deceptive practice under Section 2 of Chapter 93A." *RLI Insurance Company v. General Star Indemnity Company*, 997 F.Supp. at 151.

The Suburban Assignees correctly describe Suburban as a section 11 chapter 93A plaintiff. (Docket Entry # 110, p. 14). Indeed, plaintiffs admit and characterize Suburban as a section 11 chapter 93A plaintiff. (Docket Entry # 110, p. 8). In accordance with the law summarized in part III(3), Suburban is a section 11 chapter 93A plaintiff. Suburban was acting in a business context by performing commercial work at the station and by

the Suburban Assignees list four allegations as constituting unfair settlement practices in violation of chapter 93A. These allegations are that Sentry: (1) misrepresented pertinent insurance policy provisions relating to the coverage at issue; (2) refused to pay Suburban's claims without conducting a reasonable investigation; (3) failed to effectuate a prompt settlement of claims once liability became reasonably clear; and (4) failed to take steps to remedy its wrongful coverage decision when the facts concerning coverage became reasonably clear. (Docket Entry # 51, ¶ 77); *see also* Mass. Gen. L. ch. 176D, § 3(9)(a), (d) & (f).

In addition to the allegations of misconduct identified in Count IX, the Suburban Assignees' opposition contends that Sentry violated chapter 93A by misrepresenting the terms of the 1987 and 1988 CLP policies and the 1988 umbrella policy and failing to make a coverage determination with respect to the 1987 umbrella policy.[38] They submit that Sentry should have been

able to respond truthfully about the terms of the policies "as of the date Suburban first reported Beaudette's claim," i.e., in or around March and April 1988. In addition, citing to section 3(9)(c) of chapter 176D,[39] they submit that Sentry failed to adopt and implement reasonable standards to ensure that the recreations of the policies accurately reflected the terms of such policies.[40] (Docket Entry # 109).

 Relying on an October 10, 1997 unreported decision, *In Re Salem Suede, Inc.*, Case No. 96–13184–JNF, the Suburban Assignees primarily assert that their chapter 93A claims are not barred by the four year statute of limitations because Sentry's repeated misrepresentations constitute additional unfair and deceptive acts creating a new limitations period. (Docket Entry # 109). An unpublished decision, however, does not rise to the level of precedential, let alone binding, authority. *See Dayton v. Peck, Stow and Wilcox Company*, 739 F.2d 690, 694 n. 5 (1st Cir.1984). Accordingly, this court declines to adopt

purchasing the CLP and umbrella policies for its commercial work from Sentry. Motivated by business reasons and the need to protect itself from liability for environmental pollution, Suburban purchased the policies. Likewise, Sentry sold Suburban the policies in the course of its business insuring commercial entities. Inasmuch as Suburban was acting as a section 11 chapter 93A plaintiff, the Suburban Assignees' chapter 93A claim falls under section 11.

38. This allegation further delineates the alleged misrepresentation of insurance policy provisions alleged in Count IX.

39. Section 3(9)(c) provides that, "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" constitutes an unfair settlement practice. Mass. Gen. L. ch. 176D, § 3(9)(c).

40. These allegations comprise all of the allegations which the Suburban Assignees submit violate chapter 93A. It is not the province of this court to proffer the allegations of misconduct which constitute the alleged violation of chapter 93A sufficient to withstand a statute of limitations argument. To the contrary, it is the plaintiff's burden to identify the facts in the record which justify a finding of timeli-

ness when opposing a motion for summary judgment based on a statute of limitations defense. *Church v. General Electric Company*, 1997 WL 129381 at * 4 (D.Mass. March 20, 1997) ("the plaintiff bears the burden of pointing to facts of record that would justify a factfinder in concluding that the suit is timely"); *Reading Cycles v. Bradley*, 1992 WL 93221 at * 1 (D.Mass. April 13, 1992) ("to defeat a motion for summary judgment based on the statute of limitations on a M.G.L. c. 93A claim, the plaintiff must offer admissible evidence sufficient for a reasonable fact finder to decide that it did not know of the injury for which it seeks to recover within four years of the filing of the action"); *see also Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.*, 119 F.3d at 65 ("[u]nder Massachusetts law, the plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations"). Consequently, it is also the plaintiff's responsibility to identify the allegations of misconduct which provide the basis for the chapter 93A claim and the corresponding facts which make the alleged chapter 93A violation timely. Accordingly, this court confines its analysis to the allegations of chapter 93A violations set forth by the Suburban Assignees in Count IX and in opposition to the summary judgment motion.

its reasoning. Such reasoning would result in the limitations period continually recommencing even though Suburban incurred losses and Sentry investigated the claim, declined coverage and ceased its involvement with the state court action and with Suburban in 1989. In addition, the Suburban Assignees fail in their burden of offering admissible evidence of additional misrepresentations, beyond those taking place in 1989, which demonstrate the timeliness of the chapter 93A claim.

The crux of the Suburban Assignees' chapter 93A claim is that Sentry misrepresented the terms of the policies and/or failed to adopt and implement reasonable standards to investigate the claim and ensure that the recreations of the policies accurately reflected the terms of such policies. (Docket Entry # 109, p. 12).[41] Any such misconduct as well as loss connected to the misrepresentation or unfair act or deceptive practice, however, occurred in 1988 or 1989. As already discussed and for reasons stated in the preceding section, the Suburban Assignees' misrepresentation claim about the terms of the policies accrued in 1989. For similar reasons, the Suburban Assignees' claim that Sentry committed unfair or deceptive acts by misrepresenting the terms of the policies accrued in 1989. Sentry's alleged failure to institute reasonable standards to investigate the claim and ensure that the recreations accurately reflected the terms of the policies likewise took place in 1989 when Sentry recreated the policies, reversed its position and denied coverage. Sentry's investigation of the claim ceased in 1989. Suburban began to incur defense costs connected to the misrepresentations concerning the terms of the policies, Sentry's refusal to pay the claim without conducting a reasonable investigation, Sentry's failure

to make a coverage determination with respect to the 1987 umbrella policy and Sentry's failure to implement reasonable standards to ensure that the recreations accurately reflected the terms of the actual policies in 1989. Suburban therefore suffered a loss connected to the allegedly unfair or deceptive acts in 1989.

Even assuming application of the discovery rule, Sentry's abrupt reversal in March 1989 of its earlier decision to allow coverage was reasonably likely to put Suburban on notice that Sentry lacked reasonable standards to investigate the claim and/or to ensure the accuracy of the terms in the recreated policies. Accordingly, the allegations of chapter 93A violations set forth in the Suburban Assignees' opposition (Docket Entry # 109) and the first and second allegations of misconduct listed in Count IX and paraphrased *supra* are untimely.

With respect to the two remaining allegations of chapter 93A violations identified in Count IX, the Suburban Assignees fail to proffer admissible facts sufficient for a reasonable factfinder to conclude that Sentry failed to effectuate a settlement and to remedy its denial of coverage decision once liability became reasonably clear. Beyond arguing that the chapter 93A claim accrued either upon the entry of the April 14, 1993 final judgment or with each unidentified "new" misrepresentation of the terms of the pollution exclusion, the Suburban Assignees do not argue, let alone proffer admissible evidence, as to when liability became reasonably clear. Indeed, the evidence in the record unequivocally points to Suburban's liability becoming reasonably clear in 1988 when Down to Earth Drilling tested the underground tanks and GMRC issued its report detail-

**41.** Therein, the Suburban Assignees also cite to section 3(9)(a) and 3(9)(c) of chapter 176D. Section 3(9)(a) provides that "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue" constitutes an unfair settlement practice. Section 3(9)(c) provides that "[f]ailing to adopt and implement reasonable standards for the

prompt investigation of claims arising under insurance policies" constitutes an unfair settlement practice. Mass. Gen. L. ch. 176D, § 3(9)(a) & (c). Such conduct provides a basis for liability under section 11 of chapter 93A only to the extent it violates section 2 of chapter 93A.

ing the findings. Although other parties may have been involved to a degree, Sentry's internal worksheets also confirm that Suburban's liability was reasonably clear. (Docket Entry # 147, Ex. 18 & 19). Sentry's alleged failure to effectuate a prompt settlement once liability became reasonably clear in 1988 and its failure to rectify its allegedly wrongful March 1989 coverage determination when the facts concerning coverage became reasonably clear took place in 1989. By that time, it was apparent that the declarations page of the recreated 1987 CLP policy did not list the special pollution exclusion endorsement and the declarations page of the recreated 1988 CLP policy listed the completed operations pollution exclusion and the body of the policy contained this exclusion as well as the conflicting special pollution exclusion endorsement thereby raising the specter of an ambiguity. Suburban incurred a loss connected to the allegedly unfair or deceptive acts in 1989 when it incurred defense costs. The Suburban Assignees proffer no evidence sufficient to withstand summary judgment indicating that liability did not become clear until a later date. Hence, they fail in their burden and the remaining two allegations in Count IX of Sentry's chapter 93A claim vis-a-vis the Suburban Assignees accrued no later than 1989 and are therefore untimely.[42]

II. *DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON THE 1986, 1989 AND 1990 POLICIES (DOCKET ENTRY # 88)*

Sentry moves for summary judgment on the claims asserted by plaintiffs against Sentry under the 1986, 1989 and 1990 CLP and umbrella policies. As to the 1986 CLP and umbrella policies, Sentry submits that there was no "occurrence" during the policy period (January 1, 1986 to January 1, 1987) which could trigger coverage. As to the 1989 and 1990 CLP and umbrella policies, Sentry argues that the known loss

doctrine bars coverage under these policies. (Docket Entry 88, 89 & 165).

Turning to the former argument, plaintiffs concede that there was no "occurrence" during the policy period in effect from January 1, 1986 to January 1, 1987, that could trigger coverage. (Docket Entry # 107). Under the 1986 CLP policy, Sentry agreed to pay Suburban "all sums which [Suburban] shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence." (Docket Entry # 147, Ex. 2). The policy defines "property damage" as destruction of property "which occurs during the policy period" and "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." (Docket Entry # 147, Ex. 2). The 1986 umbrella policy contains similar definitions and indemnifies Suburban for all sums which Suburban becomes "obligated to pay by reason of legal liability for damages ... if the legal liability for damages results from ... property damage ... to which this insurance applies, caused by an occurrence." (Docket Entry # 147, Ex. 1). Subsequent policies carry these same obligations and definitions forward.

Thus, the policies are third party policies of the occurrence variety inasmuch as they provide coverage only for occurrences within the policy periods. *See Appalachian Insurance Company v. Liberty Mutual Insurance Company*, 676 F.2d 56, 60 (3d Cir.1982) (defining policy as occurrence policy where coverage is provided for occurrences within policy period); *Baker v. Aetna Casualty and Surety Company*, 1996 WL 451316 at * 15 n. 10 (D.N.J.1996) (distinguishing first party and third party policies with comprehensive general liability policies falling in latter category). Absent an applicable exclusion, contamination

---

**42.** Likewise, viewing the facts in Sentry's favor and mindful of plaintiffs' burden as the moving party, plaintiffs' cross motion for summary judgment is without merit as to the timeliness of the Suburban Assignees' chapter 93A claim.

of soil constitutes property damage within the meaning of the policies. *See Trustees of Tufts University v. Commercial Union Insurance Company,* 415 Mass. 844, 616 N.E.2d 68, 74 (1993) (quoting *Hazen Paper Company v. United States Fidelity and Guaranty Company,* 407 Mass. 689, 555 N.E.2d 576 (1990)). The relevant inquiry, therefore, is whether the property damage occurred within the policy period. *Trustees of Tufts University v. Commercial Union Insurance Company,* 616 N.E.2d at 73. It is undisputed that Suburban did not begin work at the station until November 1987. Hence, Sentry is entitled to summary judgment with respect to the claims against it under the 1986 CLP and umbrella policies.

■■■ The latter argument, resting on the known loss doctrine, requires a more detailed analysis. Under Massachusetts law, the known loss doctrine is an affirmative defense which the insurer bears the burden of establishing at trial. *United States Liability Insurance Company v. Selman,* 70 F.3d 684, 691 (1st Cir.1995). The summary judgment framework therefore differs inasmuch as Sentry, the moving party, bears the underlying burden of proof. As noted in this circuit, "The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." *Vargas v. Cummings,* 149 F.3d 29, 35 (1st Cir.1998). Consequently, if the moving party bears the burden of proof because he is a defendant asserting an affirmative defense, " 'he must establish beyond peradventure all of the essential elements of the . . . defense to warrant judgment in his favor'." *Vargas v. Cummings,* 149 F.3d at 36 (quoting *Fontenot v. Upjohn Company,* 780 F.2d 1190, 1194 (5th Cir.1986)); *accord Rushing v. Kansas City Southern Railway Company,* 185 F.3d 496, 1999 WL 615161 at * 4 (5th Cir. Aug.30, 1999) (moving party who

bears burden of establishing affirmative defenses "must adduce evidence to support each element of its defenses to demonstrate the lack of any genuine issue of material fact"). As always, the party seeking summary judgment bears the initial responsibility of informing the "court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In moving for summary judgment on the known loss doctrine, Sentry cites only paragraphs 25 to 27 of the amended complaint (Docket Entry # 51), paragraph four and exhibit A of the affidavit of Adamski (Docket Entry # 95), the provisions of the policies (Docket Entry # 95, Ex. I, ¶¶ 4–10 & Ex. 1–2) and paragraph 28 of plaintiffs' statement of undisputed facts (Docket Entry # 140).[43] (Docket Entry 89 & 165). These portions of the pleadings, affidavits, admissions and exhibits establish that Sentry issued CLP and umbrella policies to Suburban which incepted on January 1, 1986, with annual renewals thereafter. The last renewal was for the January 1, 1990 to January 1, 1991 term, i.e., the 1990 CLP and umbrella policies.

As also set forth in the aforementioned portions of the record, in February 1988 gasoline was discovered in the Rockport sewer system and traced back to the station. JBI promptly notified Suburban of the gasoline release. On April 5, 1988, Suburban notified Sentry of JBI's claim concerning the gasoline releases. (Docket Entry # 51, ¶ 25; Docket Entry # 140, ¶ 28; Docket Entry # 95, ¶ 4).

---

43. Plaintiffs do not include or incorporate by reference a statement of undisputed facts in their opposition with respect to this summary judgment motion. (Docket Entry # 107). Inasmuch as plaintiffs fail to controvert Sentry's statement, the material facts in the record set forth in the statement are admitted for purposes of the present summary judgment motion. LR. 56.1.

Beaudette and JBI hired GMRC to conduct a subsurface investigation at the station. Upon excavating and testing the four underground storage tanks in March 1988, Down to Earth Drilling determined that two of the four underground storage tanks did not perform properly. (Docket Entry # 51, ¶¶ 26–27).

On February 8, 1989, the DEQE issued a notice of responsibility letter to Beaudette.[44] The letter informs Beaudette that gasoline contaminated groundwater on his property is infiltrating the Rockport sewer system. In no uncertain terms the letter advises Beaudette of his potential legal liability for damages and clean up costs as a responsible party under Massachusetts General laws chapter 21E. The letter further identifies Beaudette as a potential source of the gasoline release. (Docket Entry # 147, Ex. 11).

On March 31, 1989, JBI filed suit against Suburban for damages resulting from its work at the station in the fall of 1987. The complaint notes that JBI continues to incur containment costs and damages resulting from Suburban's installation of the gasoline dispensing system. It also alleges that Suburban is liable for costs and damages that JBI not only has incurred but also those costs and damages that JBI may incur as a result of the gasoline releases at the station. (Docket Entry # 95, ¶ 4 & Ex. 1). Thus, as of March 31, 1989, Suburban had actual knowledge of its potential liability for costs and damages with respect to the continued contamination of the soil and groundwater resulting from its work at the station.

## DISCUSSION

■ The known loss doctrine has its roots in the prevention of fraud on the part

of the insured. *Aetna Casualty & Surety Company v. Dow Chemical Company,* 10 F.Supp.2d 771, 788 (E.D.Mich.1998). Under its common law form,[45] the doctrine "derives from the fundamental requirement of fortuity in insurance law." *Pittston Company Ultramar America Limited v. Allianz Insurance Company,* 124 F.3d 508, 516 (3rd Cir.1997). Insurance is designed to guard against risks not against already known losses. Thus, where an insured knows of the loss in advance of the insurance policy's effective date, the doctrine precludes coverage. Stated otherwise, the known loss doctrine "precludes coverage when the insured knows in advance of the policy's effective date that a specific loss has already happened or is substantially certain to happen." *United States Liability Insurance Company v. Selman,* 70 F.3d at 690.

State courts, however, "are divided as to the scope of the known loss doctrine." *Pittston Company Ultramar America Limited v. Allianz Insurance Company,* 124 F.3d at 516. A number of courts require only objective knowledge while others require subjective knowledge. In addition, some courts require knowledge of the property damage whereas others additionally require knowledge of the insured's legal liability arising from the property damage. *See Pittston Company Ultramar America Limited v. Allianz Insurance Company,* 124 F.3d at 516; *Aetna Casualty & Surety Company v. Dow Chemical Company,* 10 F.Supp.2d at 787–788.

■ Massachusetts law requires subjective knowledge on the part of the insured with respect to the common law version of the doctrine. *United States Liability Insurance Company v. Selman,* 70

**44.** Although Sentry fails to identify the page reference to this notice of responsibility letter, *see* LR. 56.1, it is exhibit 11 to the Attorney Roberts' affidavit.

**45.** Sentry does not cite to the language in the policies which define an occurrence as an accident "neither expected nor intended from the standpoint of the insured." Rather, it

bases its known loss argument on the common law version of the doctrine. *See generally United States Liability Insurance Company v. Selman,* 70 F.3d at 690 (discussing the two versions of the doctrine, one based on the contract and the provision defining occurrences and the other based on the common law).

F.3d at 691. The question therefore devolves as to whether Suburban purchased the 1989 and/or 1990 policies with actual knowledge of the loss for which it now seeks coverage. *See Aetna Casualty & Surety Company v. Dow Chemical Company,* 10 F.Supp.2d at 787.

The relevant loss is not simply knowledge of the soil contamination and its source. *See SCA Services, Inc. v. Transportation Insurance Company,* 419 Mass. 528, 646 N.E.2d 394, 398 (1995) (noting that SCA's knowledge went beyond simply knowing the existence of environmental contamination and its source); *United States Liability Insurance Company v. Selman,* 70 F.3d at 690–691 (discussing *SCA* and noting that SCA had " 'full knowledge' of its probable liability for [the class members'] damages prior to purchasing the insurance policy"). Rather, in the context of third party policies such as those at issue in this case, the insured's knowledge must include knowledge of the substantial probability of liability in the underlying suit. *See SCA Services, Inc. v. Transportation Insurance Company,* 646 N.E.2d at 396 (concluding that risk was uninsurable inasmuch as "SCA's liability in the underlying suit was a certainty, a 'known loss' "). Thus, in *SCA,* because "SCA had full knowledge of the probable loss for which it later sought defense and indemnification," the loss was uninsurable under the comprehensive general liability policy. *SCA Services, Inc. v. Transportation Insurance Company,* 646 N.E.2d at 398.

The SJC in *SCA* cited to three cases as examples of the known loss doctrine applied to environmental contamination. *See SCA Services, Inc. v. Transportation Insurance Company,* 646 N.E.2d at 397. One of the three cases, *Gloucester v. Maryland Casualty Company,* 668 F.Supp. 394 (D.N.J.1987), is particularly instructive with respect to the 1990 policies. In *Gloucester,* state authorities closed the landfill and the state department of environmental protection filed a complaint for clean up costs and damages at the contaminated landfill in 1980. In April 1982 the Township filed a declaratory judgment action seeking indemnification from various insurers. In July 1982 coverage began under the general liability policy at issue. Because the Township, which owned the land wherein the landfill was situated, had actual knowledge of the loss due to the environmental contamination at the landfill, the risk was uninsurable and the court therefore allowed the insurer's summary judgment motion. *Gloucester v. Maryland Casualty Company,* 668 F.Supp. at 402–403.

■ Similarly, there can be no doubt that on January 1, 1990, Suburban had actual knowledge of the substantial probability that it would be liable for damages and clean up costs resulting from the past or the continued contamination of the underground soil at the station due to the release of gasoline. Prior thereto, JBI had filed suit against Suburban to recover the costs and damages of the gasoline releases at the station. Indeed, plaintiffs presently seek indemnification and defense costs associated with this underlying suit which was filed before the effective dates of the 1990 policies.

Plaintiffs' argument that there are genuine issues of material fact as to whether an occurrence and property damage took place during the period of the 1990 policies is irrelevant to the application of the known loss doctrine. In other words, even assuming the existence of coverage, as the SJC assumed in *SCA Services, Inc. v. Transportation Insurance Company,* 646 N.E.2d at 396, the known loss doctrine bars coverage due to the insured's actual knowledge of the loss at the time of the inception of the policy irrespective of coverage under the terms of the policy.

■ Suburban is therefore entitled to summary judgment on the claims for cov-

erage under the 1990 CLP and umbrella policies. Under the 1989 policies, the issue is what Suburban knew on January 1, 1989. At that time, based on the undisputed facts in the record presented by Sentry, JBI had notified Suburban of the gasoline contamination at the station. As of January 1, 1989, Suburban had also notified Sentry of a potential claim stemming from its work at the station in late 1987. Down to Earth Drilling had filed a report but, based on the facts of record presented by Sentry, it is unclear whether Suburban had knowledge of the report which, in essence, determined that its work was the cause of the release. In addition, the DEQE had not yet issued its notice of responsibility which, in any event, was addressed to Beaudette. Finally, JBI had not yet filed suit against Suburban. Based on these undisputed facts, there is a genuine issue of material fact as to whether Suburban had actual knowledge on January 1, 1989, of a substantial probability that it would be liable for the gasoline releases at the station. Viewing this record in plaintiffs' favor, Suburban may not have had actual knowledge of a substantial probability that its work caused the release. Rather, through JBI, Suburban simply knew of the existence of gasoline contamination at the station. (Docket Entry # 51, ¶ 25). Suburban did not necessarily know of the report or its findings. If presented with a more developed argument supported by undisputed facts in the record, this court may well have decided this issue differently. Sentry, however, bears the burden of identifying those portions of the summary judgment record which entitle it to relief as well as establishing beyond peradventure the essential elements of its affirmative defense. Sentry fails in this burden.[46]

46. Sentry may, of course, raise the issue in post trial motions.

47. This court addresses item numbers three and four as well as arguments raised by plaintiffs in their cross motion (Docket Entry

III. *DEFENDANT SENTRY INSURANCE A MUTUAL COMPANY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CHAPTER 93A, TORT AND OTHER CLAIMS (DOCKET ENTRY # 90); CROSS–MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFFS HAVE STANDING TO PURSUE THESE CLAIMS (DOCKET ENTRY # 110)*

As previously described, Sentry moves for summary judgment on various claims brought by Beaudette and JBI because: (1) Beaudette is not a "judgment debtor" within the meaning of section 3(9) of chapter 214 and, therefore, cannot bring a reach and apply claim under section 214; (2) Beaudette and JBI lack a private right of action under sections 112 and 113; (3) Beaudette and JBI cannot assert a chapter 93A claim due to the absence of a business or contractual relationship; (4) Beaudette and Sentry cannot assert a chapter 93A claim based on a violation of section 176D because their chapter 93A claim arises under section 11;[47] (5) the chapter 93A, negligence, misrepresentation and estoppel claims are time barred; (6) Beaudette's and JBI's misrepresentation claim is deficient due to the absence of any commercial, transactional or fiduciary relationship which might give rise to a duty on the part of Sentry, the absence of any reasonable reliance and the absence of any evidence that Sentry intended to induce JBI to act on the alleged misrepresentation concerning coverage; (7) Beaudette's and JBI's estoppel claim fails due to the lack of reasonable reliance and the lack of a legal or transactional relationship with Sentry; and (8) Beaudette's and JBI's negligence claim fails because of the absence of any duty of care between Sentry vis-a-vis Beaudette and JBI. (Docket Entry 91 & 164). Plaintiffs oppose the motion and seek summary judgment that they have standing.[48] (Docket Entry # 110). The

# 110) with respect to chapter 93A collectively under the chapter 93A heading *infra*.

48. For purposes of resolving plaintiffs' motion, this court views the facts in Sentry's favor.

arguments are addressed *seriatim* with facts, to the extent relevant to the particular argument, noted where applicable.

### 1. *Beaudette's Reach and Apply Claim*

Count II of the amended complaint is styled as a reach and apply claim by Beaudette and JBI. The body of the count, however, simply states that JBI has the right to reach and apply the judgment in the state court action against Sentry. (Docket Entry #51, §§ 50–52). Sentry seeks dismissal of Beaudette's claim in Count II.

Plaintiffs' opposition clarifies that the claim is only brought on behalf of JBI. (Docket Entry #110). Count II is therefore limited to a reach and apply claim brought by JBI under chapter 214 claim.

### 2. *Beaudette's and JBI's claims under sections 112 and 113*

Sentry next asserts that sections 112 and 113 do not create a private right of action. More specifically, because neither JBI nor Beaudette were parties to the insurance contract between Sentry and Suburban, they lack a private right of action under these sections, according to Sentry.[49] (Docket Entry #91). Rather than directly address this legal argument, plaintiffs submit that Sentry continued to deny coverage after it became aware that Phillips executed the special pollution exclusion endorsement after the date of the loss in violation of section 112. Plaintiffs additionally contend that section 112 prohibits Sentry from altering or diminishing coverage once a loss has occurred. (Docket Entry #110).

 Plaintiffs style Count III under section 112 and Count IV under section 113 in the same manner that they style Count II. As previously noted, plaintiffs represent that Count II is only brought on behalf of JBI. This court therefore assumes that counts III and IV are brought on behalf of JBI as opposed to both JBI and Beaudette.[50]

---

**49.** Sentry fails to cite any case law or other legal authority to support its argument.

**50.** Arguably, counts III and IV may be read to include a claim by Beaudette as well as by JBI. In the event this court's assumption that counts III and IV are brought solely on behalf of JBI is incorrect, plaintiffs shall file a statement within 14 days of the date of this opinion indicating that counts III and IV include claims brought by Beaudette as well as JBI. The statement should include a memorandum citing legal authority to support the right of Beaudette, a non-judgment creditor, to bring a direct action against the insurer of Suburban, defendant in the underlying state court action. In order to maintain a direct claim against an insurer, the injured plaintiff in the underlying action "must recover a final judgment against [the] insured" prior to initiating the direct action against the insurer of the defendant in the underlying action. *Modern Continental Construction Company, Inc. v. United Capital Insurance Company, Inc.*, 1990 WL 44149 at * 1 (D.Mass. April 5, 1990) (citing section 113); *see Rogan v. Liberty Mutual Insurance Company*, 305 Mass. 186, 25 N.E.2d 188, 189 (1940) (sections 112 and 113 and chapter 214 afford remedy to injured plaintiff against insurer and "require as a prerequisite to suit 'the recovery of a final judgment' against the insured wrongdoer"); *Lorando v. Gethro*, 228 Mass. 181, 117 N.E.

185, 188 (1917) (noting that predecessor statute to section 112 allows "one, who has recovered a judgment against [the assured] on a liability, ...., to bring suit in his own name" against the insurer); Joseph R. Nolan and Laurie J. Sartorio 31 *Massachusetts Practice* § 387 (1993) (statutory action to reach and apply obligation owed to debtor by insurance company under sections 112, 113 and chapter 214 "must be instituted by the judgment creditor"); *see also V & V Corporation v. American Policyholders' Insurance Company*, 127 N.H. 372, 500 A.2d 695, 699 (1985) ("any direct suit against the insurer allowed under Massachusetts law requires as a prerequisite a 'judgment' against the insured"); *see, e.g., Shapiro v. State Farm Mutual Insurance Company*, 355 Mass. 54, 242 N.E.2d 753, 755 (1968) (noting, in suit filed by the plaintiff, a judgment creditor of the defendant insured, that "valid judgment in the original action ... is a prerequisite to the present suit"). If plaintiffs choose to file the aforementioned statement and memorandum, they should distinguish each of these cases and authority from Beaudette's claim under sections 112 and 113. Failure to file the statement shall constitute a waiver of Beaudette's claims under sections 112 and 113 to the extent set forth in counts III and IV.

Contrary to Sentry's assertion, section 112 gives a judgment creditor of the insured " 'a lien against the loss and *the right* to damages or indemnity arising under the policy and *to enforce it in his own name.*' " *Mayer v. Medical Malpractice Joint Underwriting Association of Massachusetts,* 40 Mass.App.Ct. 266, 663 N.E.2d 274, 278–279 (1995) (quoting *Lorando v. Gethro,* 117 N.E. at 187; emphasis added), *review denied,* 422 Mass. 1110, 665 N.E.2d 1003 (1996). Thus, the injured party can have the insurance money of the judgment debtor applied to satisfy his judgment against the insured/judgment debtor and is given a temporary lien upon the insurance money which he may enforce "by the usual remedies of a judgment creditor [citing *Lorando*] or by G.L. c. 214, § 3." *Lunt v. Aetna Life Insurance Company,* 253 Mass. 610, 149 N.E. 660, 661 (1925) (elsewhere noting that the SJC in *Lorando* declared sections 112 and 113 constitutional). In addition, sections 112 and 113 "enable the judgment creditor to secure the application of the insurance money" to satisfy the judgment without requiring the insured to initially pay the judgment. *Kana v. Fishman,* 276 Mass. 206, 176 N.E. 922, 923 (1931).[51]

All of the relevant statutes, sections 112 and 113 and section three of chapter 214, authorize the judgment creditor to reach and apply the proceeds of the judgment debtor's liability policy to satisfy the judgment "to the extent [the judgment] embraces covered claims." *Palermo v. Fireman's Fund Insurance Company,* 42 Mass.App.Ct. 283, 676 N.E.2d 1158, 1164 (1997); *accord Saunders v. Austin W. Fishing Corporation,* 352 Mass. 169, 224 N.E.2d 215, 218 (1967) (section 113 and section three of chapter 214 "permit the proceeds of an insurance policy to be reached and applied in satisfaction of a judgment"); *Swift v. Fitchburg Mutual Insurance Company,* 45 Mass.App.Ct. 617, 700 N.E.2d 288, 293 (1998) (citing sections 112 and 113 and section three of chapter

214 for principle that the plaintiffs, injured parties who obtained judgment against insured, "may reach and apply the insurance money to satisfy the judgment"), *review denied,* 428 Mass. 1108, 707 N.E.2d 366 (1998). As recognized by the SJC, sections 112 and 113 establish the plaintiff's right to the insurance proceeds and section three of chapter 214 gives the Massachusetts Superior Court jurisdiction over the reach and apply claims against the insurer. *Geehan v. Trawler Arlington, Inc.,* 371 Mass. 815, 359 N.E.2d 1276, 1278 (1977); *see also* Joseph R. Nolan and Laurie J. Sartorio 31 *Massachusetts Practice* § 387 (1993) (citing sections 112 and 113 and section three of chapter 214 for the statement that, "There exists statutory jurisdiction to entertain actions by creditors to reach and apply the obligation owed to the debtor by an insurance company"); *see, e.g., Shapiro v. State Farm Mutual Insurance Company,* 242 N.E.2d at 754 (bill in equity to reach and apply proceeds of liability policy to satisfy judgment, citing sections 112 and 113 and section three of chapter 214).

By its terms, section 113 allows the judgment creditor, "[u]pon the recovery of a final judgment" for a "loss or damage specified" in section 112, to have the insurance money of the judgment debtor applied to satisfy the judgment "as provided for in" section 3(9) of chapter 214. Mass. Gen. L. ch. 175, § 113. Section 3(9) of chapter 214 gives the SJC and Massachusetts superior courts jurisdiction over an action "to reach and apply the obligation of an insurance company to a judgment debtor" under a liability insurance policy "in satisfaction of a judgment covered by such policy." Mass. Gen. L. ch. 214, § 3(9). In sum, sections 112 and 113 and section three of chapter 214 provide the statutory basis for an action in equity by the judgment creditor to reach and apply the proceeds of an insurance policy of a judgment debtor.

**51.** The later amendments to sections 112 and 113 do not affect the SJC's pronouncement in

*Kana.*

Because all three statutory sections provide the same relief by allowing the judgment debtor to recover the amount of the judgment to the extent the policy covers the claims, plaintiffs in essence seek the same damages in counts II, III and IV albeit under different statutes.[52] Sentry's four sentence argument that sections 112 and 113 do not provide JBI with a private cause of action, however, does not provide a basis to dismiss these counts. This court expresses no opinion as to whether counts III and IV are subject to dismissal on other grounds.

### 3. Beaudette's and JBI's chapter 93A claim

As a threshold issue, it is necessary to determine whether Beaudette and/or JBI are section nine or section 11 plaintiffs. Plaintiffs' cross motion for summary judgment additionally seeks to establish that the Suburban Assignees have standing as section 11 plaintiffs.

Plaintiffs submit that Beaudette and JBI are section 9 plaintiffs. They also contend that Beaudette's and JBI's status as third party beneficiaries to the insurance policies and that JBI's status as a judgment creditor create the necessary business relationship to maintain a section 11 action.

In addition to the previously summarized facts to support plaintiffs' argument, Beaudette avers that as a result of the gasoline leak at the station he was forced to take out loans, liquidate assets and use personal income and savings to satisfy response costs and to pay his attorneys. The Massachusetts Department of Environmental Protection threatened to arrest Beaudette, according to Beaudette. In addition, he was "forced to the brink of bankruptcy attempting to finance the response costs and attorney's fees." He also experienced a loss of rent due to the release of the gasoline at the station. (Docket Entry # 142).

A plaintiff seeking damages under chapter 93A must proceed under one of two statutory sections, section nine or section 11.[53] *Shawmut Community Bank v. Zagami*, 411 Mass. 807, 586 N.E.2d 962, 966 (1992). Section nine applies to consumers, individuals who participate " 'in commercial transactions on a private, non-professional basis.' "[54] *Shawmut Community Bank v. Zagami*, 586 N.E.2d at 966. By the statute's terms, a section

---

**52.** Count II under section three of chapter 214 generally states that JBI has the right to reach and apply the proceeds of Sentry's obligations to Suburban to satisfy Suburban's liability. Count III under section 112 provides that Sentry's obligation became fixed with the first release of gasoline thereby preventing Sentry from subsequently altering the terms of coverage. Citing section 113, Count IV states that any changes to the 1987 or 1988 policies do not alter JBI's right to reach and apply Sentry's contractual obligations under the 1987 and 1988 policies. Plaintiffs could easily have brought a single reach and apply count, citing the aforementioned statutory sections and setting forth the above described theories of recovery.

**53.** See footnote number 37.

**54.** Section 9(1) entitles any person, other than a person entitled to bring an action under section 11, who has been injured by an act or practice declared unlawful under section two or affected by another person's violation of clause nine of section 176D to bring an action for damages and equitable relief. Mass. Gen.

L. ch. 93A, § 9(1). Section two prescribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. ch. 93A, § 2(a). Thus, section two, like section 11, employs the phrase "in the conduct of any trade or commerce." The language in section two only applies "to those acts or practices which are perpetrated in a business context." *Lantner v. Carson*, 374 Mass. 606, 373 N.E.2d 973, 976 (1978). The words in sections two and 11 are construed similarly. *Lantner v. Carson*, 373 N.E.2d at 976. The distinction between persons suing under section nine for unfair or deceptive practices under section two and persons suing under section 11, which applies to "persons engaged in the conduct of any trade or commerce," is that both parties in a section 11 claim must be acting in a business context whereas a section nine consumer need only suffer a loss as a result of an unfair or deceptive act or practice by a businessman. *See Lantner v. Carson*, 373 N.E.2d at 976.

nine plaintiff is "[a]ny person, other than a person entitled to bring an action under section eleven." Mass. Gen. L. ch. 93A, § 9. A section 11 individual is "any person who engages in the conduct of any trade or commerce." Mass Gen. L. ch. 93A; *see also City of Boston v. Aetna Life Insurance Company,* 399 Mass. 569, 506 N.E.2d 106, 110 (1987) (standing requirement of section 11, if one exists, is that the plaintiff must be " 'person who engages in the conduct of any trade or commerce' ").

Section 11 therefore applies "if, first, the interaction between the parties is commercial in nature, and second, the parties were both engaged in trade or commerce, and therefore acting in a business context." *Trustees of Boston University v. ASM Communications, Inc.,* 33 F.Supp.2d 66, 76 (D.Mass.1998) (internal quotation marks and brackets omitted); *Linkage Corporation v. Trustees of Boston University,* 425 Mass. 1, 679 N.E.2d 191, 206–207 (1997) (section 11 requires interaction which "is 'commercial' in nature" between two parties "engaged in 'trade or commerce' "), *cert. denied,* 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997). In other words, section 11 requires both a commercial transaction between persons who are both engaged in trade or commerce. *Linkage Corporation v. Trustees of Boston University,* 679 N.E.2d at 206–207.

In general, no commercial relationship exists where the parties only contact occurs in the context of litigation. *See First Enterprises, Limited v. Cooper,* 425 Mass. 344, 680 N.E.2d 1163, 1165 (1997). Section 11's commercial transaction requirement likewise excludes from its reach "intra-enterprise" or strictly private transactions between parties in the same venture. *Linkage Corporation v. Trustees of Boston University,* 679 N.E.2d at 207 & n. 33; *see, e.g., Linthicum v. Archambault,* 379 Mass. 381, 398 N.E.2d 482 (1979) (duplex owner who rented half of duplex to tenant and occupied remaining half was engaged

in commerce under section 11 for purposes of suit against roofing contractor).

Section 11's reference to persons engaged in trade or commerce specifically refers "to individuals acting in a business context." *Lantner v. Carson,* 373 N.E.2d at 976; *accord Linkage Corporation v. Trustees of Boston University,* 679 N.E.2d at 207. The " 'business context test' " arising out of the legislature's use of the aforementioned language in section 11 involves assessing various relevant factors such as " 'the nature of the transaction, the character of the parties involved, . . . the activities engaged in by the parties . . . whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons and whether the participant played an active part in the transaction.' " *Linkage Corporation v. Trustees of Boston University,* 679 N.E.2d at 207 (quoting *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167, 176 (1980)); *see also Poznik v. Massachusetts Medical Professional Insurance Association,* 417 Mass. 48, 628 N.E.2d 1, 3 (1994).

With Sentry having identified the absence of evidence to support a finding that Beaudette and JBI were section nine plaintiffs, plaintiffs fail to proffer sufficient facts indicating a genuine issue of material fact as to Beaudette's and JBI's section nine status. To the contrary, as pointed out by plaintiffs, Beaudette was the sole officer, director and shareholder of JBI, which owned the station where the gasoline release occurred. It is true that the DEQE issued a notice of responsibility letter to Beaudette as opposed to JBI. (Docket Entry # 142). The letter, however, identifies him as a responsible party because he was "the present owner of the gasoline service station" where the gasoline release occurred. (Docket Entry # 147, Ex. 11). It is also true that Beaudette spent personal income and savings to pay for response costs as well as attorneys' fees stemming from the gasoline release at the station. Such facts, however, do not

detract from the commercial nature of Beaudette's and JBI's interaction with Sentry as well as their involvement in trade or commerce. Nor does Beaudette's status as an individual automatically insulate his activities from the reach of section 11. The character of the parties involved, Beaudette and JBI, is commercial. Their attempts to seek reimbursement from Sentry under liability policies covering purportedly negligent commercial work at a commercial property inevitably characterizes their interactions with Sentry as arising in a business context for purposes of determining that they were engaged in trade or commerce within the meaning of section 11.

The involvement of JBI and Beaudette, as JBI's sole officer and shareholder, with Sentry results only from Sentry's issuance of insurance policies to Suburban and the claims arising thereunder for Suburban's commercial work at the station. JBI, as owner of the station, and Beaudette, as sole officer and shareholder of JBI, were acting in a business context in connection with a gasoline release at a commercial property. Accordingly, they are section 11 plaintiffs.[55] *See, e.g., DiVenuti v. Reardon,* 37 Mass.App.Ct. 73, 637 N.E.2d 234, 239 (1994) (DiVenuti's property was a business property which barred him from filing claim under section nine and required him to proceed with claim under section 11); *Brown v. Gerstein,* 17 Mass.App.Ct. 558, 460 N.E.2d 1043, 1052–1053 (1984) (the plaintiffs, as lessors of commercial property, were acting in business context and engaging in trade or commerce thereby requiring lower court to address chapter 93A claim on the merits under section 11), *review denied,* 391 Mass. 1105, 464 N.E.2d 73 (1984); *see generally Shawmut Community Bank, N.A. v. Zagami,* 586 N.E.2d at 966 (noting that if the plaintiff had been dealing with bank as plumber or commercial landlord, he could have proceeded under section 11).

 Citing *Clegg v. Butler,* 424 Mass. 413, 676 N.E.2d 1134 (1997), *Flattery v. Gregory,* 397 Mass. 143, 489 N.E.2d 1257, 1260 (1986), *Leardi v. Brown,* 394 Mass. 151, 474 N.E.2d 1094 (1985), and *Van Dyke v. St. Paul Fire and Marine Insurance Company,* 388 Mass. 671, 448 N.E.2d 357 (1983), plaintiffs nevertheless submit that their status as third party beneficiaries allows them to assert a section nine claim. Plaintiffs reason that the amended language in section nine entitling "any person whose rights are affected by another" person's violation of chapter 176D to bring a section nine claim permits Beaudette and JBI to bring a section nine claim.

In 1979 the Massachusetts legislature expanded section nine to include any person "injured by another's use" of a method, act or practice deemed unlawful under section two and any person "affected by another person['s]" violation of clause nine of section 176D. Mass. Gen. L. ch. 93A, § 9(1). Section nine's broad inclusion of any person injured by an act or practice declared unlawful by section two and any person affected by another person's violation of clause nine of section 176D applies to section nine plaintiffs. It does not apply to section 11 plaintiffs who must proceed under the language of section 11 requiring a violation of section two. Not only did the Massachusetts legislature preface section nine with language unambiguously indicating that "[a]ny person" does not include a person entitled to bring a section 11 claim, but the Massachusetts legislature did not amend section 11 in 1979 to include a reference to section 176D or to any person injured. *See* Stephen S. Young, Esq. *Chapter 93A and the Insurance Industry,* Massachusetts Continuing Legal Education, § 1413 (1997).

Accordingly, plaintiffs' reliance on the "any person … injured" language or any person affected by another's section 176D violation in section nine as well as cases involving section nine plaintiffs, *Clegg v.*

---

**55.** Likewise, viewing the facts in Sentry's favor for purposes of resolving plaintiffs' cross motion for summary judgment, JBI and Beaudette are section 11 plaintiffs.

*Butler,* 424 Mass. 413, 676 N.E.2d 1134 (1997) (section nine plaintiff, an injured motorist, entitled to sue automobile owner's liability insurers), *Leardi v. Brown,* 394 Mass. 151, 474 N.E.2d 1094 (1985) (93A claim by section nine noncommercial tenants of apartment against landlord); *Van Dyke v. St. Paul Fire and Marine Insurance Company,* 388 Mass. 671, 448 N.E.2d 357 (1983) (section nine plaintiff, patient of physician, alleging physician's insurer violated section 176D by failing to effectuate settlement and refusing to pay claims without conducting reasonable investigation, entitled to bring chapter 93A claim against insurer), is misplaced. The language in section nine does not eviscerate the longstanding distinction between section nine and section 11 plaintiffs. After the 1979 amendments the necessary injury provision in section 11 remained unchanged, i.e., the required showing of a "loss of money or property." Mass. Gen. L. ch. 93A, § 11. Likewise, the Massachusetts legislature left intact section 11's language limiting the section's applicability to "[a]ny person who engages in the conduct of trade or commerce." Mass. Gen. L. ch. 93A, § 11. Extending the language in section nine to third party beneficiaries based on the aforementioned language in section nine would encompass beneficiaries involved in a commercial transaction between persons engaged in trade or commerce and thereby eviscerate the language in section 11 requiring a loss of money or property.[56]

**56.** The SJC has not yet reached the question of whether a section 11 plaintiff may also, in the alternative, bring a section nine claim as a person "whose rights are affected by another" person's violation of chapter 176D. *See City of Boston v. Aetna Life Insurance Company,* 399 Mass. 569, 506 N.E.2d 106, 109 (1987); *Kiewit Construction Company v. Westchester Fire Insurance Company,* 878 F.Supp. 298, 301 (D.Mass.1995); Michael Weinberg, Esq. and Lawrence J. McNally, Jr., Esq., *Kapp v. Arbella Mutual Insurance Co.: Multiple Damages in Statutory Actions Against Insurers,* 43 Boston Bar Journal 10, 23 n. 12 (1999) (whether section 11 business claimant may proceed under section nine for limited

In short, plaintiffs' reliance on *Clegg* and the SJC's construction therein of the language in section nine that " 'any person whose rights are affected by another' party's violation of G.L. c. 176D, § 3(9), is entitled to bring an action under c. 93A," *Clegg v. Butler,* 676 N.E.2d at 1139 (emphasis omitted), does not extend section nine standing to section 11 plaintiffs such as Beaudette and JBI. In addition, the plaintiffs in *Clegg, Van Dyke* and *Leardi* were consumers as opposed to commercial entities such as JBI or individuals acting in a business context such as Beaudette. Plaintiffs' argument that Beaudette and JBI have standing to raise a section nine claim as intended beneficiaries of the insurance contracts between Sentry and Suburban based on *Clegg, Van Dyke* and *Leardi* and the amended language of section nine is therefore unavailing.[57] Plaintiffs' citation to *Flattery v. Gregory,* 489 N.E.2d at 1260, is also misplaced inasmuch as *Flattery* involved a breach of contract claim grounded on third party beneficiary status as opposed to a chapter 93A claim.

█ Plaintiffs' argument that, as a judgment creditor under the policies, JBI has standing under section nine is similarly without merit. JBI is a judgment creditor of Suburban not Sentry. Moreover, the judgment creditor label is simply a legal designation which does not create section nine status nor sufficiently create a genuine issue of material fact as to JBI's section 11 status. *See Begelfer v. Najarian,* 409 N.E.2d at 176 ("person is not

purpose of recovering for violation of chapter 176D "remains unsettled"). For reasons already discussed, this court declines to extend Massachusetts law to allow a section 11 plaintiff to bring a section nine claim based on chapter 176D.

**57.** To the extent plaintiffs raise this argument in their cross motion for summary judgment by stating that they are entitled to pursue section nine claims against Sentry (Docket Entry # 110, p. 11), the motion is denied. The argument is also without merit in response to Sentry's summary judgment argument that Beaudette and JBI can only be characterized as section 11 plaintiffs.

engaged in trade or commerce merely by exercise of ... legal remedies"); *Waickowski v. Perry*, 1994 WL 89429 at * 3 (Mass.App.Ct. March 1, 1994). Furthermore, any such label results from the state court action which concerns Suburban's purportedly negligent commercial work at the station which caused a gasoline release onto JBI's commercial property. Recognizing JBI as a judgment creditor of Suburban does not alter the commercial nature of the relationship which gave rise to JBI becoming a judgment creditor. In short, JBI's and Beaudette's chapter 93A claim against Sentry falls under section 11.[58]

Sentry next submits that, separate and apart from the issue of whether Beaudette and JBI engaged in trade or commerce in a professional business capacity thereby qualifying as section 11 plaintiffs, section 11 plaintiffs must have a substantial business relationship in order to maintain a chapter 93A claim. Because Beaudette and JBI lack such a relationship with Sentry, summary judgment on Beaudette's and JBI's chapter 93A claims is required, according to Sentry.

The SJC has not directly addressed this additional requirement in a section 11 claim. Rather, in *Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 446 N.E.2d 681, 683 (1983), the SJC stated, in dicta, that it was "somewhat significant" that the plaintiffs, purchasers of real property, "had no contractual or business relationship" with the defendants, land surveyors hired by the sellers. Additionally noting the land surveyors' failure to take an active role in the negotiations and the signing of the agreement to purchase, the SJC declined to impose liability on the land surveyors under chapter 93A. *Nei v. Boston Survey Consultants, Inc.*, 446 N.E.2d at 683.

Federal courts as well as lower Massachusetts state courts extend *Nei* and require a transactional business relationship between the parties in order to maintain a section 11 claim. *See Reisman v. KPMG Peat Marwick, LLP*, 965 F.Supp. 165, 175 (D.Mass.1997); *Boyd v. Boston Gas Company*, 775 F.Supp. 435, 440 (D.Mass.1991); *Cash Energy, Inc. v. Weiner*, 768 F.Supp. 892, 894 (D.Mass.1991); *Commonwealth v. Homart Development Company*, 1997 WL 124103 at * 3–4 (Mass.Super. Feb.26, 1997) (collecting cases). It is also well recognized that "[s]ection 11 does not require privity of contract." *Boyd v. Boston Gas Company*, 775 F.Supp. at 440. More specifically, "privity is not required to maintain a nonwarranty-based action under 93A, i.e., one based on fraud, so long as the parties are engaged in more than a minor or insignificant business relationship." *Standard Register Company v. Bolton–Emerson, Inc.*, 38 Mass.App.Ct. 545, 649 N.E.2d 791, 795 (1995). Following the reasoning of these cases, this court will therefore assume, for purposes of the summary judgment motions only, that section 11 contains this additional requirement. Based on this case law, active participation in more than an insignificant manner satisfies the necessary business relationship. *See Nei v. Boston Survey Consultants, Inc.*, 446 N.E.2d at 684; *Standard Register Company v. Bolton–Emerson, Inc.*, 649 N.E.2d at 795; *Chestnut Hill Development Corporation v. Otis Elevator Company*, 653 F.Supp. 927, 933 (D.Mass.1987).

■ In the case at bar, there is a genuine issue of material fact as to whether the relationship between Sentry vis-a-vis JBI and Beaudette, in his capacity as sole officer and shareholder of JBI, was more than an insignificant business relationship. Viewing the record in JBI's and Beaudette's favor, JBI's attorney regularly corresponded with Gross until Sentry ceased its participation in July 1989. Presenting various arguments to Gross, JBI's attorney repeatedly urged Gross to reconsider Sentry's denial of coverage position. Accordingly, allowance of Sentry's summary judgment motion due to the absence

---

**58.** Of course, as previously noted, conduct which violates section 176D is relevant insofar as it may amount to an unfair method of competition or unfair or deceptive act or practice under section two.

of a transactional business relationship between JBI and Beaudette, sole officer and shareholder of JBI, and Sentry is inappropriate.

Plaintiffs counter that Sentry's motion for summary judgment as to the chapter 93A claim (Docket Entry # 90) must be denied due to Sentry's failure to demonstrate the absence of a genuine issue of material fact that Beaudette's and JBI's status as third party beneficiaries[59] and JBI's status as a judgment creditor create the necessary business relationship to maintain a section 11 claim. The determination of a genuine issue of material fact as to whether the relationship between Sentry vis-a-vis JBI and Beaudette was more than an insignificant business relationship forecloses the need to address this argument at this time.

### 4. Statute of Limitations

Sentry next submits that JBI's and Beaudette's chapter 93A claim in Count VIII and their other tort causes of action for estoppel in Count V and negligence and misrepresentation in Count VII are time barred. With respect to the chapter 93A claim under section 11 set forth in Count VIII, Sentry summarily asserts that the claim is barred by the four year limitations period applicable to chapter 93A for the same reasons that the Suburban Assignees' chapter 93A claim is time barred. Sentry therefore reasons that the same analysis articulated in its memorandum in support of summary judgment on the assigned claims of the Suburban Assignees applies to bar JBI's and Beaudette's chapter 93A claim. (Docket Entry # 91, n. 10).

Similarly, Sentry maintains that the estoppel, negligence and misrepresentation claims are time barred for the same reasons that the same claims brought by the Suburban Assignees are time barred. Sentry submits that the three year limitations period in Massachusetts General Laws chapter 260, section 2A, bars the misrepresentation and estoppel claims inasmuch as any harm occurred at the time Gross made the statements in June 1988, approximately eight years prior to the time JBI and Beaudette filed suit.[60] In lieu of elaborating upon the timeliness of JBI's and Beaudette's estoppel, negligence and misrepresentation claims, Sentry refers to the arguments raised in its memorandum in support of summary judgment

**59.** With respect to a third party beneficiary's contract claim, Massachusetts law recognizes the principle that, " 'when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement.' " *Rae v. Air–Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628, 632–633 (1982) (quoting *Brewer v. Dyer*, 61 Mass. 337, 7 Cush. 337, 340 (1851)). Massachusetts law also adopts *Restatement (Second) of Contracts* §§ 302, 304, 308 and 315 (1981) for determining whether a plaintiff is a third party beneficiary of a contract between two other parties. *Flattery v. Gregory*, 489 N.E.2d at 1260. It is also well settled that, "In order to recover as a third-party beneficiary, the plaintiffs must show that they were intended beneficiaries of the contract." *Spinner v. Nutt*, 417 Mass. 549, 631 N.E.2d 542, 546 (1994). Section 302 of *Restatement (Second) of Contracts* (1981), adopted in Massachusetts, provides the means for determining whether a plaintiff is an intended or merely incidental beneficiary of a contract. *See Flattery v. Gregory*, 489 N.E.2d at 1260; *Lambert*

*v. Fall River Five Cent Savings Bank*, 1995 WL 809506 at * 2 n. 3 (Mass.Super. May 31, 1995). Where payments are made directly to the beneficiary as opposed to the insured it is likely that the beneficiary is an intended as opposed to incidental beneficiary. *See Flattery v. Gregory*, 489 N.E.2d at 1261 (quoting illustration three in section 302 of *Restatement (Second) of Contracts* (1981)); *Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass. 535, 392 N.E.2d 1045, 1052 (1979).

Finally, it is not necessary for the contracting parties to identify the intended beneficiary at the time the contract is made. *Flattery v. Gregory*, 489 N.E.2d at 1261. "[N]or is it necessary that the promisee's obligation to pay the beneficiary be in existence when the contract is made." *Flattery v. Gregory*, 489 N.E.2d at 1261.

**60.** Sentry misconstrues the nature of JBI's and Beaudette's misrepresentation claim. The claim is based on Sentry's 1989 misrepresentations of the terms of the policies as opposed to Gross' 1988 representation of coverage.

on the assigned claims of the Suburban Assignees.[61] (Docket Entry # 91, n. 11 & 12).

Turning to the chapter 93A claim, JBI's and Beaudette's chapter 93A claim, as set forth in Count VIII, mirrors the Suburban Assignees' chapter 93A claim set forth in Count IX. Both claims, based on chapter 176D as well as on chapter 93A, identify the same four allegedly unfair claim settlement practices as violations of chapter 93A. (Docket Entry # 51, ¶¶ 72 & 77). As previously summarized, these allegations are that Sentry: (1) misrepresented pertinent insurance policy provisions relating to the coverage at issue; (2) refused to pay Suburban's claims without conducting a reasonable investigation; (3) failed to effectuate a prompt settlement of claims once liability became reasonably clear; and (4) failed to take steps to remedy its wrongful coverage decision when the facts concerning coverage became reasonably clear. In addition to these allegations of misconduct, JBI's and Beaudette's opposition asserts that Sentry violated chapter 93A "by misrepresenting the terms of the Policies" by: (1) "compelling insureds," i.e., Suburban, "to institute litigation to recover amounts due under the insurance policy;" (2) "attempting to settle a claim for less than the amount to which a reasonable man would have believed he is entitled by reference to the written or printed advertising material accompanying or made part of the application;"[62] (3) "failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the claim or for the offer of a compromised settlement;"[63] and (4) "failing to fulfill its duty of good faith." (Docket Entry # 110).

Like the misrepresentation claim asserted by the Suburban Assignees, JBI's and Beaudette's misrepresentation claim alleges that Sentry misrepresented the terms of the policies in 1989 and that JBI and Beaudette relied on the misrepresentations to their detriment. Similar to the Suburban Assignees' negligence claim, JBI's and Beaudette's negligence claim arises from Sentry's negligent refusal to provide defense and indemnity coverage and its failure to enter into a good faith settlement of the state court action and negligent handling of Suburban's claim.[64]

■ In seeking summary judgment on the basis of the statute of limitations and incorporating its arguments made in relation to the Suburban Assignees' time

61. The estoppel claim, however, is not an assigned claim brought by the Suburban Assignees. Hence, the supporting memorandum fails to articulate any reason for barring the estoppel claim on the basis of a statute of limitations. Rather, the only reason Sentry articulates for entering summary judgment on the timeliness of the estoppel claim is a two sentence argument in a footnote that the claim is governed by section 2A of Massachusetts General Laws chapter 260 ("section 2A").

This court, however, questions whether JBI's and Beaudette's estoppel claim is governed by section 2A. Unfortunately, plaintiffs do not address the argument. This court will therefore allow further briefing on the limited issue as to what Massachusetts statute of limitations, if any, governs JBI's and Beaudette's estoppel claim. The parties may, of course, stipulate or agree as to which statute of limitations applies. *See, e.g., Down East Energy Corporation v. Niagara Fire Insurance Company,* 176 F.3d 7, 14 (1st Cir.1999) (parties agreed that Maine six year statute of limita-

tions applied to estoppel claim in insurance coverage dispute). Briefs shall be limited to this legal issue. The parties shall not file additional facts. Sentry and plaintiffs shall limit the briefs to no more than four pages in length, double spaced, and file the briefs on or before November 9, 1999. No extensions of time shall be permitted. Pending receipt of such briefs, this court will hold in abeyance the summary judgment motion based on the timeliness of the estoppel claim. For reasons stated *infra,* Sentry's remaining arguments as to the viability of this claim are unavailing and not effected by this court's decision to allow limited further briefing.

62. This allegation quotes section 3(9)(h) of chapter 176D.

63. This allegation quotes section 3(9)(n) of chapter 176D.

64. The negligence claim is more particularly described *infra* in part III(7).

barred claims, Sentry overlooks the distinction between the loss or harm suffered by JBI and Beaudette from the negligent acts, the misrepresentations or the unfair or deceptive practices and those experienced by the Suburban Assignees. Sentry's misrepresentations of the terms of the policies in 1989 initially resulted in Sentry's failure to assume Suburban's defense in the state court action. Although Suburban suffered a loss by incurring defense costs, Sentry's misconduct did not immediately harm either JBI or Beaudette. To the contrary, the fact that Sentry did not assume the defense on behalf of Suburban more than likely worked to JBI's and Beaudette's benefit inasmuch as Suburban proved unable to financially mount a strong defense and its counsel eventually withdrew his representation prior to the entry of the default judgment. Indeed, Sentry's negligence in handling the defense and refusing to defend Suburban in the state court action more than likely contributed to the entry of the default judgment in JBI's and Beaudette's favor. To the extent JBI and Beaudette suffered any loss connected to the alleged laundry list of purportedly unfair or deceptive acts, such loss more than likely occurred when JBI obtained a final judgment in excess of $600,000 and Suburban proved unable to pay the judgment due to its financial condition. Similarly, it is likely that Sentry's alleged negligence in failing to assume Suburban's defense, as well as its other negligent conduct and its misrepresentations of the terms of the policies, resulted in an injury, if any, to JBI and Beaudette when Suburban failed to pay the April 1993 final judgment due to Sentry's failure to indemnify Suburban. Logically, Sentry's purported negligence, misrepresentations and unfair or deceptive acts did not cause JBI and Beaudette to incur litigation costs prior to the entry of the April 1993 final judgment. Taking this line of reasoning one step further, unlike its breach of duty in relation to its insured,

Sentry's breach in relation to JBI and Beaudette did not require Sentry to assume JBI's and Beaudette's costs in litigating their causes of action against Suburban.

In short, Sentry fails in its initial burden as the moving party seeking summary judgment. Although this court has grave doubts as to whether Sentry's conduct attained the necessary level of rascality or even falls within the penumbra of a common law misrepresentation claim, Sentry is not entitled to summary judgment on JBI's and Beaudette's negligence, misrepresentation and chapter 93A claims on the basis if its statute of limitations argument.

### 5. *Misrepresentation Claim*

As an alternative means to dismiss Beaudette's and JBI's misrepresentation claim in Count VII, Sentry, as previously stated, contends that the claim is deficient due to the absence of: (1) any commercial, transactional or fiduciary relationship which might give rise to a duty on the part of Sentry; (2) any evidence that Sentry intended to induce JBI to act on the alleged misrepresentation concerning coverage; and (3) any reasonable reliance. (Docket Entry # 91). With respect to their misrepresentation claim, plaintiffs submit that Sentry informed Suburban in early 1989 that it would not provide defense or indemnity coverage based on the false representation that the subject insurance policies contained an absolute pollution exclusion. According to plaintiffs, Beaudette and JBI relied on this false representation and proceeded with costly litigation to their detriment. (Docket Entry # 110).

The parties agree on the necessary elements of a fraudulent or intentional misrepresentation claim. In order to establish such a claim, the plaintiff must show "that the 'defendant[:] (1) made a false representation of a material fact[;] (2) with knowledge of its falsity[;][65] (3) for

---

**65.** Fraudulent misrepresentation requires a showing that the defendant made the false representation of material fact with knowl-

edge of its falsity. *Town & Country Fine Jewelry Group, Inc. v. Hirsch*, 875 F.Supp.

the purpose of inducing the plaintiff to act thereon[;] (4) and the plaintiff relied upon the representation as true[;] and (5) acted upon it to his damage.'" *Roadmaster Industries, Inc. v. Columbia Manufacturing Company, Inc.,* 893 F.Supp. 1162, 1176 (D.Mass.1995); *see Bond Leather Company, Inc. v. Q.T. Shoe Manufacturing Company,* 764 F.2d 928, 935 (1st Cir.1985) (deceit requires showing that "the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage"); *McEneaney v. Chestnut Hill Realty Corporation,* 38 Mass.App. Ct. 573, 650 N.E.2d 93, 96 (1995) (misrepresentation claim requires the plaintiff to prove "false statement of material fact made to induce the plaintiff to act and reliance on the false statement by the plaintiff to his detriment"), *review denied,* 420 Mass. 1107, 652 N.E.2d 146 (1995); *Danca v. Taunton Savings Bank,* 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982); *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. 920, 922–923 (D.Mass.1993) (stating above elements).

A claim for misrepresentation further requires that "the plaintiff's reliance upon the alleged misrepresentation be reasonable." *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. at 922; *accord Hinchey v. NYNEX Corporation,* 144 F.3d 134, 145 (1st Cir.1998) (to recover for either fraudulent or negligent misrepresentation, the plaintiff must submit evidence "that he reasonably relied on [the] misrepresentations"); *Hogan v. Riemer,* 35 Mass.App.Ct. 360, 619 N.E.2d 984, 988 (1993) (essential elements are "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying"); *see also*

872, 876 (D.Mass.1994); *Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass. 1990). Stated otherwise, innocent misrepresentations do not create liability inasmuch as the plaintiff must show that "'the defendant

*Doyle v. Hasbro, Inc.,* 884 F.Supp. 35, 40–41 (D.Mass.1995) (misrepresentation requires showing that the defendant made "false representation of material fact with knowledge of its falsity for the purpose of inducing him to take action, and that he reasonably relied upon the representation to his detriment"), *aff'd,* 103 F.3d 186 (1st Cir.1996).

■ Sentry maintains, in part, that there is no factual basis to establish that Sentry intended to induce any action on the part of JBI because Gross made the statements in the context of Sentry's handling of Suburban's claim for coverage. Having identified the absence of evidence to support this element of Beaudette's and JBI's misrepresentation claim, plaintiffs fail to proffer sufficient facts showing the existence of a genuine issue of material fact. Indeed, plaintiffs fail to address this argument in their opposition. (Docket Entry # 110). As previously indicated, in order to recover for fraudulent misrepresentation, Beaudette and JBI bear the underlying burden of establishing that Gross made the misrepresentation[s] for the purpose of inducing them to act thereon. Neither the affidavits cited by plaintiffs (Docket Entry # 110, p. 16) nor the facts submitted in support of the motion (Docket Entry # 110, pp. 2–6) provide a basis for a jury to find that Gross made the misrepresentation[s] regarding coverage for the purpose of inducing Beaudette and JBI to act thereon.

In addition, any reliance on the part of JBI and Beaudette, in light of their being engaged in litigation against Sentry's insured and JBI's representation by an attorney who repeatedly questioned Gross' denial of coverage, is absent. Furthermore, even if such reliance exists, it was not reasonable due, in part, to JBI's representation by counsel and Suburban having

made a false representation of a material fact with knowledge of its falsity.'" *Compagnie De Reassurance v. New England Reinsurance,* 57 F.3d 56, 73 (1st Cir.), *cert. denied,* 516 U.S. 1009, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995).

copies of the policies. Failing in their summary judgment burden, Sentry is entitled to dismissal of Beaudette's and JBI's misrepresentation claim.[66]

### 6. Estoppel Claim

Sentry raises two arguments in seeking summary judgment of Beaudette's and JBI's estoppel claim in Count V.[67] First, Sentry contends that Beaudette and JBI did not reasonably rely on any 1988 statement because Sentry informed Suburban and JBI of its denial of coverage in early 1989. Second, Sentry contends that Massachusetts courts have never extended the principles of estoppel to parties lacking a legal or transactional relationship with the insurer. Plaintiffs submit that discovery is ongoing and summary judgment on the estoppel claim should be stayed under Rule 56(f) ("Rule 56(f)"), Fed.R.Civ.P.

 Initially addressing plaintiffs' argument, it is true that Rule 56(f) "provides a safety valve for claimants genuinely in need of further time to marshal facts, essential to justify their opposition to a summary judgment motion." *Reid v. State of New Hampshire*, 56 F.3d 332, 341 (1st Cir.1995) (internal quotation marks and ellipses omitted). Although courts liberally construe the rule, it nevertheless requires due diligence from the party seeking additional discovery. *Morrissey v. Boston Five Cents Savings Bank*, 54 F.3d 27, 35 (1st Cir.1995). A strong presumption arises in favor of discovery where the party seeking discovery articulates a plausible need for the discovery, makes a timely proffer, shows good cause for not conducting the discovery earlier, and demonstrates that the facts are discoverable within a reasonable amount of

time and, if adduced, will influence the outcome of the pending summary judgment motion. *Morrissey v. Boston Five Cents Savings Bank*, 54 F.3d at 35; *Resolution Trust Corporation v. North Bridge Associates, Inc.*, 22 F.3d 1198, 1203 (1st Cir.1994). In its discretion, a court may excuse or relax one or more of these requirements in order "to address the exigencies of a given case." *Resolution Trust Corporation v. North Bridge Associates, Inc.*, 22 F.3d at 1203.

Beyond their bald and now incorrect assertion that discovery is ongoing, plaintiffs fail to articulate any plausible need for additional discovery, demonstrate good cause or identify the relevant facts which, if adduced, will result in a successful estoppel claim. Accordingly, their argument fails to provide any justification to stay summary judgment on the estoppel claim.

 " 'In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm.' " *Royal–Globe Insurance Company v. Craven*, 411 Mass. 629, 585 N.E.2d 315, 319 (1992); *see also O'Blenes v. Zoning Board of Appeals of Lynn*, 397 Mass. 555, 492 N.E.2d 354, 356 (1986). Stated otherwise, " 'The essential factors giving rise to an estoppel are (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omissions.' "

---

**66.** Inasmuch as Sentry is entitled to summary judgment dismissal of Beaudette's and JBI's misrepresentation claim in Count VII on the basis of the lack of evidence to support the aforementioned essential elements, this court need not address Sentry's remaining arguments alleging the absence of a duty.

**67.** In addition, Sentry also asserts that an estoppel cannot expand coverage beyond the terms of the policy. As explained *infra*, however, the terms of the policies are in dispute. It is for the factfinder to determine which policies, i.e., one or more of the so-called original policies or the recreated policies, were in effect during the relevant time period. In the event the factfinder determines that the relevant policies are the so-called original 1987 and/or 1988 CLP policy, then coverage may exist for the release. Accordingly, it is not necessary to address this argument at this time.

*Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 596 N.E.2d 989, 991 (1992). In addition, the reliance of the party asserting estoppel "must have been reasonable." *Turnpike Motors, Inc. v. Newbury Group, Inc.*, 596 N.E.2d at 993; *O'Blenes v. Zoning Board of Appeals of Lynn*, 492 N.E.2d at 356; *see, e.g., Kahn v. Royal Insurance Company*, 429 Mass. 572, 709 N.E.2d 822, 826 (1999) (noting that Royal made no representation which would lead the Kahns "to believe reasonably" that the six year limitations period would determine timeliness).

 As noted by plaintiffs, Beaudette is the sole officer and shareholder of JBI. By letter dated June 3, 1988, Gross wrote to JBI's attorney and unequivocally informed him "that there would be coverage for both on-site and off-site damage and cleanup costs." (Docket Entry # 147, Ex. 20). The letter made no mention of a reservation of rights. It was also reasonable to assume at that time that Sentry was aware of the terms of coverage of its policies. The fact that Sentry subsequently disclaimed coverage to JBI's attorney nine months later does not establish as a matter of law that JBI's reliance in June 1988 was unreasonable. After all, the doctrine of estoppel operates to bar an insurer's subsequent denial of liability, i.e., Sentry's March 1989 disclaimer of coverage. *See generally* John Alan Appleman 7C *Insurance Law and Practice* § 4692 (1979) (where insurer undertakes defense with knowledge of insured's breach without disclaiming liability, insurer is generally estopped to invoke such breach subsequently). The determination of estoppel "is a question of fact where ... the evidence will support conflicting inferences." *In re Capozzi's Case*, 4 Mass.App.Ct. 342, 347 N.E.2d 685, 689 (1976). Accordingly, summary judgment in Sentry's favor on Count V based on the absence of a genuine issue of material fact with respect to the reasonableness of Beaudette's and JBI's reliance is unwarranted.

 Contrary to Sentry's position that the party asserting estoppel must have a legal or transactional relationship with the estopped party, an injured third party such as JBI may raise a claim that the insurer waived a defense such as noncooperation on the part of the insured. *See DiMarzo v. American Mutual Insurance Company*, 389 Mass. 85, 449 N.E.2d 1189, 1199 (1983). Sentry's argument that "Massachusetts has simply never extended principles of 'estoppel' to situations" where the party asserting estoppel lacks a legal or transactional relationship ignores caselaw which impliedly recognizes estoppel claims in injured third party suits against insurers. *See Polito v. Galluzzo*, 337 Mass. 360, 149 N.E.2d 375, 378 (1958) (recognizing waiver or estoppel claim by injured third party but finding it unavailable due to insurer's reservation of rights); *Goldstein v. Bernstein*, 315 Mass. 329, 52 N.E.2d 559, 561–562 (1943) (recognizing third party's estoppel claim in dicta by noting that insurer was not required to request continuance when insured failed to appear inasmuch as "[s]uch conduct might have later subjected it to a claim of waiver or estoppel"); *see also* John Alan Appleman 7C *Insurance Law and Practice* § 4694 at 355 (1979). Furthermore, the single case cited by Sentry for its one sentence argument, *Turnpike Motors, Inc. v. Newbury Group, Inc.*, 596 N.E.2d at 991–993, recognizes an estoppel claim by the seller's broker against the seller and fails to mention any principle limiting estoppel claims to parties with legal or transactional relationships with the estopped party.

In the case at bar, Sentry affirmatively represented to JBI's attorney that coverage existed. Nine months later, Sentry disclaimed such coverage in a letter sent directly to JBI's attorney. Consequently, even assuming the correctness of Sentry's position, there is sufficient evidence of a transactional relationship to survive summary judgment. In sum, absent a more developed argument with supporting authority as to a third parties' inability to raise an estoppel claim absent a legal or transactional relationship, Sentry is not

entitled to dismissal of the estoppel claim.[68]

### 7. *Negligence Claim*

As a final argument, Sentry moves for summary judgment on Beaudette's and JBI's negligence claim in Count VII on the basis that Sentry did not owe a legal duty of care to either Beaudette or JBI. As pointed out by Sentry, neither Beaudette nor JBI are parties to the insurance policies. Sentry additionally asserts that there is no evidence that Beaudette and JBI relied upon Gross' denial of coverage or that any such reliance was reasonable. (Docket Entry # 91).

With Sentry having identified the absence of evidence to support the creation of a duty of care, plaintiffs fail to identify facts or a legal theory to support such facts and thereby create a genuine issue of material fact as to Sentry's breach of a duty of care owed to Beaudette and JBI. Plaintiffs' failure to demonstrate that a trier of fact could find in their favor on the first element of a negligence claim, i.e., the existence of a duty of care, requires summary judgment in Sentry's favor on Beaudette's and JBI's negligence claim.[69] In lieu of identifying facts as well as a legal theory under which Sentry owed Beaudette and JBI a duty of care, plaintiffs simply allege that Sentry made repeated misrepresentations concerning the policies and, at a minimum, there is a genuine issue of material fact as to the terms of such policies. Plaintiffs therefore reason that summary judgment is inappropriate as to the negligence claim. (Docket Entry # 110).

Plaintiffs' negligence theory arises from Sentry's negligent refusal to provide defense and indemnity coverage and its fail-ure to enter into a good faith settlement of the state court action and negligent handling of Suburban's claim. Plaintiffs' failure to more particularly describe Beaudette's and JBI's negligence claim increases the difficulty of analyzing the merits of the claim with respect to the existence of a duty of care. Nevertheless, the claim can be read to encompass a negligent misrepresentation claim when Gross represented to JBI's attorney in March 1989 that there was no coverage when, in fact, the so-called original policies provided defense and indemnity coverage. It could also encompass a claim that Gross negligently investigated the coverage by failing to ascertain the correct terms of the policies, including the existence of conflicting pollution exclusions, and, as a result, incorrectly concluded there was no coverage and failed to enter into a good faith settlement of the state court action.

▮ In order to sustain a negligence claim, "the plaintiffs must show that the defendants owed them a duty of care." *Spinner v. Nutt*, 417 Mass. 549, 631 N.E.2d 542 (1994); *accord Flattery v. Gregory*, 489 N.E.2d at 1259 (the defendant insurance agent of the insured liable to injured driver for promise to obtain optional liability coverage "only if he violated a duty to the plaintiff imposed by law"). Although not argued by plaintiffs in the context of the negligence claim, "a claim in tort may arise from a contractual relationship and may be available to persons who are not parties to the contract." *Parent v. Stone & Webster Engineering Corporation*, 408 Mass. 108, 556 N.E.2d 1009, 1012 (1990) (injured electrician's negligence claim against company which installed distribution panel without proper warning label under contract with the plaintiff's employer).[70]

---

**68.** This court makes this conclusion solely for the purpose of the summary judgment motion. Sentry is not foreclosed from presenting additional authority for its position in a motion for judgment as a matter of law.

**69.** In the alternative, this court will also address the merits of Sentry's argument.

**70.** As noted by the SJC in *Parent*, the company, pursuant to "its contractual duties, either did discover, or should have discovered, the fact that the distribution panel at issue ... was not properly labeled." *Parent v. Stone & Webster Engineering Corporation*, 556 N.E.2d at 1013. Accordingly, a jury could find it foreseeable that the company's negligent performance of its contractual duties created a

Massachusetts law, however, distinguishes the duty owed by a professional such as Gross to a third party such as Beaudette or JBI for personal injuries from that owed to such a third party for pecuniary loss. *Nycal Corporation v. KPMG Peat Marwick, L.L.P.,* 426 Mass. 491, 688 N.E.2d 1368, 1370 (1998); *see Fleet National Bank v. The Gloucester Corporation,* 1994 WL 924308 at * 3 (D.Mass. Aug.8, 1994) (when considering duty of care owed to persons not in privity or parties to contract, Massachusetts courts "routinely distinguish between personal injury cases and cases involving strictly pecuniary loss"). Beaudette's and JBI's negligence claim falls under the latter category.

▮ In order for a duty of care to arise in a negligence claim or a negligent misrepresentation claim involving pecuniary loss by a noncontractual third party, there must be foreseeable reliance on the defendant's services. *See Flattery v. Gregory,* 489 N.E.2d at 1260. More explicitly, recovery is "limited to instances where the defendant knew that the plaintiff would rely on his services." *Flattery v. Gregory,* 489 N.E.2d at 1260; *accord Quigley, Jr. v. Bay State Graphics, Inc.,* 427 Mass. 455, 693 N.E.2d 1368, 1372 (1998) (absent "foreseeable reliance on the promised services being performed by someone, we have never held that 'a promisor of services may be liable in tort not only to the promisee but also to potential beneficiaries of the promise' "); *Nycal Corporation v. KPMG Peat Marwick, L.L.P.,* 688 N.E.2d at 1371; *see, e.g., Couillard v. Pick,* 397 Mass. 756, 493 N.E.2d 865, 866 (1986) (recognizing foreseeable reliance where promised insurance was mandated by statute but not recognizing foreseeable reliance where insurance optional).

▮ In the case at bar, even assuming that Gross negligently handled the investigation and negligently concluded there was no coverage, there is no showing that it was foreseeable or that Gross knew that Beaudette or JBI would rely on his representations as to lack of coverage or his negligent refusal to provide coverage. *See, e.g., Page v. Frazier,* 388 Mass. 55, 445 N.E.2d 148, 154–155 (1983) (affirming lower court due to lack of foreseeable reliance by mortgagors on bank's attorney's negligent title search). To the contrary, at the time Gross made the representation after allegedly negligently handling the investigation, JBI was represented by its own attorney. Gross communicated with JBI's attorney who then repeatedly questioned Gross' position as to lack of coverage and demanded a copy of an executed pollution exclusion. In short, plaintiffs fail to identify specific facts showing that Gross knew that Beaudette and JBI would rely on his representation or his allegedly negligent refusal to provide coverage as well as his allegedly negligent failure to enter into a good faith settlement.[71] Sen-

---

risk to plant employees such as the plaintiff. *Parent v. Stone & Webster Engineering Corporation,* 556 N.E.2d at 1013.

*Parent* involved a negligence claim involving personal injuries as opposed to a negligent misrepresentation claim involving pecuniary loss. *See Nycal Corporation v. KPMG Peat Marwick, L.L.P.,* 426 Mass. 491, 688 N.E.2d 1368, 1371 n. 4 (1998) (distinguishing *Parent*). The court in *Malloy v. Rona Engineering Corporation,* 1995 WL 933796 (Mass.Super. Feb.10, 1995), however, applied *Parent* to a negligence claim involving strictly pecuniary loss due to a structural engineer's purportedly negligent inspection of a home. In so doing, however, the court did not apply *Parent's* foreseeability test but correctly applied the test applicable to pecuniary losses which requires a showing of foreseeablity and

reliance. *Malloy v. Rona Engineering Corporation,* 1995 WL 933796 at * 2 (Mass.Super. Feb.10, 1995).

**71.** Plaintiffs do not argue that Beaudette's and JBI's purported status as third party beneficiaries satisfies the duty of care under the negligence claim. In any event, such an argument is unavailing, *see Quigley, Jr. v. Bay State Graphics, Inc.,* 693 N.E.2d at 1372, and sounds in contract as opposed to tort. *See Rae v. Air-Speed, Inc.,* 435 N.E.2d at 631–632 (separately addressing negligence claim by administratrix of deceased husband against insurance agent for negligently failing to forward premiums and only addressing third party beneficiary argument in context of breach of contract claim); *Spinner v. Nutt,* 631 N.E.2d at 544–546 (addressing third party beneficiary argument only in context of

try is therefore entitled to summary judgment on the negligence claims of Beaudette and JBI. For similar reasons, any alleged reliance was not reasonable.

## IV. *PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 140)*

Plaintiffs move for summary judgment on the basis that they met their burden of proof in establishing coverage. Inasmuch as plaintiffs correctly note that Sentry has the underlying burden of establishing that the exclusions were in effect and applicable to the claim,[72] plaintiffs submit that Sentry fails to establish a genuine issue of material fact that the special pollution exclusion endorsements in the recreated policies were effective prior to their execution or prior to their approval by DICM.

Plaintiffs base their entitlement to summary judgment on the allegation that the so-called original 1987 CLP policy, which contains a sudden and accidental pollution exclusion, and/or the so-called original 1988 CLP and umbrella policies, which contain completed operations pollution exclusions, govern this dispute. Plaintiffs additionally characterize the release as sudden and accidental or from a completed operation. Hence, they move for summary judgment that the terms of the so-called original 1987 CLP policy and 1988 CLP and umbrella policies govern this dispute, that they respectively contain the sudden and accidental pollution exclusions and the completed operations pollution exclusions and therefore afford coverage as a matter of law.[73]

Plaintiffs additionally argue that the special pollution exclusion endorsement in the so-called original umbrella policy required Suburban's signature which was lacking. Consequently, the sudden and accidental pollution exclusion set forth in item (k) in the body of the policy governs the release and provides coverage as a matter of law.

Citing section 22A of Massachusetts General Laws chapter 175 ("section 22A"), plaintiffs also submit that Sentry did not file copies of the special pollution exclusion endorsements with the Commissioner of Insurance as required under the statute. Plaintiffs therefore reason that the endorsements were not effective.

Plaintiffs additionally move for summary judgment on the basis of the coverage provided under the so-called original 1990 CLP and umbrella policies. They submit that because Suburban did not execute the special pollution exclusion endorsements until March 1990, as shown by Phillips' affidavit, they were not effective until March 1990. Consequently, the lack of a required signature between January and March 1990 results in the sudden and accidental pollution exclusion in the so-called original 1990 CLP and umbrella policies governing the release and providing coverage.[74]

Plaintiffs further contend that the recreated 1988 CLP and umbrella policies contain both completed operations pollution exclusions and special pollution exclusion endorsements. The ambiguity thereby created requires construing the coverage

breach of contract claim as opposed to negligence claim).

**72.** A caveat to this principle is that the underlying burden with respect to a sudden and accidental pollution exclusion does not always remain with Sentry.

**73.** Plaintiffs also submit that if these provisions govern the release, then Sentry had a duty to defend Suburban in the state court action inasmuch as the allegations in the complaint were reasonably susceptible to an interpretation that they state or adumbrate a

claim. Inasmuch as Sentry breached its duty to defend, it is responsible for all consequential damages flowing therefrom, according to plaintiffs.

**74.** Sufficient contrary evidence shows that the endorsements were executed on March 10, 1988. Accordingly, summary judgment is unavailing with respect to the 1990 CLP and umbrella policies on the basis of this argument. In addition, as previously determined, the known loss doctrine precludes recovery under the 1990 CLP and umbrella policies.

provided in favor of Suburban, the insured. Accordingly, the completed operations pollution exclusion governs the release and provides coverage as a matter of law under the recreated 1988 CLP and umbrella policies.

Plaintiffs also argue that section 112 precludes changing the policies after the date of loss. Because Suburban did not sign the special pollution exclusion endorsements until March 10, 1988, at the earliest, they cannot operate to bar coverage prior to that date for an existing loss pursuant to section 112.

In addition, plaintiffs assert that Sentry is bound by the default judgment in the state court action and must pay plaintiffs the full amount of the judgment together with interest, costs, attorneys' fees and consequential damages.[75] These and other arguments relative to the terms of the disputed policies are addressed *infra* in section one in the order set forth in plaintiffs' supporting memorandum, items III through XIII.[76]

Additionally, in item XIV, plaintiffs move for summary judgment on their misrepresentation claim on the basis that Sentry misrepresented the terms of the policies. Under item XV, plaintiffs request a declaration that Sentry negligently handled the investigation and that they are entitled to damages resulting from Sentry's negligent claims handling practice.[77] Finally, in item XVI, plaintiffs move for summary judgment on the chapter 93A claim. These remaining items are also addressed *infra*.

### 1. Terms of the Policies

Under Massachusetts law, "The insured bears the initial burden of 'proving that the loss is within the description of the risks covered.'" *Highlands Insurance Company v. Aerovox, Inc.*, 424 Mass. 226, 676 N.E.2d 801, 804 (1997) (internal brackets omitted); *accord Camp Dresser & McKee, Inc. v. Home Insurance Company*, 30 Mass.App.Ct. 318, 568 N.E.2d 631, 633 (1991) ("policyholder bears the initial burden of proving coverage

**75.** This argument, however, presupposes plaintiffs establishing coverage and Sentry failing in its burden of establishing an effective exclusion. Because it is a genuine issue of material fact for the factfinder to determine the evidence which correctly reflects the complete and accurate contents of the policies in effect at the relevant time, this argument does not provide a basis for entry of summary judgment.

**76.** Item I is a general statement of the standard of review on a summary judgment motion and need not be addressed. Item II is a summary of various arguments or conclusions resulting from arguments made in subsequent items in the memorandum as well as a statement of the law applicable to the interpretation of an insurance contract. Inasmuch as this court addresses the subsequent items, this court need not address the conclusions asserted by plaintiffs in item II.

Finally, on the basis of the above summarized arguments, plaintiffs request entry of partial summary judgment declaring that: (1) the sudden and accidental pollution exclusion governs the 1987 CLP and umbrella policies; (2) the completed operations pollution exclusion governs the 1988 CLP and umbrella policies; (3) the special pollution exclusion endorsement was not effective until executed by

the insured; (4) Phillips' March 10, 1988 execution of the special pollution exclusion endorsement for the 1988 CLP and umbrella policies has no effect because it postdates the date of the loss; (5) the damages caused by the release of gasoline at the station constituted "occurrences" within the meaning of the policies; (6) Sentry wrongfully refused to provide defense and indemnity coverage to Suburban under the policies; (7) Sentry is obligated to pay JBI the default judgment in the state court action together with attorneys' fees, costs, interest and consequential damages suffered by Beaudette; (8) Sentry misrepresented the terms of the policies to JBI and Beaudette; (9) Sentry mishandled the investigation and adjustment of claims made by Suburban and Beaudette for coverage; (10) Sentry's wrongful denial of defense and indemnity coverage, its inadequate investigation and its misrepresentation of the terms of the policies violated chapters 93A and 176D; and (11) Sentry is liable to plaintiffs for all consequential damages caused by its wrongful conduct.

**77.** For previously stated reasons, the above described misrepresentation and negligence claims asserted by the Suburban Assignees are time barred.

within the policy description of covered risks"). "Once an insured establishes that a claim comes within the terms of coverage, the insurer must demonstrate .'the applicability of any exclusion.'" *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282; *see Camp Dresser & McKee, Inc. v. Home Insurance Company,* 568 N.E.2d at 633. Exclusions from coverage are strictly construed. *Quincy Mutual Fire Insurance Company v. Abernathy,* 393 Mass. 81, 469 N.E.2d 797, 799 (1984); *Camp Dresser & McKee, Inc. v. Home Insurance Company,* 568 N.E.2d at 635 (exclusions "strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased"). An exception to the aforementioned allocation of the burden of proof exists with respect to sudden and accidental pollution exclusions. Where, as here, the sudden and accidental pollution exclusion appears in a separately labeled section within a policy, the insured bears "the burden of proving that the contamination was caused by an accidental and sudden release." *Highlands Insurance Company v. Aerovox, Inc.,* 676 N.E.2d at 805.

Massachusetts courts construe policy language "with a view to whether an objectively reasonable insured would expect to be covered." *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282 (internal quotations marks and ellipses omitted); *accord Western Alliance Insurance Company v. Gill,* 426 Mass. 115, 686 N.E.2d 997, 998 (1997) ("'when construing language in an insurance policy, we "consider what an objectively reasonable insured, reading the relevant policy language, would expect to

be covered"'"). Where there is no ambiguity, courts "'construe the words of the policy in their usual and ordinary sense.'" *Citation Insurance Company v. Gomez,* 426 Mass. 379, 688 N.E.2d 951, 952 (1998); *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282 ("unambiguous terms are given their plain meaning"); *Camp Dresser & McKee, Inc. v. Home Insurance Company,* 568 N.E.2d at 635 (insurance contract construed according to "fair and reasonable meaning of its words").

■ With particular reference to the terms employed in the various policies in this case, it is worth noting that terms such as "'discharge,' 'dispersal,' 'release,' and 'escape'" appearing in pollution exclusions generally reference damage "caused by improper disposal or containment of hazardous waste." *Western Alliance Insurance Company v. Gill,* 686 N.E.2d at 999. Although "Massachusetts has not yet ruled on the proper approach to take in determining whether there has been actual property damage during the policy period," *Millipore Corporation v. Travelers Indemnity Company,* 115 F.3d 21, 32 (1st Cir.1997), the SJC recognizes that "contamination of soil and groundwater by the release of hazardous material involves property damage."[78] *Hazen Paper Company v. United States Fidelity and Guaranty Company,* 407 Mass. 689, 555 N.E.2d 576, 582 (1990). Finally, in a case involving language similar to that used in the CLP policies and an underlying suit involving allegations similar to those in the state court action, the First Circuit determined that the insurer had no duty to defend or indemnify inasmuch as the claims fell within the absolute pollution exclusion.[79] *Dryden Oil Company of New England, Inc. v.*

**78.** The CLP policies provide coverage for sums which the insured becomes legally obligated to pay as damages because of "property damage ... caused by an occurrence." An "occurrence" is an "accident including continuous or repeated exposure to conditions which results in ... property damage neither expected nor intended from the standpoint of the insured." "Property damage" refers to "physical injury to or destruction of tangible property" or "loss of use of tangible property." Although the release therefore consti-

tutes an "occurrence," it is plaintiffs' burden to show that the property damage occurred during the policy period. *See Millipore Corporation v. Travelers Indemnity Company,* 115 F.3d at 32 & n. 17.

**79.** The language of the absolute pollution exclusion at issue in *Dryden* is virtually identical in all relevant respects to that used in the special pollution exclusion endorsement.

As previously explained, an insurer must defend an action if "the allegations are rea-

*Travelers Indemnity Company,* 91 F.3d at 282–284 & 290 (affirming lower court's summary judgment in favor of insured on this issue); *see also Rubin v. St. Paul Fire and Marine Insurance Company,* 1995 WL 809524 at * 4–5 (Mass.Super. April 19, 1995).

An ambiguity arises "in an insurance contract when the language contained therein is susceptible of more than one meaning." *Lumbermens Mutual Casualty Company v. Offices Unlimited, Inc.,* 419 Mass. 462, 645 N.E.2d 1165, 1168 (1995). More specifically, language is ambiguous only if "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Insurance Company v. Gomez,* 688 N.E.2d at 953. An ambiguity does not arise "simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." *Lumbermens Mutual Casualty Company v. Offices Unlimited, Inc.,* 645 N.E.2d at 1168. Doubts created by ambiguous words are resolved against the insurer. *Quincy Mutual Fire Insurance Company v. Abernathy,* 469 N.E.2d at 799; *Jefferson Insurance Company of New York v. National Union Fire Insurance Company of Pittsburgh,* 42 Mass.App.Ct. 94, 677 N.E.2d 225, 228 (1997). This cannon of construction or rule resolving doubts in favor of the insured, however, "must give way to the primary objective that a contract is to be construed to reflect the intention of the parties." *Affiliated FM Insurance Company v. Constitution Reinsurance Corporation,* 416 Mass. 839, 626 N.E.2d 878, 881 (1994).

Plaintiffs first argue that Sentry's evasive answers to plaintiffs' requests to ad-

mit establish the terms in the CLP and umbrella policies for the years 1986 through 1990. Not only do plaintiffs fail to point out which requests establish such facts, after plaintiffs filed their memorandum, this court allowed Sentry leave to file amended responses to plaintiffs' requests to admit (Docket Entry 148, 207–208 & 210–214). These amended responses do not establish the terms of the policies in plaintiffs' favor. Summary judgment based on plaintiffs' undeveloped argument that Sentry's failure or refusal to answer the requests to admit establish the terms of the 1987 through 1990 CLP and umbrella policies is without merit.

Plaintiffs next argue in item IV that the best evidence rule as well as the parol evidence rule precludes Sentry's reliance on the secondary evidence of the recreated policies in light of the existence of the so-called original and allegedly integrated policies. Sentry counters that plaintiffs fail to authenticate the so-called original policies and that the best evidence rule does not bar admission of the secondary evidence where, as here, there is a question as to whether the so-called original policies are accurate and complete. With respect to the parol evidence rule, Sentry maintains that the so-called original policies are not complete and integrated contracts. Hence, the parol evidence rule does not bar reliance on the recreated policies.

As previously explained, there is sufficient evidence to allow a reasonable person to believe that the so-called original policies are what plaintiffs purport them to be, i.e., complete and accurate renditions of the original policies.[80] This ruling, howev-

---

sonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms." *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,* 91 F.3d at 282 (internal quotation marks omitted). The duty to indemnify is defined less broadly and depends on the evidence as opposed to "an expansive view of the complaint." *Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company,*

91 F.3d at 282. Where an insurer's refusal to defend an underlying action is unjustified or wrongful, the insurer will bear the burden of proving that the underlying claim was not within the policy's coverage and normal contract damages will apply. *Polaroid Corporation v. Travelers Indemnity Company,* 414 Mass. 747, 610 N.E.2d 912, 921–922 (1993).

**80.** See footnote number four.

er, does not preclude Sentry's reliance on the recreated policies as secondary evidence which more accurately reflects the contents of the actual policies. Having made the preliminary determination of authenticity, it is for the factfinder to decide the weight he or she will give the evidence that the so-called original policies comprise the complete and correct actual policies.[81]

Thus, in the case at bar, authentication is a matter of conditional relevancy under Rule 104(b) ("Rule 104"), F.R.E., with the factfinder ultimately deciding if the so-called original policies, the recreated policies or some combination thereof constitute the complete and accurate version of the actual policies. *See United States v. Branch*, 970 F.2d 1368, 1370–1371 (4th Cir. 1992); *Ladson v. Ulltra East Parking Corporation*, 878 F.Supp. 25, 29 (S.D.N.Y. 1995); *see also* Advisory Committee Notes, Rule 901, F.R.E. ("requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedures set forth in Rule 104(b)"). The relevancy of the so-called original documents depends upon the condition that they are complete and accurate renditions of the actual policies. In order for plaintiffs to establish as a matter of law that the so-called original policies govern the coverage issues pertaining to the release, there must be no genuine issue of material fact that these policies are the complete and accurate renditions of the actual policies. Sentry, however, proffers more than

sufficient evidence for a factfinder to conclude that the so-called original policies are not the complete and correct renditions of the actual policies.[82] Summary judgment based on the terms of the so-called original policies is therefore inadvisable.

Furthermore, as a matter of procedure, it is best for the factfinder to resolve this preliminary and critical issue in the first phase of a two phase trial. Bifurcating the trial will result in less confusion and properly focus on the critical issue in this case. Resolution of the issue may also obviate the need to decide other claims. The parties should be prepared to address the issue of bifurcation at the upcoming status conference.

▮▮▮ Neither the best evidence rule nor the parol evidence rule bar admission of the secondary evidence of the recreated policies as well as the evidence Sentry offers to support its contention that the recreated policies more correctly reflect the contents of the actual policies. The best evidence rule, codified in Rules 1001 through 1008, F.R.E., *United States v. Carroll*, 860 F.2d 500, 506 n. 12 (1st Cir. 1988), "generally requires the use of the original as proof of its contents." 6 Jack B. Weinstein *Weinstein's Federal Evidence* § 1001.02 (1999). Upon a proper showing that the original is lost or unavailable, "secondary evidence of its contents may be received." *Sylvania Electric Products, Inc. v. Flanagan*, 352 F.2d 1005,

---

81. See footnote number four.

82. For example, Phillips cannot recall whether he ever asked Attorney Sullivan to check the contents of the policies and to verify that the exclusion quoted in Sentry's March 17, 1989 letter was part of the policies at issue. (Docket Entry # 170, Ex. L). Attorney Sullivan, however, remembers reviewing the policies. Although he cannot remember actually reviewing the policies to determine if the language quoted in the March 17, 1989 letter was included, he is sure that he did. He also assumes that he would have contacted Suburban if he believed that Sentry was erroneously claiming there was a special pollution exclusion endorsement in the policies. (Docket

Entry # 170, Ex. O). With the exception of the April 7, 1989 letter from JBI's attorney to Gross requesting a copy of the signed pollution exclusion, JBI's attorney had no recollection of contesting Sentry's position that the policies contained the special pollution exclusion endorsement quoted in Sentry's March 17, 1989 letters. In addition, JBI's attorney hypothesizes that he would have brought it to Gross' attention if he believed Gross was quoting the wrong pollution exclusion. (Docket Entry # 170, Ex. N). Various Sentry officials state, by affidavit or deposition, that the special pollution exclusion endorsements were part of the policies from their inception. Footnote number four sets forth additional evidence.

1008 (1st Cir.1965). The trial judge makes the preliminary determination of unavailability, *Sylvania Electric Products, Inc. v. Flanagan*, 352 F.2d at 1008, and also determines other preliminary matters such as whether the writing is a collateral matter within the meaning of Rule 1004(4), F.R.E. 6 Jack B. Weinstein *Weinstein's Federal Evidence* § 1008.04 (1999). Although most preliminary questions of fact concerning the application of the best evidence rule are for the trial judge under the principles embodied in Rule 104,[83] Rule 1008 ("Rule 1008"), F.R.E., expressly allocates three issues to the factfinder inasmuch as they depend upon the probative force of the secondary evidence and the credibility of the proponent.[84] 6 Jack B. Weinstein *Weinstein's Federal Evidence* § 1008.05[1] (1999).

Here, the parties do not dispute that an original once existed. Instead, they dispute whether the so-called original policies or the secondary evidence in the form of the recreated policies constitute the actual policies. There is sufficient evidence for a reasonable factfinder to conclude that either the so-called original policies or the recreated policies constitute the complete and accurate renditions of the actual policies.

The contents of the policies involve a critical issue concerning the merits and require an assessment of the credibility of the Sentry officials versus the individuals used to establish the authenticity of the so-called original policies. Having made a preliminary determination of authenticity, it is the province of the factfinder to decide the authenticity of the so-called original policies. Exclusion of Sentry's secondary evidence challenging the authenticity is inconsistent with the best evidence rule. *See* 6 Jack B. Weinstein *Weinstein's Federal Evidence* § 1008.05[3] (1999). Citing Rule 1008, Professor Weinstein explains that where one party disputes the authenticity of the "original," he is not foreclosed

from offering secondary evidence to the factfinder and the best evidence rule does not bar admission of such evidence:

When the challenge to the admission of secondary evidence of contents of a writing is premised on the claim that another writing, recording or photograph already produced at trial is really the original, the preliminary condition to be answered by the jury relates to authenticity. So long as the requirements of Rule 901 are met, the court should not usurp the jury's role in deciding questions of authenticity that depend simply on evaluations of probative force ... "If both sides grant that there was an original and one presents a document which the other disputes, by what line of reasoning can either be deprived of the right to have the jury determine whether the presented document is the original?" ... Exclusion of the secondary evidence might prevent the proponent from challenging the authenticity of the "original" already in evidence, which is inconsistent with the rationale underlying the rule.

6 Jack B. Weinstein *Weinstein's Federal Evidence* § 1008.05[3] (1999). Accordingly, at least with respect to phase one of the trial, the best evidence rule does not bar the factfinder from considering the secondary evidence offered by Sentry.

The parol evidence rule is equally unavailing as a means to bar admission of the recreated policies. First, as noted *supra*, the issue of what policies govern this dispute is for the factfinder. Hence, plaintiffs fail to establish as a matter of law that the so-called original policies constitute the complete and correct rendition of the actual policies. It is axiomatic that before the parol evidence "rule comes into operation, 'the court must be sure it has before it a written contract intended by the parties as a statement of their complete agree-

---

83. *See* Advisory Committee Notes, Rule 1008.

84. These issues are: whether the writing ever existed; whether another writing is the original; and whether other evidence of contents correctly reflects the contents of the original. Rule 1008, F.R.E.

ment.'" *Ryder v. Williams*, 29 Mass.App. Ct. 146, 558 N.E.2d 1134, 1136 (1990). "If not, the rule is inapplicable." *Ryder v. Williams*, 558 N.E.2d at 1136. Moreover, there is sufficient evidence for the factfinder to conclude that the special pollution exclusion endorsement was part of one or more of the actual policies from their inception and, accordingly, part of the allegedly integrated policies.

█ Second, the parol evidence rule, which precludes the use of prior or contemporaneous oral agreements "to vary or modify the terms of an unambiguous written contract," *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir.1992); *Coll v. PB Diagnostic Systems*, 50 F.3d 1115, 1122 (1st Cir.1995) (quoting *Fairfield*); *New England Financial Resources v. Coulouras*, 30 Mass.App.Ct. 140, 566 N.E.2d 1136, 1139 (1991), does not bar evidence of subsequent modifications of an integrated original agreement, *New England Factors, Inc. v. Genstil*, 322 Mass. 36, 76 N.E.2d 151, 154 (1947); *Capitol Bank and Trust Company v. Pre-Schools, Inc.*, 10 Mass.App.Ct. 907, 410 N.E.2d 737, 737 (1980), "based upon valid consideration." *Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 597 N.E.2d 1017, 1021 (1992); 13A John Alan Appleman *Insurance Law and Practice* § 7603 (1976) (modification of "coverage in a policy requires some consideration"). Sufficient evidence in the record exists whereby Sentry subsequently issued endorsements modifying or replacing the terms of the sudden and accidental pollution exclusion.[85] Hence, the parol evidence rule does not

bar evidence of the recreated policies and the special pollution exclusion endorsements therein.

Plaintiffs next argue in item V that section 22A provides that, "No company shall issue any policy of insurance ... until a copy of the form of the policy has been on file for thirty days with the commissioner." Mass. Gen. L. ch. 175, § 22A. Plaintiffs point out that Sentry fails to submit evidence that it properly filed and obtained approval from the Division of Insurance of the special pollution exclusion endorsements in the recreated 1987 through 1989 CLP and umbrella policies. Plaintiffs additionally submit that Sentry's policy requiring the insured's acknowledgment on the special pollution exclusion endorsement constitutes an admission that the exclusion was not in effect until the insured signed the exclusion.

█ With respect to the latter argument, there is sufficient evidence in the record for a reasonable factfinder to conclude that the special pollution exclusion endorsement was in effect in the recreated 1987 CLP policy from the date of the policy's inception. Accordingly, no signature is required.[86] 13A John Alan Appleman *Insurance Law and Practice* § 7537 (Supp.1998) ("endorsement need not be signed by insured") & § 7538 n. 21.25 (1976). In addition, the language of the recreated 1987 CLP policy and the plain meaning of the language of the special pollution exclusion endorsement does not require the insured's signature to validate

---

**85.** To the extent Sentry relies on subsequent endorsements to the policies at trial, it should offer sufficient evidence of consideration or authority that such consideration is not required.

**86.** Similarly, plaintiffs' argument that Phillips executed the special pollution exclusion endorsement after the date of the loss need not be addressed because there is sufficient evidence in the record for a factfinder to find that the exclusions were part of the recreated policies from the date of their inception. In such circumstances, a signature of the insured is not required, as indicated above,

particularly where, as here, the plain meaning of the language of the exclusion and the body of the policy do not require such a signature. Likewise, this court need not address plaintiffs' argument in item VIII inasmuch as it depends upon a finding that liability under the special pollution exclusion endorsement did not become fixed until Phillips endorsed the exclusion on March 10, 1988. Sentry provides more than sufficient evidence to create a genuine issue of material fact that the exclusion was in effect from the policies' inception and that there is a genuine issue of material fact with respect to Sentry's reformation claim.

the exclusion. To the contrary, the language of the exclusion states that, "It is agreed that [the sudden and accidental pollution exclusion] is replaced by the following," i.e., the language of the special pollution exclusion endorsement. Similarly, the general language in the body of the recreated 1987 CLP policy with respect to changes in the policy, i.e., subsequently issued endorsements, omits any reference to requiring the insured's signature prior to effectuating an endorsement. Rather, the relevant language simply notes that the policy "may not be changed or waived except by endorsement issued by us." Furthermore, the fact that the recreated 1987 CLP policy initially contained a special pollution exclusion endorsement without a signature line and that Sentry subsequently issued a special pollution exclusion endorsement with a signature line does not establish an admission as a matter of law that Suburban's signature was required in order to effectuate the exclusion. *See, e.g., Boruski v. Securities Exchange Commission,* 289 F.2d 738, 740 (2d Cir.1961).

 With respect to the former argument and notwithstanding other deficiencies in plaintiffs' argument, Sentry correctly maintains that the absence of the Division of Insurance's approval does not automatically void or negate the language of the parties' agreement containing the exclusion. The language of section 22A neither suggests nor expressly requires nullification of the exclusion.[87] *See Great Lakes Container Corporation v. National Union Fire Insurance Company of Pittsburgh, Pa.,* 727 F.2d 30, 31–32 (1st Cir. 1984) (construing similar New Hampshire statutes); *Home Indemnity Company v. Hoechst Celanese Corporation,* 128 N.C.App. 226, 494 S.E.2d 768, 772–773 (1998) (statute requiring approval of forms by Department of Insurance did not declare all unapproved policy provisions void, specifically provided for penalties and, hence, voiding of absolute pollution exclusion was not required by statute), *review*

*denied,* 348 N.C. 72, 505 S.E.2d 869 (1998). "The majority of jurisdictions" addressing the effect of an insurer's failure to file an insurance policy form as required by a state statute "have concluded that the failure to file the policy or endorsement does not render it invalid." *Cage v. Litchfield Mutual Insurance Company,* 45 Conn. Supp. 298, 713 A.2d 281, 284–285 (1997) (collecting cases); *see, e.g., Gary v. American Casualty Company of Reading, Pa.,* 753 F.Supp. 1547, 1551 (W.D.Ok.1990) (failure to file endorsement with insurance board and obtain approval required by statute did not render endorsement unenforceable or void); *National Union Fire Insurance Company of Pittsburgh, Pa. v. Ambassador Group, Inc.,* 157 A.D.2d 293, 556 N.Y.S.2d 549, 553 (1st Dept.1990) (failure to file endorsement with Superintendent of Insurance for approval did not void endorsement), *appeal dismissed,* 77 N.Y.2d 873, 568 N.Y.S.2d 915, 571 N.E.2d 85 (1991); *Highlands Insurance Company v. American Marine Corporation,* 607 F.2d 1101, 1104 (5th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980).

Furthermore, the Commissioner of Insurance, as opposed to nonparties to the insurance agreement, has the power to administer and enforce the provisions of chapter 175. Mass. Gen. L. ch. 175, § 3A; *see also* Mass. Gen. L. ch. 175, § 3B. Such an enforcement scheme, which omits any reference or ability of a private, nonparty to the insurance contract to void an endorsement on the basis of noncompliance with the statute, indicates that the legislature did not intend to create such a mechanism. *See Federal Deposit Insurance Corporation v. American Casualty Company of Reading, Pa.,* 975 F.2d 677, 683 (10th Cir.1992) (failure to provide for voiding of policy in statute and providing for such voiding elsewhere indicated legislative intent to preclude voiding of insurance provision). It is also worth recognizing

---

87. Likewise, Bulletin SRB–89–2, at best, provides that incomplete or inconsistent filings will simply "be returned 'unfiled' … or disapproved." (Docket Entry # 1347, Ex. 28).

that voiding an exclusion in an insurance policy "is a severe penalty which alters the very terms of the deal between the parties" and "requires the insurer to provide coverage for uncontracted risk." *Federal Deposit Insurance Corporation v. American Casualty Company of Reading, Pa.,* 975 F.2d at 683. Finally, like the plaintiff in *Great Lakes,* plaintiffs provide no viable criteria to void the exclusion without voiding the entire policy, *see Great Lakes Container Corporation v. National Union Fire Insurance Company of Pittsburgh,* 727 F.2d at 32, inasmuch as section 22A applies, by its terms, to "any policy" as opposed to a part of the policy. Accordingly, Sentry's apparent failure to file the pollution exclusions in the recreated 1987 through 1989 CLP and umbrella policies does not, as plaintiffs contend, render such exclusions null and void.

With respect to the recreated 1990 CLP policy, plaintiffs argue that Bulletin SRB–89–2, applicable to policies dated after July 1, 1989, required the signature of the insured on the special pollution exclusion endorsements and that, according to Phillips' affidavit, he did not endorse the exclusions until March 1990. Plaintiffs therefore reason that the exclusion was not in effect until April 1990. Even irrespective of the merits of the argument, Sentry proffers sufficient evidence for a reasonable factfinder to conclude that Phillips signed the special pollution exclusion endorsement prior to January 1, 1990. Plaintiffs' argument therefore fails to provide a basis for establishing as a matter of law that the sudden and accidental pollution exclusion governed the recreated 1990 CLP and umbrella policies from January through March 1990.[88]

Next, in items VI and VII, plaintiffs submit that the recreated 1988 CLP and umbrella policies contain two irreconcilable pollution exclusions, i.e., the completed operations pollution exclusion and the special pollution endorsement exclusion. In light of such an ambiguity as to which provision controls, plaintiffs assert that the issue is resolved in favor of the insured and, hence, the less draconian completed operations pollution exclusion is the operative exclusion. Sentry contends there is no ambiguity and that the issue, properly focused, is which language controls. Even if an ambiguity exists, the rule requiring construction in favor of the insured must give way to the contrary result intended by the parties that the special pollution exclusion endorsement is the operative pollution exclusion, according to Sentry. Finally, Sentry argues that genuine issues of fact concerning its counterclaim for reformation of the policies based on a mutual or a unilateral mistake made by one party and made known to the other party preclude summary judgment that the completed operations pollution exclusion is the operative language of the 1988 recreated CLP and umbrella policies.

Viewing the facts in Sentry's favor as the nonmoving party, there is sufficient evidence for a reasonable factfinder to conclude that the recreated 1988 CLP policy included the special pollution exclusion endorsement from the policy's inception. Again viewing the record in Sentry's favor, Phillips signed the endorsement, although he did not acknowledge the handwriting setting forth the March 10, 1988 date and the name of his company. To the extent the declarations page for the recreated 1988 CLP policy lists the completed operations pollution exclusion (IL 09 28) but omits the special pollution exclusion endorsement, these were mistakes or clerical errors, according to various Sentry officials. Including the completed operations pollution exclusion as opposed to the special pollution exclusion endorsement was contrary to Sentry's policy at the time with respect to the type of risk insured. The body of the recreated 1988 CLP policy contains both the special pollution exclu-

---

**88.** Furthermore, as previously determined, coverage under the 1990 CLP and umbrella

policies is barred by the known loss doctrine.

sion endorsement and the completed operations pollution exclusion.

Evidence in the record additionally supports a conclusion that the so-called original and recreated 1988 umbrella policies included the special pollution exclusion endorsement and that Phillips' signature appears on one version with the March 10, 1988 date. To the extent the declarations page of the recreated 1988 umbrella policy lists the completed operations pollution exclusion (UB–106), as well as the special pollution exclusion endorsement, these were mistakes or clerical errors, according to various Sentry officials.

Again viewing the facts in Sentry's favor, the recreated 1987 CLP policy contained a special pollution exclusion endorsement without a place for the insured's signature from the date of the policy's inception. The declarations page for the recreated 1987 CLP policy nevertheless fails to list the special pollution exclusion endorsement. There is also evidence in the record that the so-called original 1987 umbrella policy and the recreated 1987 umbrella policy contained a special pollution exclusion endorsement without a place for the insured's signature. Finally, evidence in the record also supports the reasonable inference that in 1989 neither Phillips nor Attorney Sullivan questioned Sentry's position that the 1988 CLP and umbrella policies contained special pollution exclusion endorsements.[89]

Turning to the parties' arguments, if the factfinder determines that the recreated 1988 CLP and umbrella policies, which contain both a completed operations pollution exclusion and a special pollution exclusion endorsement, constitute the complete and correct renditions of the actual 1988 CLP and umbrella policies, then the issue will arise as to the presence or absence of an ambiguity, as alleged by plaintiffs.[90] Assuming, for purposes of argument only with respect to the summary judgment motion, that the presence of these two pollution exclusions creates an ambiguity, as convincingly argued by plaintiffs, and, therefore, the completed operations pollution exclusion constitutes the operative provision in light of the principle that "doubts created by any ambiguous ... provisions are to be resolved against the insurer," *Camp Dresser & McKee, Inc. v. Home Insurance Company*, 568 N.E.2d at 635, plaintiffs are still not entitled to summary judgment that the completed operations pollution exclusion is the operative provision due to the presence of genuine issues of material fact concerning Sentry's claim for reformation based on mutual mistake.[91]

The doctrine of mutual mistake allows the adversely affected party to void the contract at his election because "there has been no 'meeting of the minds.'" *LaFleur v. C.C. Pierce Company, Inc.*, 398 Mass. 254, 496 N.E.2d 827, 830 (1986). By definition, the mistake must be mutual, that is, it "must be shared by both parties." *LaFleur v. C.C. Pierce Company, Inc.*, 496 N.E.2d at 830; *accord First Safety Fund National Bank v. Friel*, 23 Mass.App.Ct. 583, 504 N.E.2d 664, 667

**89.** See footnote number 82.

**90.** It is unclear as to whether the completed operations or special pollution exclusion endorsement is the last in time and therefore possibly controlling, *see* 13A John Alan Appleman *Insurance Law and Practice* § 7538 (1976) (where several endorsements appear, "the last in point of time is controlling").

**91.** In light of the presence of factual issues with respect to the issue of mutual mistake, this court need not address the merits of Sentry's argument based on unilateral mistake. Citing *Southeastern Insurance Agency v.*

*Lumbermens Mutual Insurance Company*, 650 N.E.2d at 1287, plaintiffs contend that reformation is inappropriate where the party's negligence constitutes the unilateral mistake. Plaintiffs' reliance on *Lumbermens* for this principle, however, is misplaced. The court in *Lumbermens* was simply stating the position of one of the party's, a position that the court rejected. Although this court need not address the argument in the context of a unilateral mistake, this court will address *infra* the issue of a party's negligence as affecting the party's ability to rely on the doctrine of mutual mistake.

(1987) (under principle of mutual mistake, "mistake must be shared by both parties"). The mistake must also "relate to an essential element of the agreement." *LaFleur v. C.C. Pierce Company, Inc.*, 496 N.E.2d at 830 (citing *Cavanagh v. Tyson, Weare & Marshall Company*, 227 Mass. 437, 116 N.E. 818, 820 (1917)).[92] In addition, a party may not rely on the doctrine where he bears the risk of the mistake under the contract or where he is aware that he has limited knowledge of the pertinent facts yet treats his limited knowledge as sufficient.[93]

■■■■■ Consequently, where the language of a contract "does not reflect the true intent of both parties, the mutual mistake is reformable." *Polaroid Corporation v. Travelers Indemnity Company*, 414 Mass. 747, 610 N.E.2d 912, 917 (1993). Moreover, insurance policies are subject to reformation under the same principles applicable to other contracts. *See Polaroid Corporation v. Travelers Indemnity Company*, 610 N.E.2d at 917.

■■■■■ Sentry's underlying burden, as the party seeking to reform the insurance policies, is to establish the mutual mistake by " 'full, clear and decisive' evidence." *LaFleur v. C.C. Pierce Company, Inc.*, 496 N.E.2d at 833 n. 10; *accord Polaroid Corporation v. Travelers Indemnity Company*, 610 N.E.2d at 917. Finally, "The parol evidence rule is no bar to the consideration of extrinsic evidence of intent when mistake is alleged." *Mickelson v. Barnet*, 390 Mass. 786, 460 N.E.2d 566, 569 (1984); *accord Polaroid Corporation v. Travelers Indemnity Company*, 610 N.E.2d at 917.

With respect to the doctrine of mutual mistake, Massachusetts cases "are substantially in accord with the articulation made in *Restatement (Second) of Contracts* § 152 (1979)." [94] *Duclersaint v. Federal National Mortgage Association*, 427 Mass. 809, 696 N.E.2d 536, 539 n. 4 (1998); *accord Ross v. Friedman*, 22 Mass. App.Ct. 513, 495 N.E.2d 321, 323 n. 8 (1986); *Maloney v. Sargisson*, 18 Mass. App.Ct. 341, 465 N.E.2d 296, 299 (1984). Indeed, numerous Massachusetts cases cite or rely on the *Restatement (Second) of Contracts*, albeit prior editions or tentative drafts to the current edition. *See, e.g., Massachusetts Municipal Wholesale Electric Company v. Town of Danvers*, 411

---

**92.** In contrast, the mistake alleged by Sentry, i.e., the improper inclusion of the completed operations pollution exclusions in the recreated 1988 CLP and umbrella policies, goes to the very essence of this dispute and, more importantly, concerns an essential element of the parties' contract.

**93.** Section 152 of *Restatement (Second) of Contracts* § 152 (1981) states the above described general rule that:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party *unless he bears the risk of the mistake under the rule stated in § 154.*

*Restatement (Second) of Contracts* § 152 (1981) (emphasis added).

Section 154 states the exception, applicable to mutual mistakes under section 152, that:

> A party bears the risk of a mistake when
> (a) the risk is allocated to him by the agreement of the parties, or
> (b) he is aware, at the time the contract is made, that he has only limited knowledge

with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (C) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

*Restatement (Second) of Contracts* § 154 (1981).

Plaintiffs' argument that Sentry drafted the policies which also constitute adhesion contracts misperceives the nature of the exception. Viewing the facts in Sentry's favor, both parties recognized the importance of pollution exclusions yet were simply mistaken as to the inclusion of an unintended version. *See Dover Pool & Racquet Club, Inc. v. Brooking*, 366 Mass. 629, 322 N.E.2d 168, 171 (1975); *see also Covich v. Chambers*, 397 N.E.2d 1115, 1121–1122 (1979) (discussing *Dover*). At least with respect to plaintiffs' summary judgment motion, there is sufficient evidence that Sentry did not bear the risk of the mistake.

**94.** This articulation now appears in section 152 of *Restatement (Second) of Contracts* (1981).

Mass. 39, 577 N.E.2d 283, 291 n. 8 (1991) (citing *Restatement (Second) of Contracts* § 152 (1981)); *LaFleur v. C.C.Pierce Company, Inc.,* 496 N.E.2d at 830 (citing *Restatement (Second) of Contracts* § 152 (1975)); *Howell v. Glassman,* 33 Mass. App.Ct. 349, 600 N.E.2d 173, 175 (1992) (citing *Restatement (Second) of Contracts* § 155 (1979)); *First Safety Fund National Bank v. Friel,* 504 N.E.2d at 667 (citing *Restatement (Second) of Contracts* §§ 152–154 (1979)); *Covich v. Chambers,* 397 N.E.2d at 1121 (citing *Restatement (Second) of Contracts* §§ 293–295 (Tent. Draft No. 10 1975)). Section 157 of *Restatement (Second) of Contracts* (1981) sets forth the principle applicable to cases involving the fault of the party seeking reformation. Entitled "Effect of Fault of Party Seeking Relief," it provides that:

> A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation . . ., unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

*Restatement (Second) of Contracts* § 157 (1981). As reasoned in the comments, barring all relief due to an inadvertent, negligent act on the part of the party seeking reformation would sharply circumscribe the reach of the doctrine. *Restatement (Second) of Contracts* § 152 cmt.a (1981); *see also De Vincent Ford Sales, Inc. v. First Massachusetts Corporation,* 336 Mass. 448, 146 N.E.2d 492, 494 (1957).

■ In the case at bar, Sentry offers sufficient evidence to demonstrate that a reasonable factfinder could find in Sentry's favor. The earlier recreated 1987 CLP and umbrella policies contained special pollution exclusion endorsements. The recreated 1988 CLP and umbrella policies did not advise Suburban of a decrease in premium due to the inclusion of a less restrictive pollution exclusion. *See, e.g., Hanover Insurance Company v. American Engineering Company,* 105 F.3d 306,

310 (6th Cir.1997) (finding similar circumstantial evidence sufficient to support jury's finding of mutual mistake and denial of opposing party's motion for judgment as a matter of law). Phillips' signature appears on the special pollution exclusion endorsements for the recreated 1988 CLP and umbrella policies dated March 10, 1988, thereby providing circumstantial evidence that at the time of the policies' renewal on January 1, 1988, he believed that the policies contained such an exclusion. Notwithstanding an incentive to contest the inclusion of the special pollution exclusion endorsement in 1989, neither Phillips, Attorney Sullivan nor JBI's attorney questioned Sentry's March 1989 position that the policies contained at least an unsigned version of the exclusion thereby providing additional circumstantial evidence of a belief as of January 1, 1988, that the policies contained the exclusion. Sentry's policy prior to issuance of the 1988 policies made the completed operations pollution exclusion unacceptable for businesses involved in underground tank and piping service. *See, e.g., Polaroid Corporation v. Travelers Indemnity Company,* 610 N.E.2d at 918. Summary judgment in plaintiffs' favor on the basis that the recreated 1988 CLP and umbrella policies contained the completed operations pollution exclusion is therefore unavailing.

Plaintiffs additionally contend, in items IX and X, that Suburban was entitled to defense coverage in the state court action and that Sentry's breach of its duty to defend Suburban results in liability for all consequential damages flowing therefrom as a matter of law. Plaintiffs also assert, in item XI, that Suburban is bound by the default judgment. Sentry, however, provides sufficient evidence for a factfinder to reasonably conclude that the relevant policies contained special pollution exclusion endorsements. Moreover, genuine issues of material fact exist as to whether the sudden and accidental and the completed operations pollution exclusions were the operative exclusions.[95] In the event Sen-

---

**95.** Accordingly, plaintiffs' argument in item XIII fails to provide a basis for summary

judgment inasmuch as it is dependent upon a

try establishes that the special pollution exclusion endorsements were in effect, then Sentry would not have a duty to defend or indemnify Suburban for the state court action. *See Dryden Oil Company of New England, Inc. v. Travelers Indemnity Company*, 91 F.3d at 282–284. Nor would Sentry be bound by the default judgment.[96] Summary judgment that Sentry wrongfully refused to provide defense and indemnity coverage to Suburban and is obligated to pay the amount of the default judgment and consequential damages is inappropriate.

## 2. *Misrepresentation and Negligence Claims*

As explained *supra*, the Suburban Assignees' misrepresentation claim in Count VII is time barred. Likewise, the Suburban Assignees' negligence claim that Sentry negligently mishandled the claim in the state court action by incorrectly determining the terms of the policies, insufficiently investigating the claim, negligently representing the terms of the policies and negligently reversing its coverage decision is time barred. Nor can plaintiffs rely on a continuing tort theory as previously determined. JBI's and Beaudette's negligence and misrepresentation claims are deficient for previously explained reasons. Accordingly, to state the obvious, viewing the facts in favor of the nonmoving parties, plaintiffs are not entitled to summary judgment on the misrepresentation claim or the above described portion of their negligence claim. Plaintiffs' arguments in items XIV and XV are therefore without merit.

finding that the sudden and accidental and/or the completed operations pollution exclusions were the operative exclusions in the actual policies. Likewise, plaintiffs' two sentence argument in item XII that JBI is entitled to have Sentry pay the full amount of the default judgment in the state court action is unavailing.

## 3. *Chapter 93A Claim*

As a final argument, plaintiffs seek summary judgment that Sentry's misrepresentations of the terms of the policies constitute a violation of section nine and/or 11 of chapter 93A. They additionally seek summary judgment to the extent that Sentry's wrongful denial of defense and indemnity coverage and its inadequate investigation violate section nine and/or 11 of chapter 93A. Contrary to plaintiffs' position and for previously explained reasons, plaintiffs cannot rely on a continuing tort theory as a means to take their allegations outside the reach of the statute of limitations. Their incorporation of arguments set forth in their opposition to Sentry's summary judgment motion on the assigned claims fails to demonstrate the timeliness of the Suburban Assignees' chapter 93A claim.[97] Plaintiffs' arguments in opposition to Sentry's summary judgment motion on JBI's and Beaudette's misrepresentation claim is deficient for previously explained reasons. Viewing the record in Sentry's favor, in light of Sentry's reformation claim as well as the dispute concerning the authenticity of the so-called original policies, there are genuine issues of material fact as to whether Sentry misrepresented the terms of the policies.[98] It is for the factfinder to determine which policies are the complete and actual policies, preferably in phase one of a bifurcated trial. In sum, plaintiffs fail to meet their burden on summary judgment with respect to their allegations of chapter 93A violations in counts VIII and IX. Sentry's conduct falls far short of constituting a violation of section 11 of chapter 93A as a matter of law. Accordingly, plaintiffs are not entitled to summary judgment on the chapter 93A claim in

**96.** It is therefore unnecessary to resolve the issue of whether Sentry can reopen and challenge the default judgment in the state court action.

**97.** This claim is time barred as noted *supra*.

**98.** The affidavits of William E. Bailey, Esq. and Arthur P. Doyle do not alter this court's conclusion.

Count VIII and the chapter 93A claim in Count IX is time barred.

## CONCLUSION

In accordance with the foregoing discussion, the motion to strike Phillips' affidavit (Docket Entry # 193) is **DENIED**. The motion to strike plaintiffs' summary judgment affidavits (Docket Entry # 161) is **ALLOWED** in part and **DENIED** in part. Sentry's motion for summary judgment on the chapter 93A and tort claims (Docket Entry # 90) is: (1) **ALLOWED** to the extent that Count II is limited to a reach and apply claim brought by JBI as opposed to Beaudette; (2) **DENIED** as to counts III and IV; (3) **ALLOWED** inasmuch as the claim falls under section 11 and otherwise **DENIED** as to Count VIII; (4) **ALLOWED** as to JBI's and Beaudette's misrepresentation and negligence claims in Count VII; and (5) **DENIED** as to Count V except with respect to the statute of limitations argument which is held in abeyance until November 9, 1999.[99] Sentry's motion for summary judgment on the 1986, 1989 and 1990 policies (Docket Entry # 88) is **ALLOWED** as to the 1986 and 1990 policies and **DENIED** as to the 1989 policies. Sentry's motion for summary judgment on the assigned claims (Docket Entry # 92) is: (1) **ALLOWED** in part and **DENIED** in part as to counts I, VI and VII; and (2) **ALLOWED** as to Count IX. Plaintiffs' motion for summary judgment (Docket Entry # 140) and plaintiffs' cross motions for summary judgment (Docket Entry 109 & 110) are **DENIED** except to the extent set forth in this opinion. The parties shall appear for a status conference at 10:45 a.m. on November 5, 1999.

---

99. See footnote number 61.